## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        v.<br><br>JESUS D. RIVERA,<br><br>        Defendant. | Criminal Action No. 21-060 (CKK) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
(June 17, 2022)

A two-day bench trial in this criminal matter concluded on June 15, 2022. The Government charged Defendant Jesus Rivera ("Defendant" or "Rivera") by Information with: (1) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (3) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Am. Information, ECF No. 39. In support of its case, the Government introduced testimony from four witnesses: (1) Inspector Lanelle Hawa of the United States Secret Service; (2) Captain Carneysha Mendoza of the United States Capitol Police Department; (3) Special Agent Alex Nogueiras of the Federal Bureau of Investigation; and (4) Special Agent Nicholas Chan of the Federal Bureau of Investigation. Additionally, the Court admitted 72 exhibits into evidence in full; one exhibit was admitted into evidence in part. Defendant asserted his constitutional right not to testify or present evidence. Rather, at the close of the Government's case, Defendant moved for a judgment of acquittal as a matter of law pursuant to Federal Rule of Criminal Procedure 29. That motion remains pending before the Court.

1

Based on the following findings of fact and conclusions of law, Court **DENIES** Defendant's Rule 29 motion by separate order.

The Court finds Defendant Jesus Rivera **GUILTY** on Counts 1, 2, 3, and 4, the Government having carried their burden beyond a reasonable doubt as to each element of each charge.

In reaching a decision on the following findings of fact and conclusions of law, the Court has considered the pleadings, the record, testimony, the parties' stipulations, the demeanor of the witnesses while testifying, the reasonableness of or unreasonableness of the testimony, the probability or improbability of the testimony, and all reasonable inferences to be drawn therefrom, among all other matters bearing on the credibility of the witnesses and the facts, and exhibits in evidence.  The Court credits the following testimony and evidence as undisputed and/or unrebutted.

### I.     Findings of Fact

"I can honestly say I had a great time."[1]

Shortly after returning home from the insurrection at the United States Capitol, Defendant sent that message to one of his Facebook friends.  Over the course of several hours two days prior, Rivera recorded himself and recorded fellow rioters who tore through barricades, police lines, and broken windows and doors to gain access to the Capitol and halt Congressional proceedings.  As Rivera made his way in his livestream from broken police line to broken police line, he urged his Facebook followers to "share, share, share!"[2]  He told his followers that his

---

[1]  Gov.'s Ex. 400
[2]  Gov.'s Ex. 310

fellow rioters were "patriots."[3]  Facing police lines, "we just ke[pt] coming."[4]  In the moment, Rivera thought the riot righteous, cheering on a "revolution"[5] that, he hoped, would pull Members of Congress' "asses out of there."[6]  In referring to the insurrection, Rivera states "this was what we need"[7] on January 6, 2021.  According to Rivera, Americans needed no peaceful transfer of power, nor orderly Congressional proceedings.  Rather, Rivera claimed he "pushed [his] way through the [lines of] riot police."[8]  Fellow rioters ransacking this country's seat of government was, to Rivera, as he proudly stated, "something we [could] tell our kids about."[9]  For those who disagreed, Rivera told them they were "weak as fuck."[10]  "It [was] time," Rivera insisted, "to do some Patriot shit."[11]

    A. <u>Security Preparations at the Capitol for the Certification of the Electoral College Vote and the Insurrection's Destruction of Protective Lines</u>

The Government's first two witnesses, Inspector Lanelle Hawa and Captain Carneysha Mendoza, explained the security precautions taken before January 6, 2021.[12]  The Court finds that the Capitol, guarded 24 hours a day, was open only to those with official business (along with Members and staff) from March 2020 to January 6, 2021.  Had the Capitol been open to the public, all members of the public would be required to enter through the Capitol Visitor's Center.  Additionally, aside from Members, anyone seeking to enter the Capitol must show identification, go through a metal detector, put their belongings through an x-ray machine, and are otherwise

---

[3] Gov.'s Ex. 305; Gov.'s Ex. 310; Gov.'s Ex. 332
[4] Gov.'s Ex. 305
[5] Gov.'s Ex. 317
[6] *Id.*
[7] *Id.*
[8] Gov.'s Ex. 331
[9] Gov.'s Ex. 317
[10] Gov.'s Ex. 332
[11] *Id.*
[12] Unless another citation to evidence is offered, these findings rely on the testimony of Inspector Hawa and/or Captain Mendoza.

subject to search by United States Capitol Police ("Capitol Police") officers. During the closure to the public, members of the media were permitted to enter the Capitol building only after they had been vetted by their company, vetted by the Capitol Police, and issued official badges by the Sergeants-at-Arms. Were someone to enter the Capitol without passing through security, Capitol Police would work to find and detain that person; if necessary, Capitol Police would lock down portions of the Capitol in such a way that could include stopping certain Congressional proceedings.

In preparation for Vice President Michael R. Pence's visit to preside over the counting of the votes of the Electoral College on January 6, Inspector Hawa coordinated the Vice President's visit with the Capitol Police. In partnership with the Capitol Police, the United States Secret Service ("Secret Service") set up a protective perimeter around the entire grounds of the United States Capitol. Only those with credentials or with permission from either agency were permitted beyond that point. The security perimeter is standard for visits by heads of state (in which category the Secret Service includes the Vice President) but was also implemented in light of security concerns arising from then-President Donald J. Trump's scheduled "Stop the Steal" rally near the White House. At various places, the protected area had successive lines of barriers made of snow barriers, interconnected bike racks, or mesh fencing. *See also* Gov.'s Ex. 302. Most of these barriers included at regular intervals "Area Closed" signs printed in large font. *Id.*; Gov.'s Ex. 102a; Gov.'s Ex. 306.

Although it is unclear exactly what time Inspector Hawa arrived, the Court infers from her testimony that she arrived at the Capitol in the morning on January 6 to coordinate the Vice President's visit that day. Vice President Pence arrived approximately at 12:30 p.m. with his wife and daughter, and Inspector Hawa escorted the Vice President and his family to the Vice

President's Ceremonial Office in the Capitol.  The Joint Session for the count of the Electoral College votes began at 1:00 p.m. with Vice President Pence presiding.  Gov.'s Ex. 211.  Fifteen minutes later, the two Houses of Congress retired to their respective chambers to debate the certification of the votes from the state of Arizona.  *Id.*

After 1:15 p.m., which was fifteen minutes after the Vice President returned to the Senate, the Secret Service learned of breaches to its protective area, i.e., the mob had made its way through barriers and onto the Capitol grounds by that time.  At that time, the Secret Service began to discuss moving the Vice President and his family to a more secure location.  At around 2:30 p.m., when the rioters first breached the Senate side of the Capitol itself, the Secret Service evacuated the Vice President and his family to a more secure location in the Capitol.  Shortly thereafter, with multiple police lines overrun and the several entrances to the Capitol breached, the Senate recessed for its own safety; the House shortly followed.  Gov.'s Ex. 211 (House recess); Gov.'s Ex. 212 (Senate recess).[13]

On the west side of the Capitol, the farthest edge of the security line was Peace Circle.  That line was breached at around 12:55 p.m.  Gov.'s Exs. 302-303.  The mob began to tear down fencing across the West Front of the Capitol at that same time.  At the time of these initial breaches, Captain Mendoza and other Capitol Police officers surged to support surviving police lines, mainly on the Upper and Lower Terraces on the West Front of the Capitol.  Officers of the Metropolitan Police Department ("MPD") joined Capitol Police on these lines in stages.  Over the course of the following hour, various sections of the police line broke in the face of heavy violent resistance, including the northwestern stairway on the West Front leading from the Lower Terrace to the Upper Terrace at 2:09 p.m.  Just a few minutes later, the rioters smashed through

---

[13]  The Court also relies on Captain Mendoza's testimony for this proposition.

the Senate Wing Door and its windows. Capitol Police officers briefly reclaimed the Senate Wing Door, only for rioters to overwhelm that line again at 2:49 p.m. Meanwhile, another door with access to the Senate side of the Capitol, the Parliamentarian Door, was breached at 2:42 p.m. For some period of time after 1:00 p.m. and before 2:42 p.m., MPD deployed chemical spray (pepper spray or something similar) to disperse the insurrectionists who had yet to join the portion of the riot that had captured the Upper West Terrace, ultimately to little effect. Gov.'s Ex. 307.

When rioters entered the Capitol, they were met with a loud PA system urging Capitol visitors and staff to take shelter due to an incursion into the Capitol. *See also* Gov.'s Ex. 321. Although Capitol Police officers "engaged in combat" with the rioters to prevent them from further breaking police lines, Capitol Police officers were ultimately unsuccessful. At that point, the focus of the Capitol Police shifted to convincing rioters to leave the Capitol and stemming particularly severe acts of violence. Law enforcement and the National Guard were unable to secure the Capitol and the safety of the Vice President, Members of Congress, and staff until several hours later. With Vice President Pence presiding, Congressional proceedings only resumed at approximately 8:00 p.m. when all of the rioters had been removed.

B. Rivera's Participation in the Riot

Broadly, the Court finds Defendant was a willing and supportive participant in the riot. Rivera excitedly announced on Facebook at the end of December 2020 that he was going to Washington, DC to attend then-President Trump's "Stop the Steal" rally. Gov.'s Ex. 406. Defendant then attended the "Stop the Steal" rally at which then-President Trump claimed that the 2020 presidential election had been "stolen" and urged his supporters to march to the

Capitol.[14] Sometime after attending the rally, Defendant became determined to march to the Capitol itself. On his way, and outside the E. Barrett Prettyman Courthouse, a block away from Capitol grounds, he comments that he was "about to take [his] ass to the middle of the [United] State[s] Capitol," which he did in reaching the Crypt at the Capitol. Gov.'s Ex. 305; Gov.'s Ex. 326 (Crypt). At this early stage, he identified with the assembling mob, gushing "we just keep coming" and approvingly shouting "America!" as he saw more and more of the crowd in front of him. *Id.* He also urged his followers watching his Facebook livestream to share his livestream with their friends and followers. *Id.*

As he penetrated the restricted area, he saw destroyed and torn fencing that he understood had been erected to keep members of the public off Capitol grounds. Gov.'s Exs. 306, 410. His livestream, which the Court infers to be Defendant's sightline, also captured fencing that was still intact with "Area Closed" signs clearly visible. Gov.'s Ex. 306. As Defendant worked his way up to the Capitol building itself, he passed a man who exclaimed, "we're not supposed to be here; it's all blocked off." *Id.* Nevertheless, Defendant made a concerted effort to get as far to the front of the mob as possible. *See id.*; Gov.'s Ex. 307. Defendant arrived near the foot of the northwestern stairway on the West Front leading from the Lower Terrace to the Upper Terrace at approximately 1:59 p.m. Gov.'s Exs. 307, 310. Once there, Rivera filmed the police line struggling to hold back a crush of rioters attempting to make their way to the Upper Terrace. Rivera also filmed the fall of the police line at 2:09 p.m. Gov.'s Exs. 310, 312.

While filming, Defendant proclaimed to his audience, "Patriots are going crazy. Let's get out there!" Shortly after, and before the stairway line fell, MPD was, in Rivera's words,

---

[14] As to what occurred at the "Stop the Steal" rally, the Court takes judicial notice of the United States Court of Appeals for the District of Columbia Circuit's factual conclusions. *See, e.g.*, *Trump v. Thompson*, 20 F.4th 10, 17-18 (2021).

"shooting pepper spray and stuff." Gov.'s Ex. 310. Rivera commented to his followers, "let's see if my time in the 'OC chamber' helps me out." *Id.* The Court credits Agent Nogueiras's testimony that an "OC chamber" is a tool the United States military uses to train soldiers to withstand the effects of chemical sprays and irritants such as pepper spray. Even though Rivera had, at that point, made his way through an unauthorized area and been sprayed with pepper spray in law enforcement's effort to turn back Defendant and other members of the mob, Rivera continued onwards. In fact, Defendant himself thought that "it was going to get bad," stating "I was expecting this, but this is going down" with "Patriots at the Capitol." *Id.* With tear gas around him, Rivera again urged his followers to share his livestream. *Id.*

Once the police line on the stairway had broken, Rivera made his way up the stairs and arrived on the Upper West Terrace at 2:23 p.m. Gov.'s Ex. 312. Ten minutes prior, the Senate Wing Door was breached for the first time. Three minutes later, at 2:26 p.m., Vice President Pence was removed from the Senate chamber for his safety. At the same time, while on the Upper West Front, Rivera saw fellow rioters attempting to climb a western-facing wall and shouted at them, "there's an easier way up!" Gov.'s Ex. 333.

Rivera then made his way near the front of the crowd attempting to breach the Senate Wing Door for the second time. Rivera watched as rioters in front of him breached that door and the Parliamentarian Door. The latter was breached at 2:49 p.m., the former at 2:42 p.m. All the while, Rivera admired the destruction around him, celebrating with a rioter near him that the events felt like a "birthday" present, his birthday to come several days after January 6. Gov.'s Ex. 317. Rivera went further, telling a rioter near him:

> This is what me and my boy were talking about, saying [that] the only way this would be a real revolution is if we go in and pull their asses out of there. This is the only fucking way. All this fucking talk—it has to get done, dude. This is what we need. This is what they needed.

8

Gov.'s Ex. 317. From there, and ten minutes after insurrectionists broke through the Senate Wing Door and two large, adjacent windows, Rivera entered the Capitol building itself through a broken window. Gov.'s Exs. 321, 322. As he entered, the PA system blared, urging staffers and Members to hide and take cover. Gov.'s Ex. 322. Rivera spent approximately twenty minutes roaming the halls of the Capitol, videoing, livestreaming, and taking selfies. *See* Gov.'s Exs. 321, 322, 328, 329. Rivera exited through the broken window opposite the one through which he entered. Gov.'s Ex. 329.

After Rivera returned home to Florida, he proudly told his followers of his participation in the riot. He was happy to have "challenge[d] authority" on January 6 after "push[ing] his way through [] riot police" and making his way to "the front lines." Gov.'s Ex. 331. Of his followers who did not approve of Rivera's actions, Rivera told them they were "weak as fuck." Gov.'s Ex. 332. He argued that if "BLM [Black Lives Matter] and 'Antifa' has been able to do it so long," a violent assault on the seat of government was appropriate. *Id.* He further insisted that the insurrectionists were not "Antifa; it was pissed off Patriots." *Id.* To reiterate, as Rivera told a friend, "I can honestly say I had a great time." Gov.'s Ex. 410.

    C. *New American* Video

Although not published to the Court during trial, the Court has reviewed an interview Defendant gave after his arrest to a podcast called "New American" which was admitted into evidence as Government's Exhibit 335. Therein, Rivera tells the interviewer that he came to the District of Columbia to attend and record the "Stop the Steal" rally. He indicates that he has previously filmed other Trump rallies. After leaving the rally to get lunch, Rivera states that he heard from others that there "was so much stuff going on" at the Capitol and resolved to make his way there in order to "document" footage that would help him "get his name out there." He

further states that he is, in no uncertain terms, "not a journalist," and did not go to the Capitol as such, though he might eventually in another career "want to be one." Rather, he tells the interviewer that he is a "photographer," a "cinematographer," and a "videographer" by trade. Beyond these few statements, Rivera makes a number of admissions and inculpatory statements. To the extent that he also makes some self-serving statements, these are contradicted by video evidence and his own statements and conduct on January 6, 2021.

## II. Conclusions of Law

### A. Count One

To find a defendant guilty of Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1), the Court must find the following beyond a reasonable doubt: (1) the defendant entered or remained in a restricted building without lawful authority to do so; and (2) the defendant did so knowingly. First, Defendant does not contest that the Capitol grounds and the Capitol were a "restricted building" on January 6, 2021, and the testimony of Inspector Hawa and Captain Mendoza establish that fact. Second, the overwhelming weight of evidence shows that Rivera knew that he was not permitted on Capitol grounds or inside the Capitol. Rivera passed destroyed barriers that had been erected to keep members of the public off Capitol grounds. Gov.'s Exs. 306, 410. He also saw intact barriers with signs that clearly read "Area Closed." Gov.'s Ex. 306. In addition, he saw and commented upon the police line on the northwest stairway being overrun by rioters. Gov.'s Ex. 307, 310. If that were not sufficient, Rivera admitted that he had been tear gassed and pepper sprayed, Gov.'s Ex. 310, a sure sign that his presence on Capitol grounds was not permitted. As he continued to the Upper West Terrace, Rivera could clearly see that the Parliamentarian Door and the Senate Wing Door were firmly shut while insurrectionists battled to open them. Gov.'s Ex. 317. Entering through a large, broken window was further notice to Rivera that his presence in the Capitol would be

unwelcome.  Accordingly, the evidence establishes beyond a reasonable doubt that (1) Rivera entered or remained in a restricted building without lawful authority to do so and (2) Rivera did so knowingly.  The Court therefore finds Defendant **GUILTY** on Count 1.

B.  Count Two

To find a defendant guilty of Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2), the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building; (2) the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (3) the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

First, "disorderly" conduct is that which "tends to disturb the public peace, offend public morals, or undermine public safety."  "Disorderly," *Black's Law Dictionary* (9th ed. 2009); *see also* "Disorderly," *Oxford English Dictionary* (2nd ed. 1989) ("Not according to order or rule; in a lawless or unruly way; tumultuously, riotously.").  Conduct is "disruptive" if it "tend[s] to disrupt some process, activity, condition, etc."  "Disruptive," *Merriam-Webster.com Dictionary* (June 16, 2022).  Even mere presence in an unlawful mob or riot is both (1) "disorderly" in the sense that it furthers the mob's "disturb[ing] the public peace" and (2) "disruptive" insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants.  Were it not, it must be said that continued presence in a mob that is being tear gassed and pepper sprayed is disorderly insofar as a person's continued presence clearly impedes law enforcement's efforts to regain control of a particular area.  Additionally, as Captain Mendoza explained, entering a Capitol building without

authorization is necessarily "[n]ot according to order and rule," "unruly," and may "disrupt [Congressional] . . . activity" insofar as Capitol Police would seek out and detain anyone who enters a Capitol building without authorization. Accordingly, the Court concludes that Rivera "engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building."

Second, the law permits the factfinder to infer that a person intends the natural and probable consequences of their actions. *See United States v. Meija*, 597 F.3d 1329, 1341 (D.C. Cir. 2010). Particularly in light of Defendant's inculpatory statements, the Court applies that principle here. As Captain Mendoza aptly explained, the probable and natural consequence of breaking into the United States Capitol is the disruption of Congressional business and proceedings. Even if this principle did not apply to this case, Rivera's inculpatory statements demonstrate a clear intent to disrupt Congressional proceedings. To at least one nearby rioter, Rivera stated that the violence around him was a righteous "revolution" that would hopefully "pull [Members of Congress'] asses out of" the Capitol. Gov.'s Ex. 317. Although he thought the ongoing riot, with tear gas canisters flying, was "going to get [even worse]," he said he was "expecting this" and gleefully remained in the riot and its ongoing disruption. Gov.'s Ex. 310. Moreover, in the days that followed, he ratified those statements, stating that he had a "great time" doing the "Patriot shit" that disrupted Congress' Joint Session. Additionally, it is clear from Rivera's knowledge of and attendance at the "Stop the Steal" rally that he knew Congress was meeting in joint session on January 6, 2021 to count the votes of the Electoral College. Accordingly, the Court concludes that the evidence shows, beyond a reasonable doubt, that Rivera intended to disrupt Congressional proceedings.

Third, Defendant argues that he did not *in fact* disrupt Congressional proceedings because both Houses of Congress had recessed by the time he had entered the Capitol itself.

This argument fails. As Captain Mendoza explained, proceedings could not recommence until the entire building was secured and cleared of rioters. Indeed, even the presence of *one* unauthorized person in the Capitol is reason to suspend Congressional proceedings. Defendant's argument would have the Court add an additional requirement to the statute's causation clause, mandating that a defendant be the *but for* cause of a disruption. There is no such term, and the Court does not read terms into statutory provisions that are not there. *See Romag Fastener's, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020).[15]

The following metaphor is helpful in expressing what the statute *does* require. Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption. Because Rivera's presence and conduct in part caused the continued interruption to Congressional proceedings, the Court concludes that Rivera in fact impeded or disrupted the orderly conduct of Government business or official functions.

Altogether, the Court finds that the evidence shows, beyond a reasonable doubt, that Rivera knowingly, and with the intent to impede or disrupt the orderly conduct of Government

---

[15] Although it is uncommon for a criminal statute to require something less than but-for causality, "courts have not always required strict but-for causality" where, under the circumstances, a crime may involve "multiple sufficient causes [that] independently, but concurrently, produce a result." *Burrage v. United States*, 571 U.S. 204, 214 (2014) (emphasis omitted). In determining whether but-for causation is required, the Court looks both to text and context. *See id.* at 213; *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018). In this statute, there is no language that would suggest but-for causation, such as "results from" or "because of." *See Burrage*, 571 U.S. at 210-211 (those terms imply but-for causality). Additionally, it is likely often the case that this statute would be aimed at protests involving several people who collectively disrupt proceedings but where no individual person's presence or actions would *alone* disrupt proceedings. Accordingly, and in light of very limited argument to the contrary, the Court concludes that this statute does not have any but-for causation element.

business or official functions, engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building that in fact impeded or disrupted the orderly conduct of Government business or official functions.  The Court therefore finds Defendant **GUILTY** on Count 2.

C.  Count Three

In order for the Court to find Defendant guilty of Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings; (2) the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress; and (3) the defendant acted willfully and knowingly.  Broadly, a person acts "willfully" when they "'act[] with knowledge that [their] conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *see also United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010) (Kavanaugh, J., concurring).  As the Court has already concluded that Rivera knew his presence around and in the Capitol was unauthorized, and that his continued presence was disruptive, the Court has found that Rivera acted willfully as well.   For the other elements of the offense, for the same reasons the Court found Defendant guilty on Counts 1 and 2, the Court finds that the Government has carried its burden beyond a reasonable doubt and finds Defendant **GUILTY** on Count 3.

D.  Count Four

To find a defendant guilty of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), the Court must find the following beyond a reasonable doubt: (1) the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings; and (2) the defendant acted willfully and knowingly.

14

First, to "parade" means to take part in "[a] march or procession, organized on a grand scale, in support of some political object." "Parade," *Oxford English Dictionary* (2nd ed. 1989); *see also* "Parade," *Merriam-Webster.com Dictionary* (June 16, 2022) ("to march in or as if in a procession"). Similarly, to "demonstrate" means to take part in "[a] public manifestation, by a number of persons, of interest in some public question, or sympathy with some political or other cause; usually taking the form of a procession and mass-meeting." "Demonstration," *Oxford English Dictionary* (2nd ed. 1989); *see also* "Demonstration," *Merriam-Webster.com Dictionary* (June 16, 2022) (to take part in "a public display of group feelings toward a person or cause," e.g., "peaceful *demonstrations* against the government" (emphasis original)). Defendant primarily argues that because he was "recording" as a "videographer," he was not "parading" or "demonstrating." The two, however, are not mutually exclusive. In truth, Defendant acted more as a social media influencer might, frequently urging his followers to "share, share, share!" Gov.'s Ex. 310. Sharing, Rivera may have hoped, could have helped him "get [his] name out there," one of Rivera's stated reasons for going to the Capitol on January 6, 2021. Gov.'s Ex. 335. Indeed, just before he joined the crowd, he was primarily concerned that no one appeared to be watching his Facebook Live. Gov.'s Ex. 305.

As he joined the mob, he identified with those around him. Those who screamed, shouted, and fought to, in then-President Trump's words, "Stop the Steal" were, to Rivera, "Patriots." As discussed above, his presence was part of the floodwaters that drowned the Capitol in insurrection and destruction.[16] In other words, Rivera was no passive observer.

---

[16] The Court would further conclude that mere presence in a protest, along with other words or conduct that ratify interest in demonstrating, is "demonstrating" for the purposes of a criminal statute that bars the actus reus of "demonstrating." *See Brown v. Louisiana*, 383 U.S. 131, 142 (1966) (protest and demonstration includes the right to "protest by silent and reproachful presence"); *cf. also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (concluding

15

Clearly, the evidence shows, beyond a reasonable doubt, that Rivera took part in a "public manifestation" in furtherance of "some political or other cause."

Second, to act "willfully and knowingly" is to "be aware of and knowingly violate[] [a] legal obligation not to commit the charged *actus reus*." *United States v. Burden*, 934 F.3d 675, 680 (D.C. Cir. 2019). For the same reasons the Court concluded that Defendant acted "willfully and knowingly" in Count 3, the Court concludes that the evidence shows, beyond a reasonable doubt, that Defendant "willfully and knowingly" "paraded [ or] demonstrated" "in any of the United States Capitol Buildings." The Court therefore finds Defendant **GUILTY** on Count 4.

### III.   Conclusion

The evidence shows beyond a reasonable doubt that Jesus Rivera was no mere passive observer on January 6, 2021. He took a side, and it was the side of the insurrection. By his words and conduct, the Court finds Jesus Rivera **GUILTY** of Counts 1, 2, 3, and 4.

Dated: June 17, 2022

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

that sleeping, as mere presence within a demonstration, is itself demonstrating). However, Defendant went further than mere presence in a demonstration by his own words and conduct.