1          **UNITED STATES DISTRICT COURT**
           **FOR THE DISTRICT OF COLUMBIA**

2     _____

3     UNITED STATES OF AMERICA,        ) Criminal Action
                                       ) No. 1:21-cr-00060-CKK-1
4                       Plaintiff,     )
                                       ) **Bench Trial**
5     vs.                              )
                                       )
6     JESUS D. RIVERA,                 ) Washington, D.C.
                                       ) **June 14, 2022**
7                       Defendant.     ) Time:  8:30 a.m.

8     _____

9                    **Transcript of Bench Trial**
                           **Held Before**
                **The Honorable Colleen Kollar-Kotelly**
10                  **United States District Judge**

11
                      A P P E A R A N C E S
12
      For the Government:     **Barry K. Disney**
13                            DEPARTMENT OF JUSTICE
                              1331 F Street, Northwest
14                            Washington, D.C. 20005

15                            **Mona Furst**
                              OFFICE OF THE UNITED STATES ATTORNEY
16                            301 North Main, Suite 1200
                              Wichita, Kansas 67052
17
      For the Defendant:      **Guy L. Womack**
18                            GUY L. WOMACK & ASSOCIATES, P.A.
                              609 Heights Boulevard
19                            Houston, Texas 77007

20    _____

      Stenographic Official Court Reporter:
21                            Nancy J. Meyer
                              Registered Diplomate Reporter
22                            Certified Realtime Reporter
                              333 Constitution Avenue, Northwest
23                            Washington, D.C. 20001
                              202-354-3118
24

25

1 **I N D E X**

2                                                    PAGE:

3 **Opening Statements**:

4     By Mr. Disney.................................... 6
      By Mr. Womack................................... 18
5


6


7 **Witnesses**:

8 Lanelle Hawa

9     Direct Examination by Mr. Disney................. 23
      Cross-Examination by Mr. Womack.................. 46
10

11 Carneysha C. Mendoza

      Direct Examination by Mr. Disney................ 50
12    Cross-Examination by Mr. Womack................. 90

13 Nicholas Chan

14    Direct Examination by Ms. Furst................. 94

15 Alex Nogueiras, Jr.

16    Direct Examination by Ms. Furst................. 104

17


18 **Exhibits Admitted**:

19    Exhibits Listed on Government's Exhibit List..... 5
20    Government Exhibit 9............................ 98

21

22

23

24

25

P R O C E E D I N G S

1    THE COURTROOM DEPUTY:  Criminal Case 21-060, the

2  United States of America v. Jesus Rivera.

3    Counsel, would you please come forward and identify

4  yourself for the record.

5    MR. DISNEY:  Your Honor, the government appears by

6  Barry Disney and Mona Furst.

7    THE COURT:  All right.  Good morning.

8    MR. DISNEY:  Good morning, Your Honor.

9    MR. WOMACK:  Good morning, Your Honor.  Guy Womack

10  for Mr. Rivera.

11    THE COURT:  All right.  Good morning.  And Mr. Rivera

12  is present as well.

13    I would just ask that those that are in the gallery, if

14  you would keep your masks on in the courtroom.  You're required

15  to in the courthouse, but I would appreciate it if you would

16  leave them on.  I am allowing at various points for people

17  speaking, either witnesses or attorneys, to take it off so that

18  we can hear and get a record.

19    Let me start, before we do openings, with a preliminary

20  matter, and this relates to the exhibits.  We did have some

21  stipulations earlier relating to the exhibits.  I received an

22  email that indicates that the parties have reached an agreement

23  pertaining to admission of exhibits and that the -- you're

24  going to be moving and that there will not be an objection.  If

1    I could just clarify two quick things.

2         My understanding is that the -- there's no issue in

3    terms of their admission in terms of authenticity but

4    Mr. Womack is reserving the right to make objections about

5    relevance.  Is that correct, Mr. Womack?

6         MR. WOMACK:  That's correct, Your Honor.

7         THE COURT:  Okay.  And then Exhibit No. 403 was an

8    Instagram live video with Mr. Rivera and his wife in a car.  My

9    understanding is that that is being admitted, there's no issue

10   of authenticity, but it wasn't clear to me whether you were

11   still reserving, Mr. Womack, your argument about whether or not

12   it's an adoptive statement.

13        MR. WOMACK:  Yes, Your Honor, we still have that

14   outstanding objection.

15        THE COURT:  Okay.  All right.  And then my

16   understanding is -- the other one is Exhibit 318, which I

17   believe was a TikTok or something from -- from TikTok -- that's

18   now been substituted -- from the Capitol Police, so that

19   there's no issue with that; is that correct?

20        MR. DISNEY:  That's correct, Your Honor.  We left the

21   number the same, but it is a breach video, not -- not a TikTok

22   video.

23        THE COURT:  Okay.  So as I understand it then, the

24   exhibit list that I have has all of the exhibits and that the

25   only objection that would be left would be relevance and the

1    objection about the use of the one Instagram, as I understand

2    it; is that correct?

3         MR. DISNEY:  That's correct.  And -- so under the

4    agreement, all the other evidence -- all the exhibits are

5    admitted, and Mr. Womack would then raise specific objections

6    as the videos are played.

7         THE COURT:  Okay.  That's fine.

8         All right.  So why don't you formally go ahead and ask

9    for their admission.

10        MR. DISNEY:  Your Honor, we have provided the Court

11   with an exhibit list that contains all the exhibits that the

12   government intends to offer at trial.  I won't read each

13   exhibit number, unless the Court requires, but we would move to

14   admit each exhibit contained on the government's exhibit list

15   into evidence, subject to a relevancy objection by the defense.

16        And for the record, we would like to mark -- or have the

17   exhibit list itself entered into the record.

18        THE COURT:  All right.  We can do that.

19        All right.  And my understanding is, Mr. Womack, you're

20   agreeing to that; is that correct?  So they can --

21        MR. WOMACK:  So no objections except as to the

22   adopted statement.  And then we'll object as to relevance to

23   some of the videos as well.

24        THE COURT:  Okay.  And then I can go ahead and admit

25   all of the exhibits that are listed in, I guess, government's

1    exhibit -- what do you want to call it?

2            MS. FURST:  Your Honor, it's -- the final one is ECF

3    No. 58.  Maybe we'll just call it that.

4            THE COURT:  All right.  You need to speak in front of

5    the microphone.  I know I'm sort of a pest about that, but it

6    makes it difficult, especially with the masks, for the court

7    reporter to get anything.

8            All right.  If we've taken care of all of the

9    preliminary matters, then let's start with opening statements.

10           MR. DISNEY:  Thank you, Your Honor.  And with the

11   Court's permission, I'd like to remove my mask for openings.

12           THE COURT:  Yes.  Go ahead.

13           MR. DISNEY:  And I believe I have told the Court that

14   all the presentations will be made through the government's

15   computer, even -- even what Mr. Womack or the defense wants to

16   display.  So as far as allowing the audience to see, it's only

17   going to be -- we're only going to use this one.

18           THE COURT:  That's fine.  And Mr. Womack had agreed

19   that it was easier to have the -- you know, not to have two

20   separate sets of exhibits, if you're using the same one.

21           So it will be the government's exhibits, but Mr. Womack

22   can use them.

23           MR. DISNEY:  Thank you, Your Honor.

24           (A video recording was played.)

25           MR. DISNEY:  "Pushed my way through the riot police

to get to where I wanted to get to."  This is how Mr. Rivera

describes his actions at the U.S. Capitol on January 6th.  He

said it was a time to -- that he challenged authority, and he

cheered when the police were overrun and had to retreat.

        And as we watched a door to the Capitol be broken --

broken open by the rioters, and the mob started to stream

inside, Mr. Rivera gleefully said -- and excuse my language,

Your Honor.  He said, "This is my birthday.  This is my fucking

birthday."

        Then he made his way to the front and crawled through a

smashed-out window into the Capitol.  As members of Congress

hid, as the police tried to maintain control, as the Capitol

was in a state of lockdown, Mr. Rivera roamed the halls.  He

had no authority.  He hadn't been through any screening.  No

one knew if he had a knife, a gun, or something worse.  And

there was no way Congress could get back to its work until the

defendant and those just like him had been cleared.

        And what did he say when he finally left the Capitol

after he took his selfies and broadcast himself over the

internet?  His words, "This is something we can tell our kids

about."

        Your Honor, on January 6th, 2021, Congress met at the

United States Capitol to count the Electoral College votes, and

Vice President Pence, as president of the Senate, presided at

this session.  His wife and his daughter also attended the

1    January 6th session.  And all three of these individuals were

2    people who were protected by the Secret Service.

3        And because the Vice President and his family were going

4    to be at the Capitol on the 6th, the Secret Service had

5    established a perimeter around the Capitol.  And that perimeter

6    is shown with the red line.  And this perimeter was important

7    in protecting the Vice President because it required that

8    anyone going into the Capitol or going past this security

9    passed through security screening.  And the Secret Service

10   could know then that the people that came into the building

11   were authorized and did not have any dangerous weapons on them.

12   And no one except members of Congress was allowed to simply

13   walk into the Capitol without going through security.

14       Mr. Rivera was in Washington, D.C., on January 6th.  In

15   fact, he filmed himself right outside the entrance of this

16   courthouse on 3rd and Constitution.  And in the video, the

17   defendant tells the audience that he's going to the Capitol.

18   And Mr. Rivera did go to the Capitol that day.  He walked

19   across Constitution Avenue, right outside, and turned east

20   towards Peace Circle and onto the Capitol Grounds on the

21   northwest side of the Capitol lawn.

22       Now, as Mr. Rivera walked up on the lawn on the west

23   side of the Capitol, he crossed the perimeter that was set up

24   by the Secret Service.  That area was also restricted because

25   workers were building the stage for the inauguration, and the

area that Mr. Rivera first went into had a construction trailer
and other equipment that the Court will see in the videos.  And
that area is clearly marked as restricted.  There were signs on
the fencing that made up that red perimeter that clearly say no
entrance, and these signs can be -- can be seen attached to the
fencing on video that Mr. Rivera took.

Now, on the screen is a model showing the areas outside
the U.S. Capitol that Mr. Rivera went to on January 6th.  The
first area is not shown on the screen.  It was down here at
3rd and Constitution.  And the area inside the Capitol was not
seen, but the other areas are here.

And as illustrated by the red dot, the first place
that -- that the defendant stopped was on the northwest lawn
where there is construction equipment being used.  And this
diagram shows the main Capitol Building in the area right --
right below it.  The first area that Mr. Rivera went to sits
right below the main Capitol Building.  And normally -- and
it's important to note that normally there's a wide set of
stairs right where the number 3 is in the video -- in the
diagram, but because they were building this inauguration
stage, there was scaffolding and work being done that basically
eliminated all but a narrow path up that stairs; and those
stairs will be instrumental in the presentation of this case.

And Mr. Rivera was in the area -- and you can see from
the video that he was in the area that day, and that's him with

the red plaid coat and stocking cap.  And after the crowd had

pushed their way past the police at Peace Circle -- and we'll

show the Court the video of the breach at Peace Circle where

that perimeter was set up and how the police were overrun.  But

after -- after the crowd had pushed their way through past the

police and went to the west lawn of the Capitol, the police

tried to prevent them from going into the Capitol Building by

basically blocking off these stairs.

And at the top of the stairs, the police had placed a

metal barrier in place, and as -- Mr. Rivera knew this because

this is footage from his video.  He knew that that metal

barrier was there.  He videotapes it.  And you can see from the

video that he took when he -- when he arrives on the northwest

lawn, you can see from this video that these stairs are empty

when he arrives.

But as Mr. Rivera watches and continues the video, the

mob starts gathering on these steps that were right there,

right behind the yellow flag.  That's that backdrop of the

inauguration stage.  And the crowd starts gathering.  And as

the crowd starts to cheer, they start -- the crowd becomes more

antagonistic towards the police, and when the mob surges

forward to get up the stairs, you will hear Mr. Rivera say,

"Come on, come.  There you go," cheering the crowd on.

And as the defendant watches and the mob -- and cheers,

and the mob continues to grow and -- until finally at

1    2:10 p.m., the mob simply overruns the police.  And this is a

2    video from -- this is from the Capitol -- the Capitol TV video.

3    The police are simply overrun, and they're forced to re- -- to

4    retreat to the top -- or back into the Capitol Building.

5         So the first place the defendant comes to near the

6    Capitol is on the west lawn.  He then goes over to the -- once

7    the stairs are breached, he then goes over to the stairs, the

8    very area that he had just seen be overrun.  And as shown in

9    the video that he took, he makes his way up to the top of the

10   stairs to the -- what is called the upper west terrace.  And

11   you can see that the defendant then makes his way up, and it's

12   about 2:13 that he gets to the top of the stairs.

13        And by this time, you can -- that we'll show through

14   video from the Capitol, the crowd has grown exponentially into

15   the thousands.  And we'll try to give the Court an idea of

16   what -- what it was like that day with people screaming,

17   yelling, tear gas in the air, police trying to do what they

18   could to keep people away.  And all this is seen by Mr. Rivera

19   as he climbs the steps to the upper west terrace.

20        Now, this is a diagram of the upper west terrace, and up

21   by -- this is on the Senate side of the Capitol.  And the upper

22   west terrace is shown here with the number 4.  And then the

23   location where the number 5 is, is where the doors are that

24   were ultimately breached.  And when Mr. Rivera gets to this

25   upper west terrace, he takes the selfie of himself up there.

1       And on that area -- if I go back, you see where the

2    number 5 is, and then we go to the next slide -- where the

3    number 5 is, there's two doors that are relevant.  One is

4    called the parliamentarian door.  It's actually a fire safety

5    door.  And the second is the Senate wing door.  And both of

6    those doors were breached, and access was gained into the

7    Capitol.

8       And just like when he was on the lawn and when the mob

9    started forming on the steps, the mob has now moved to the

10    upper west terrace, and they start focusing on the two doors

11    that I just showed.  In this picture, the parliamentarian door

12    is on the left.  There's a red Trump flag and a -- another red,

13    white, and blue flag.  On that side is the parliamentarian

14    door.  And then straight ahead there's three arches.  And in

15    the middle arch is the Senate wing door.  And the evidence will

16    show that Mr. Rivera was up on this upper west terrace by

17    2:13 p.m.  And as he's up there, the mob continues to grow and

18    continues to become more and more hostile at trying to find a

19    way into the building.

20       And as the crowd is there, Mr. Rivera, observing all

21    this, makes a comment in his video that captures his thinking.

22    And, again, pardon the language.  But his -- what he commented

23    on the video is, quote, this is what me and my boys were

24    talking about.  We were saying the only way this would be a

25    real revolution is if we go in and pull their asses out.  All

this fucking talk needs to be done.  This is what we need.
Those are the words of Mr. Rivera captured on the video that he
made.

And as Mr. Rivera is on the upper west terrace, he
witnesses the mob break out that parliamentarian door,
literally smash in the window and gain access into the
building.  And you will hear Mr. Rivera's reaction when he saw
that door being broken.  His birthday was in two days, on
January 8th.  But on January 6th, Mr. Rivera said this in
reaction to the parliamentarian door being broken:  "And my
birthday is in three days, but I'll take it as this one.  Today
is my fucking birthday."

And the mob turns -- also turns, not only on the
parliamentarian door, but also on the Senate wing door.  And
when the mob first got up to the Senate wing door, they breach
that door, but that -- the police were able to -- to secure the
door.  So that Senate wing door that's shown in red was
actually breached twice.

But -- so -- so we have -- the crowd gets to the upper
west terrace.  We have a breach of the Senate wing door
that they're able to secure.  The crowd is outside.  They then
are able to get into the parliamentarian door, and once they're
into the parliamentarian door and into the building, the Senate
wing door collapses again.

And this is from CCTV video that shows the second breach

1    of the Senate wing door.  And you can -- this is at 2:47 in the

2    afternoon.  So the defendant got to the upper west terrace at

3    2:13.  And by 2:47 there's a second breach of the Senate wing

4    door.  And you can see the police are trying to keep the mob

5    out.  You can also see that the windows have already been

6    smashed from the first breach.

7         But the mob -- the more the police try to keep the mob

8    out, the harder the mob is pushing.  And the police are doing

9    everything they can to keep the mob out of the door until,

10   finally, at 2:49 the police are -- are just completely overrun,

11   just like they were overrun at Peace Circle and just like

12   they're overrun on the stairs.  There's simply too many people,

13   and the -- and the police were pushed back as far as they could

14   go.

15        And this is a clip that the defendant made as he was

16   filming on the upper west terrace, and he inadvertently caught

17   a person next to him, the camera -- or the phone that they were

18   using.  So that's a picture from Mr. Rivera's video that

19   captures a person in front of his phone.  And you can see the

20   time on that is 2:59.  And it's 2:59 as the defendant

21   approaches the window.  And on the right is a photograph from

22   Mr. Rivera's -- or a still shot from Mr. Rivera's video as he

23   approaches the Senate wing window that had been smashed out

24   right at 2:59.

25        So then if you go inside -- from the CCTV video inside

the Senate wing security camera at 2:59, you can see the

defendant entering into the very window that he was outside of.

And this shows the defendant as he is finally jumping down from

the window on -- into the Senate wing chamber -- or into the

Senate wing side.

And then he goes into the crowd.  And this is the same

security video as he turns to the camera.  And then the

defendant begins to wander the Capitol.  He, essentially,

goes -- stays on one level, goes down the hall.  He films some

private senator's office.  This is Senator Merkley's office

that he filmed inside of.  He's not shown in this video.  But

despite the best efforts of the police, the defendant's inside

the Capitol and he's walking the hall.

He hasn't gone through security screening.  He hasn't

produced any credentials.  The Secret Service has no idea who

he is or what he could be carrying.  And the perimeter that

they had set up to protect the Vice President and his family

has failed.  And you'll hear that there's no way the

Secret Service could allow the Vice President to resume

presiding over the counting of the electoral votes that he was

required to do until all the others just like him had been

removed from the Capitol.

Mr. Rivera's unlawful entry into the Capitol impeded the

functioning of Congress, as it delayed the resumption of the

counting of the electoral votes.  And to be clear, the evidence

will show that Congress had went into lockdown before

Mr. Rivera entered the Capitol, but we will establish that his

continuing presence in there delayed starting the voting

because they could not start it when him and others like him

were inside the Capitol.

And because of this action, all business of the Capitol

had to go into lockdown.  And we'll establish that the Capitol

was -- that the certification of the Electoral College, as

shown in the Congressional Record, was stopped from 2:13 p.m.

to 8:06 p.m.  And the defendant was inside the Capitol from,

essentially, 3 o'clock to 3:20, causing this -- causing, along

with other people, the lockdown and the delay of the

certification of the vote.

This is a layout of the Capitol on the level that

Mr. Rivera went into.  And in the center on the level that he

went into, there's an area known as the Crypt, and it's shown

with that purple number 6 there.  It's directly under the

Rotunda, directly under the dome, as you can see.

And the defendant makes his way into the Crypt -- down

the hall, into the Crypt, but we have more than security video

showing that he's in there because he took a selfie of himself

showing that he was in the Crypt at that time.

So the defendant enters in on the Senate side, makes his

way down to the Crypt, photographing offices, taking selfies,

gets to the Crypt, turns around, comes back, essentially, the

same way, and comes back to the windows that have been broken

out.  And at 3:20 p.m., he exits out a window.  He exits out

the opposite window that he came in from.

Your Honor, this is a straightforward case.  The

defendant unlawfully, intentionally, and without authority

entered into the Capitol.  And that's what's charged in

Count 1.

But he did more than just enter.  Given what the

defendant witnessed prior to entering the Capitol, given his

glee at seeing doors being broken and stairs being overrun,

given all the circumstances that were present when he went into

the Capitol, we will ask that you find that the defendant

intended the natural and probable consequences of his unlawful

entry; and that is the disruption of orderly business of

Congress, as set out in Count 2; and the disruption of

Congress, as set out in Count 3; and disorderly conduct in a

Capitol Building, as charged in Count 4.

And for these reasons, we will ask that at the

conclusion of this case that you find the defendant guilty of

all four of those crimes.  And we believe it's a verdict that

the evidence in this case is going to demand and that justice

is going to require.

Thank you, Your Honor.

THE COURT:  All right.

Mr. Womack, do you want to make a statement now or

1    reserve?

2              MR. WOMACK:  I'll make it now, Your Honor.  Thank

3    you.

4              THE COURT:  All right.

5              MR. WOMACK:  May I also remove my mask?

6              THE COURT:  Yes.  Of course.

7              MR. WOMACK:  Your Honor, this is one of those rare

8    cases where there's film of everything that was done in this

9    case by other people and some of it where Mr. Rivera also

10   participated by filming the crew.

11             Jesus Rivera after high school joined the United States

12   Marine Corps.  So for ten years, in Iraq in Operation Iraqi

13   Freedom, in Afghanistan during Operation Enduring Freedom.

14             And thereafter in 2013, he went to work for a company

15   called Hellcat.  Basically, they were doing filming in the

16   greater Pensacola and Panhandle of Florida area.  They would

17   film trick flying expeditions by the Blue Angels, school

18   events, things for the local news outlets, and for public use.

19   He was a cinematographer, and he's done that from 2013 until

20   now.

21             In January of 2021, when he went to the Capitol for

22   the -- the events, he -- he drove up from Florida the day

23   before.  You will find out he went to the rally that

24   President Trump had, and then he left and went to go get

25   something to eat.  That afternoon, while eating dinner

somewhere in the D.C. area, he heard that people had gone to the Capitol, things were going on there. And as a cinematographer, he decided he should go and record that. That's all he did. He went there to record the actions.

And as you will see from all the videotape the government has, every time closed-circuit television or his own video shows him, Mr. Rivera is standing in the crowd holding cameras. He has a large professional camera that he's using for much of the shooting. He also has a handheld cell phone that he does some filming as well. It turns out you can livestream with one device, but not the other. So he's using two devices to try to get out the images that he's seeing. He's there as an observer only. There will be no footage of him encouraging someone to break anything, to commit any act of violence. He will merely narrate what he is seeing and his thoughts.

You'll notice when he gets into the Senate wing, which were part of the government's exhibits, he's not talking to anyone. He's not -- he's not counseling anyone: Hey, go over there and do something. He is merely walking among the crowd filming them. That's all he does. And he is only in the Capitol for 20 minutes.

Very importantly, he goes into the Capitol after -- 46 minutes after -- the Senate had ceased and Congress had ceased counting the ballots and had secured themselves because

1   there were people running around the Capitol, and completely

2   understandable.

3        That is, he does not cause them to stop.  He was not

4   even in the building when they stopped.  He was outside filming

5   things.  He was never in the building when that decision was

6   made.  And he was only in there for 20 minutes.  If the Senate

7   was waiting for him to leave, he did, and after -- about 3:20.

8   They didn't start back until 8 o'clock.  It had nothing to do

9   with Jesus Rivera.  Mr. Rivera was there simply recording what

10  he saw, and that will come out in all the video.  And the

11  gratuitous comments he made were to himself and to the video

12  that he was filming.

13       He intended that these videos would be seen, and they

14  were.  It was nothing more.  He did not parade or demonstrate

15  in any way in the Capitol.  He was walking by himself.  He did

16  not do anything to disrupt Congress.  Of course, they had

17  already stopped.  He didn't know that, perhaps, but he was not

18  being disruptive.  He was walking and filming and making

19  comments only to himself.  So there's nothing there.  So

20  Counts 3 and 4 certainly don't -- don't exist.

21       With regards to Count 2, he did nothing to disrupt the

22  Vice President or in any way to threaten the Vice President.

23  The Vice President had left the area, and that will come out

24  that he had left that area well before that.

25       The only issue, Your Honor, that we see that really is

close here is whether or not he had entered into and remained in a restricted area.  I think the government will have ample evidence that their -- the Capitol had signs around it and would look to have been restricted.  But the front lawn of the Capitol is America's front lawn.  And he started out standing on America's front lawn.

And -- and the staircase, this narrow staircase, that the government talked about, you'll see from the video, was always open.  There was a -- a structure where they were working on the viewing stand, I guess, but the staircase was always open, and -- and people went up there.  He was not the first, and he was not telling anyone what to do.  He followed them up there.

And if you go to a place you thought might have been closed, but the American public is being allowed in and they're walking in and they're not fighting their way in -- the people he sees are walking in.  By the time he gets there, there are no policemen telling anyone to stay out.  You'll see him walk by police officers while in the Capitol.  No one is saying: Hey, Bubba, get out of here.  You're not welcome.

He's walking with the crowd.  And every time that -- when we see him in the Crypt, where the beautiful statues are, he's walking around like a tourist, like many of us have -- have had the opportunity to do.  He's looking at the artwork. He's taking pictures of the crowd.  And no one is fighting or

1    yelling or doing anything wrong.  Police officers were

2    everywhere.  The crowd is -- is mild-mannered and doing nothing

3    other than standing in the U.S. Capitol.  And no one is being

4    disruptive in the area where he's in.

5         We know Your Honor will consider all the evidence.  With

6    regard to the relevance objections that we will make, they're

7    only in -- there are videos of things that clearly occur when

8    he is not present, before he's present, and we'd expect

9    Your Honor to disregard those unless they just show, like, a

10   framework for what happened before him.  But you'll be able to

11   separate out what he saw and where he was at the relevant

12   times.

13        Thank you, Your Honor.

14            THE COURT:  All right.

15        All right.  You can call your first witness.

16            MR. DISNEY:  Your Honor, we'll call Inspector Lanelle

17   Hawa.

18            THE COURT:  All right.  If you would come over here.

19   Just make your way around.  Step up.  And then if you would

20   remain standing, and we'll swear you in.

21            THE COURTROOM DEPUTY:  Can you raise your right hand,

22   please.

23            (Oath administered.)

24            THE WITNESS:  I do.

25            THE COURTROOM DEPUTY:  Please be seated.

1          THE COURT:  All right.  You need to speak in a very

2    loud, clear voice.  If -- you can take your mask down in terms

3    of addressing so we can hear what your answers are.  What I

4    would ask is that you let counsel finish their questions before

5    you start to answer, even if you know what they're asking you.

6    And they should wait until you finish your answer before they

7    move on, so we make sure we hear both the question and the

8    answer and we have a record.

9          If you hear the word objection and you see counsel start

10   to stand, they're going to object; so if you're in the middle

11   of the answer, please stop.  If you haven't started to answer,

12   don't answer.  Let me hear the objection, and I'll make a

13   ruling.  All right?

14               THE WITNESS:  Yes, Your Honor.

15               MR. DISNEY:  Your Honor, may the witness and myself

16   remove our masks for this?

17               THE COURT:  Yes, so we can hear you.

18                     DIRECT EXAMINATION

19   BY MR. DISNEY:

20   Q.  Good morning.

21   A.  Good morning.

22   Q.  Will you please tell us your name?

23   A.  Sure.  It's Lanelle Hawa.

24   Q.  And you might adjust that mic just so --

25               THE COURT:  You need to speak right into the

1    microphone.

2    BY MR. DISNEY:

3    Q.  It's a little unnatural, but just kind of lean forward and

4    speak in.

5         And, Ms. Hawa, what is your occupation?

6    A.  I'm a Secret Service agent.

7    Q.  And your current --

8         THE COURT:  Excuse me.  Ms. Patterson, can you show

9    her how to do it.

10   BY MR. DISNEY:

11   Q.  And how long have you been with the Secret Service?

12   A.  A little over 23 years.

13   Q.  And can you tell us where in the Secret Service you were

14   assigned in 2021, January of 2021?

15   A.  In January 2021, I was at the -- I was at the liaison

16   division.

17   Q.  And what are the duties of the liaison division?

18   A.  So the liaison division, we help coordinate and facilitate

19   visits of our protectees -- and when I say "protectees," I mean

20   individuals that we are authorized to protect -- to the

21   United States Capitol.  Sometimes we're off-site at other areas

22   when there's -- our protectees are involved and congressional

23   members.  So sometimes we'll assist off-site as well.

24   Q.  So as I understand what you're saying, the Secret Service

25   has certain individuals they're designated to protect; correct?

1   A.  Correct.

2   Q.  Often you have those protected people coming to the

3   U.S. Capitol; is that correct?

4   A.  Correct.

5   Q.  And the Secret Service decides -- decided to form a

6   division within the Secret Service that acts as a liaison for

7   the protected people who come to the Capitol, essentially to

8   focus on their visits to the Capitol?

9   A.  Correct.  The Capitol is one of many facilities or

10  government agencies we work with.

11  Q.  And in January of 2021, you worked in that liaison

12  division?

13  A.  Correct.

14  Q.  Thank you.

15          THE COURT:  Mr. Disney, if you move -- you can move

16  the microphone.  Just move it over.

17          MR. DISNEY:  Okay.

18          THE COURT:  Yeah.

19          MR. DISNEY:  Thank you.

20          THE COURT:  Speak into it.

21  BY MR. DISNEY:

22  Q.  And just so we have the jurisdiction, can you tell us the

23  location of the U.S. Capitol Building?

24  A.  In Washington, D.C.?

25  Q.  That's really my question.  It's in the District of

1  Columbia, Washington, D.C.; correct?

2  A.  Correct.

3  Q.  All right.  I just wanted to get that in there.

4       When a protected person, a person protected by the

5  Secret Service, comes to the Capitol, who all does the

6  Secret Service coordinate with in regards to that visit?

7  A.  We will coordinate with the U.S. Capitol Police.  We will

8  coordinate with the Sergeant at Arms office, either on the

9  Senate side or the House side, depending on where the visit is

10  on the Capitol Grounds.  Sometimes we'll involve staff,

11  congressional staff.  And other Secret Service entities would

12  also be involved.

13  Q.  And are you familiar with a document that's called the

14  United States Secret Service head of state notification

15  worksheet?

16  A.  Yes.

17  Q.  What is that worksheet?  What's the purpose of it?

18  A.  That's the worksheet that we would use if the President or

19  the Vice President or a head of state was coming to visit the

20  Capitol.  And, again, if we were -- if we were protecting them.

21  If they were coming to visit the Capitol, we would use that

22  sheet to make notification to the Capitol Police, the Sergeant

23  at Arms offices, and then other -- other entities that were

24  involved.  It was usually Secret Service --

25  Q.  Thank you.

1    A.  -- members of the detail.

2    Q.  I'm going to show you what's been marked as State's [sic]

3    Exhibit 204.  And it should come up on your screen in just a

4    second.

5                THE COURT:  Not quite yet.

6                MR. DISNEY:  Your Honor, it's on our screen.  I'm not

7    sure.

8                THE COURT:  Dorothy has to -- excuse me.

9    Ms. Patterson has to -- it's not showing up yet.  Well, you can

10   see in front of you, it's not there.

11               MR. DISNEY:  If we can have just a moment, Your

12   Honor.

13               THE COURT:  We're not seeing it.  So what's the

14   problem, Dorothy?

15               MR. WOMACK:  We're not seeing it at all.

16               THE COURT:  I'm sorry?

17               MR. WOMACK:  We're not seeing it either.

18               THE COURT:  No, it's not showing at all.

19               MR. DISNEY:  We're going to try one other thing.

20               THE COURT:  Okay.  Well, none of us can see it,

21   including the witness; right?

22               MR. DISNEY:  Your Honor, we're going to try again.

23               THE COURT:  Okay.  Well, we need to have this work.

24   So -- I'm not quite sure.  We saw things earlier.  Was that the

25   same system or what?  Because --

1          MR. DISNEY:  Yes, it was.

2          THE COURT:  -- it's not showing on our screens.

3    Nobody can see it.

4          MR. DISNEY:  We're using the same computer and the

5    same --

6          THE COURT:  Okay.  Take your time.

7        Dorothy, do we have the thing on, because I know you

8    have to do something.

9          THE COURTROOM DEPUTY:  I didn't touch anything,

10   Judge.

11         THE COURT:  I think what we'll do, since we need this

12   to work, let me call the IT people.  We have gone through all

13   of this, but there's always something.

14         MR. DISNEY:  Yeah.  Thank you, Your Honor.

15         THE COURT:  Hold on.  Maybe it's coming up.  There we

16   go.  Is that what you were looking for?

17         MR. DISNEY:  Yes, Your Honor.  We're going to try to

18   get our trial directory up so that we don't have this going on.

19         THE COURT:  Do you still need -- so we still need to

20   get somebody up here so you can see it?

21         MR. DISNEY:  No, Your Honor.  I think we'll -- we're

22   fine now.  Thank you.

23         THE COURT:  Okay.

24   BY MR. DISNEY:

25   Q.  So do you recognize what's shown in State's [sic]

1    Exhibit 204?

2    A.  Yes, I do.

3    Q.  I'm sorry.  Speak into the microphone.

4    A.  Yes, I do.

5    Q.  And what is that?

6    A.  That is the Head of State Worksheet that we utilize in the

7    liaison division.

8    Q.  Would it be correct to say this is, essentially, the game

9    plan that all the agencies coordinated with for the

10   Vice President's visit on January 6th?

11   A.  Yes.  It's a notification form that we use to -- to advise

12   them of the number of cars in the motorcade, the expected

13   arrival area, the routes we're going to take once we're there.

14   Q.  Thank you.

15       Okay.  And who were the protected people that were going

16   to be coming to the Capitol?

17   A.  It was the Vice President; his wife, Mrs. Pence; and their

18   daughter, Charlotte.

19   Q.  And what date were they scheduled to come to the Capitol?

20   A.  January 6th, 2001.

21   Q.  And does that --

22   A.  2021.  Excuse me.

23   Q.  Thank you.

24       Does that worksheet tell you -- tell us the function or

25   the purpose of their visit?

```
1    A.  Yes, it does.

2    Q.  And what was that?

3    A.  It was for the certification of the Electoral College

4    votes.

5    Q.  Thank you.

6         Now, was that Head of State Worksheet then distributed

7    to your various partners that were working with you on the

8    Vice President's visit to the Capitol?

9    A.  Yes, it was.

10   Q.  And I'll show you what's been marked as State's [sic]

11   Exhibit 203 and ask you if you recognize this document.

12   A.  Yes, I do.

13   Q.  And can you just tell the Court what that is.

14   A.  That's just the cover sheet.  The first document you showed

15   me --

16        THE COURT:  Can you speak into the microphone.  I

17   know -- you have to talk right into the head.

18   A.  So that's the cover sheet, and the -- to the attachment

19   that you had previously shown me.

20   BY MR. DISNEY:

21   Q.  And who was -- was the Capitol Police, the United States

22   Capitol Police, included on the distribution of that Head of

23   State Worksheet?

24   A.  Yes, they were.

25   Q.  Now, does the United States Secret Service work with the
```

1    United States Capitol Police on establishing a perimeter that

2    would be set up when a protected person visits the Capitol?

3    A.  Yes, we do.

4    Q.  And were restrictions put up on the Capitol Grounds -- I'm

5    sorry.  Were perimeters set up on the Capitol Grounds in

6    anticipation of the Vice President and his family's visit to

7    the Capitol on January 6th?

8    A.  Yes.

9    Q.  And I'll show you what's been marked as State's [sic]

10   Exhibit 100.  Do you recognize what's shown in this document?

11   A.  Yes, I do.

12   Q.  And can you orient us -- I know it's pretty obvious, but

13   since you're the first witness to talk about that, kind of tell

14   us what we're seeing here.

15   A.  So it's the United States Capitol surrounded by -- the red

16   line indicates the perimeter that was established as a -- as a

17   secured area on January 1st, 2021.

18   Q.  And the street that runs along the top is Constitution

19   Avenue; is that correct?

20   A.  Correct.  Constitution Avenue, Northwest.

21   Q.  And on the bottom is Independence Avenue?

22   A.  Correct.

23   Q.  And the red line shows the perimeter that the -- does the

24   red line show the perimeter that the Secret Service adopted as

25   restricted for -- in anticipation of Vice President Pence's

1    visit on January 6th?

2    A.   Correct.

3    Q.   I want to ask you, why is it important for the

4    Secret Service to establish a perimeter which restricts

5    people's movements in -- in -- when you are dealing with a

6    protected person?  What's the importance of having a perimeter?

7    A.   Sure.  Well, obviously, for the safety of our protectee

8    and -- and any others who are involved in that event.  It kind

9    of eliminates any surprises or vulnerabilities, in that we're

10   controlling the access into what we establish as our site.

11   Meaning, there's law enforcement officers at the points of

12   entry so that we're controlling the access.  So only authorized

13   personnel would be authorized to come in that day.

14   Q.   And is it important to you in providing protection to your

15   protected people to know not only who was in the perimeter but

16   what they have on their bodies?

17   A.   Yes.

18   Q.   And why is that?

19   A.   Well, for safety concerns, obviously.  We wouldn't want any

20   weapons or anything that could harm someone to come in.

21   Q.   Okay.  Thank you.

22        Now, in your work dealing with protected people and

23   dealing with visits to the Capitol, do you prepare an emergency

24   action plan?

25   A.   Yes.

1    Q.  And what's the purpose of the emergency action plan?

2    A.  The emergency action plan is to deal with any unknown or

3    dangerous occurrence that might -- might evolve.  That could be

4    anything from a national or local emergency, to a medical event

5    with our protectee, or an attack on or a threat to our

6    protectee.

7    Q.  And what happens to the plan -- let's say Vice President

8    Pence was there to certify the Electoral College.  If an

9    emergency action were to take place, what does the -- what does

10   the Secret Service urge or -- or instruct the protected person

11   to do?

12   A.  Well, it -- it would depend on what our plan was, but we

13   would ask that, you know, they follow our guidance.  To get

14   them to -- obviously, for safety purposes, we would ask that

15   they follow our plan because it would be in their best

16   interest.

17   Q.  And -- and cease what they were doing and do what you

18   instruct instead?

19   A.  Yes.  We would have to remove them from -- if it was a

20   threat of some sort, we'd have to move them to safety or, you

21   know, get them medical attention, whatever -- whatever the --

22   the event was that was causing us to enact an emergency action

23   plan.

24   Q.  Thank you.

25        Now I want to focus on the events that took place on

1  January 6th, 2021.  Did you work at the Capitol on that day?

2  A.  Yes, I did.

3  Q.  And did you meet Vice President Pence at the Capitol on

4  January 6th, 2021?

5  A.  Yes, I did.

6  Q.  And where was the first place that you met him?

7  A.  I met his motorcade at the Senate carriage entrance.

8  Q.  And about what time was that?

9  A.  I would say it was a little before 12:30 p.m.

10  Q.  And -- and -- I'm sorry?

11  A.  I said 12:30 p.m.

12  Q.  Thank you.

13       And was his wife, Mrs. Pence, and his daughter,

14  Charlotte, also present?

15  A.  Yes, they were.

16  Q.  And I think it's clear from the record, but Mr. Pence,

17  Mrs. Pence, and Charlotte Pence are all people who were under

18  and are under the protection of the Secret Service; is that

19  correct?

20  A.  That is correct.

21  Q.  And upon Mr. -- upon the Vice President's arrival, where

22  did he go?

23  A.  After the motorcade arrived, we proceeded with

24  Vice President Pence, Mrs. Pence, and their daughter to the

25  Vice President's ceremonial office, which is on the second

1    floor of the Senate side of the Capitol.

2    Q.  And what was your plan as far as what you envisioned

3    happening as far as the Vice President that day, as -- as it

4    relates to movement within the Capitol?

5    A.  So the plan was the Vice President was to go into the

6    Senate Chamber at some point and proceed with the senators over

7    to the House side, into the House Chamber, to move on with the

8    certification of the Electoral College votes.  And if at any

9    point there was a break in the certification and they needed to

10   gather in separate -- the Senate side and the House side, then

11   we would proceed back to the Senate side of the Capitol.  So

12   there was an understanding that there was a potential to move

13   back -- you know, back and forth between the Senate side and

14   the House side of the Capitol that day.

15   Q.  And was part of your job, basically, to work out the

16   logistics?  Okay.  Here's how we're going to move the

17   Vice President here and here's how we're going to take him

18   back.

19   A.  Yes, in coordination with the Senate and the House Sergeant

20   at Arms personnel.

21   Q.  And it sounds like, Agent, that there's a lot of planning

22   that goes into something as simple as the Vice President coming

23   to the Capitol.  Is there a lot of planning that goes into even

24   the smallest movements?

25   A.  There is.  A lot of planning.

1    Q.  And --

2           THE COURT:  Can I ask you to be in front of the

3    microphone a little bit?

4           MR. DISNEY:  I'm sorry, Your Honor.

5    BY MR. DISNEY:

6    Q.  When Vice President Pence arrived, you said he was taken to

7    the Senate Chamber; correct?

8    A.  First we went to his ceremonial office.

9    Q.  Okay.  And then where did he go?

10   A.  And then he went over to the Senate Chamber.

11   Q.  And what about Mrs. Pence and their daughter, Charlotte?

12   A.  At some point they -- they did not go into the Senate

13   Chamber, but when we moved over to the House -- to the House

14   Chamber, they moved over to the House gallery.

15   Q.  And what time was the certification of the Electoral

16   College set to begin?

17   A.  I believe it was set to begin at 1 o'clock p.m.

18   Q.  Thank you.

19          And can you tell me, then, the movement of the

20   Vice President in the moments before 1 o'clock p.m.?

21   A.  Yes.  So as I said, we -- upon arrival, we moved to the

22   ceremonial office, the Vice President's ceremonial office.  He

23   then went into the Senate Chamber.  We then proceeded -- he

24   led -- or walked with the senators over to the House side, and

25   there was a -- so they choreographed a ceremonial procession

1    that was, again, kind of at the direction of the Sergeant at

2    Arms offices.  They kind of coordinated that.

3           With them was, obviously, the Sergeant at Arms office

4    personnel, Secret Service personnel, Capitol Police, our

5    counterparts; and we proceeded over to the House side.  And the

6    Vice President and the other senators proceeded into the House

7    Chamber.

8    Q.  And in this movement from the Senate side to the House

9    side, are you using just the normal hallways of the Capitol?

10   Is that correct?

11   A.  That's correct, on the second floor, just somewhat of a

12   straight shot across.

13   Q.  Okay.  He wasn't taken by some sort of hidden passage?

14   He's just right out in the hallway?

15   A.  Correct.

16   Q.  And then how long was the Vice President in the House

17   Chamber?

18   A.  I believe it was --

19   Q.  Approximately.

20   A.  Approximately, 15 minutes.

21   Q.  And then what occurred that caused him to leave the House

22   Chamber?

23   A.  My understanding is there was an objection to, I believe,

24   the votes for Arizona, and -- at which point they -- they

25   stopped.  And then the two sides, the House and the Senate,

1    they break off individually.  And then the Senate -- the

2    senators go back over with the Vice President to the Senate

3    side, and they gather in the Senate Chamber.  And the House

4    members gather in the House Chamber, and they proceed with the

5    counting of the votes.

6    Q.  And is that what happened; that the Vice President went to

7    the House side, the certification started, there was an

8    objection, and that required him and the senators to move back

9    to the Senate side?

10    A.  That's my understanding, yes.

11    Q.  Now -- and you're with the Vice President and his team

12    during this whole time?

13    A.  Correct.

14    Q.  Now, starting around 2:00 p.m., while the Vice President is

15    back on the Senate side, did you begin receiving some

16    communications that concerned you?

17    A.  Yes.

18    Q.  And can you describe that to the Court.

19    A.  Yes.  So soon after we proceeded over to the Senate side --

20    so the 1:15 time frame -- we were receiving information.  And I

21    say "we," the Capitol Police officers were receiving

22    information over the radios.  There was a breach, a security

23    breach, on the west side of the Capitol.  And I could hear that

24    there was a confrontation of sorts on the inaugural stage, the

25    inaugural platform, which is set up on the west side as well.

1    There was, obviously, a ruckus, if you will.  They were

2    calling for backup.  They were calling for assistance.  It was

3    known that there was a breach.

4    Q.  And is all this information you're hearing over the Capitol

5    Police radio?

6    A.  Yes, it was.  And at the same time, I was receiving

7    information from the Vice President's detail.  They were

8    getting phone calls from the agents who were in the Vice

9    President's motorcade, which was staged on the east plaza, that

10   there was going to be a heavy presence of rioters, personnel,

11   what appeared to be individuals coming from another event that

12   was taking place in the city that day.  They were gathering,

13   and that they were -- they were wanting to move the vehicles

14   because it didn't -- to them it was starting to get unsafe.

15       So we were helping to coordinate moving the motorcade

16   and making decisions because it was becoming an uncomfortable

17   situation because we didn't know who -- didn't know who -- who

18   these individuals were, what their intentions were, but we knew

19   we had a breach of our security perimeter.

20   Q.  And did you personally see or hear anything?

21   A.  Yes.  I did see individuals -- I could only glance out the

22   window, but I did see individuals who were much closer than

23   they should have been.  And then I did hear on my

24   counterparts -- the Capitol Police counterparts' radio, you

25   know, the struggle that was ensuing.  There was obviously a

1    confrontation occurring on -- on the west side.  There was --

2    there was -- it was hard to hear.  They were getting overrun.

3    The Capitol Police was getting overrun.

4    Q.  Okay.  And let me ask you then, based on -- you know, we

5    had talked about this Head of State Worksheet where you had a

6    plan.  Based on what was going on outside the Capitol as you've

7    just described, did there come a point in time when that plan

8    had to be abandoned?

9    A.  Yes.

10   Q.  And tell us about that.

11   A.  Again, numbers were -- we were getting more information

12   of the number of personnel that were -- not specifically,

13   but it was a large group, the -- the number was getting larger.

14   I was seeing that they were getting too close.  And then

15   we -- at one point there was actually -- they had individuals

16   who had actually breached the House side, meaning they

17   had broken through some windows and were getting into the

18   Capitol.

19   Q.  You had talked about an emergency action plan.  Did there

20   come a time when the -- an emergency action plan with the

21   Vice President was started?

22   A.  Yes.

23   Q.  And about what time was that?  I know that we have video

24   that shows the exact time; so I'm just asking you for the

25   approximate time.

1    A.  Well, I would say we -- we -- we were discussing the plan

2    as soon as we knew there was a security breach.  So as early as

3    1:15.  But the physically moving of the Vice President would

4    have happened -- I think it was close -- close to -- before

5    2:30 where we knew.  And that was because I had physically seen

6    these protesters had entered the Senate side.  There was a

7    point where they were on the Senate side and they were getting

8    way too close.

9    Q.  Thank you.

10        I want to show you a video that is marked as

11   Government's Exhibit 27.  I'll just take a second to pull that

12   up.  We won't start it.  I just want to -- I just want to pull

13   the video up and not play it.

14            THE COURT:  I'm sorry.  What was the number?

15            MR. DISNEY:  It's -- I'm sorry, Your Honor.  I said

16   27.  I mean 327.

17   BY MR. DISNEY:

18   Q.  Agent, do you recognize the scene that is shown here in

19   Government's Exhibit 327?

20   A.  Yes.

21   Q.  And what are we seeing here?

22   A.  So the doors that you see on the right side are the doors

23   that lead into the Senate Chamber and the Vice President's

24   ceremonial office.  And those stairs are referred to as the

25   members' stairs, and they are on the Senate side of the

1   Capitol.

2   Q.  And we see in the photograph the large portrait, and

3   there's an individual standing directly under that large

4   portrait with what looks like a black mask on.  Do you

5   recognize that person?

6   A.  Yes.

7   Q.  Who is that?

8   A.  That's me.

9   Q.  And what is this -- what does this video show?

10  A.  We are getting ready to move the Vice President;

11  Mrs. Pence; and their daughter, Charlotte; to a more secure

12  location.

13  Q.  Thank you.

14       And what time did that take place?

15  A.  Well, according to the video, it looks about two -- 2:25.

16  Q.  Okay.  And that's -- to the best of your knowledge, that's

17  accurate; correct?

18  A.  Correct.

19  Q.  And if we could just -- this video is only 33 seconds.  If

20  we can just go ahead and play the video.

21           (A video recording was played.)

22  BY MR. DISNEY:

23  Q.  Is that the Vice President there?

24  A.  Yes.

25           (A video recording was played.)

BY MR. DISNEY:

Q.  Agent, when the Vice President and -- was his family with him in that video?

A.  Yes.

Q.  When the Vice President and his family were moved from the ceremonial office, were they relocated to someplace within the United States Capitol Building?

A.  Yes.

Q.  And I won't get into exactly where, but is it accurate that the Vice President and his family never left the restricted area during this whole period?

A.  That's correct.

Q.  Thank you.

     And were you with the Vice President the entire time of his evacuation?

A.  Yes.

Q.  And approximately what time was he in this secure location within the restricted area?

A.  What time did he arrive in the secure location?

Q.  I'm just wondering, what time did he -- what time did he get there, and what time did he come back?

A.  We were down there for several hours.  So I would say we were -- I don't believe we came back into the chamber until sometime between 7 and 8 --

Q.  Thank you.

A.   -- p.m.

MR. DISNEY:  Your Honor, as part of the record, we have to establish that there's a disruption of congressional business or -- and we have an Exhibit 301 that is a short montage that sets out what was going on at the Senate and the Capitol, and it's supplemented with the Congressional Record. All these are things that are in evidence, but we would like to play to the Court Exhibit -- or Video 301 because it supports all of the -- all of -- the fact that Congress had -- had to cease counting of the electoral votes, and we think it's -- we think we have to show that for part of the elements.  And it's a very short video.

THE COURT:  All right.  Mr. Womack, no objection?

MR. WOMACK:  No objection, Your Honor.

THE COURT:  All right.  Go ahead.

MR. DISNEY:  And if we could show Video 301 then.

(A video recording was played.)

MR. DISNEY:  Thank you.

BY MR. DISNEY:

Q.   And, Agent, that was, I know, a little long.  Would you agree that what we saw, the disruption in the sessions of -- in the House and in the Senate were caused by the breaches of individuals into the Capitol?

A.   Yes.

Q.   And you got the Vice President -- did you get the

1    Vice President and his family to safety?

2    A.   Yes.

3    Q.   And as an agent trained to provide protection to your

4    protected people -- in this case the Vice President and his

5    family -- would you deem it advisable to allow him to go back

6    to the Senate or the House side while unknown individuals

7    roamed the halls of the Capitol?

8    A.   No.

9    Q.   And why is that?

10   A.   It's really unsafe.  We didn't know who the individuals

11   were.  We didn't know if -- you know, if they were armed or

12   they have anything dangerous on their person.  We didn't know

13   what their intentions were.  They were uninvited.  So it would

14   not be recommended that we go back in when those individuals

15   were --

16   Q.   When -- when would you recommend that the Vice President

17   could commence his business of certifying the electoral votes?

18   A.   Once we conducted, in conjunction with our law enforcement

19   counterparts, a sweep, where we could render it safe; meaning

20   any unknown individuals had been removed from the Capitol

21   Grounds -- more importantly, the Capitol structure itself --

22   and that there was nothing -- no dangerous materials or objects

23   or anything, you know, along our paths or in the areas where we

24   would be.

25   Q.   Thank you.  Hold on just one second.

```
1              Thank you, Agent.  Mr. Womack may have some questions.
2     A.  Okay.
3              THE COURT:  All right.  Cross.
4              MR. WOMACK:  Thank you, Your Honor.  Your Honor, may
5     I remove my mask as well?
6              THE COURT:  Yes.
7                        CROSS-EXAMINATION
8     BY MR. WOMACK:
9     Q.  Good morning, Special Agent.
10    A.  Good morning.
11    Q.  When you arrived --
12             MR. WOMACK:  If we can see Government's Exhibit 100,
13    the photo of the Capitol.
14    BY MR. WOMACK:
15    Q.  Ma'am, when you arrived at the Capitol --
16             THE COURT:  You need to put it back up again.
17    BY MR. WOMACK:
18    Q.  I'm waiting for the picture to come back up.
19         You said the area marked in red was, basically, a
20    restricted area; is that correct?
21    A.  That's correct.
22    Q.  And if I term the -- the grassy area on one side of the
23    Capitol, the left side as we look at the photograph, would we
24    call that, basically, the front of the Capitol?
25    A.  I'm not clear when you say when you term the photograph.
```

1    What do you mean?

2    Q.  You're looking at Exhibit 100?

3    A.  Yes.

4    Q.  Do you see a large grassy area circled in red?

5    A.  Yes.

6    Q.  Okay.  Would that be the Capitol lawn?

7    A.  That's the west lawn, yes.

8    Q.  Okay.  The west lawn?

9    A.  West lawn.

10   Q.  Okay.  And the east lawn is not marked?  It's not

11   restricted?

12   A.  Yeah.  The east side lawn; correct.

13   Q.  Okay.  So on the west lawn --

14   A.  Yes.

15   Q.  -- when you came in with the Vice President that day, I

16   think it was around 12:30; is that right?

17   A.  12:30, approximately, is when he arrived, yes.

18   Q.  Okay.  There was already a crowd in that lawn area, was

19   there, on the west lawn?

20   A.  That is incorrect.

21   Q.  Okay.  So when you came in at 12:45, whatever, there was no

22   one out there?

23   A.  I didn't come in at 12:45.  The Vice President arrived at

24   12:30, a little before 12:30.

25   Q.  Okay.

1    A.  And there was no one -- there was nobody on the west lawn.

2    When -- meaning that the west side had been breached?

3    Q.  Right.  Just the grassy area, the lawn area?

4    A.  That had not occurred.

5    Q.  Okay.  All right.  Thank you.

6        And while you were in the Capitol, did you see the crowd

7    on the front lawn, on the west lawn?

8    A.  The area that I saw was more to the north area.  I was on

9    the east Senate side, and I looked out the window.  And I saw

10   them more on the north side, but I could hear -- I could hear

11   the ruckus on the west -- on the west side because the officers

12   who were calling for assistance were on the inaugural stage.

13   Q.  But throughout this time, you were actually inside the

14   building; is that correct?

15   A.  That's correct.

16   Q.  Thank you.

17        MR. WOMACK:  Your Honor, no further questions.

18        THE COURT:  All right.  So if I could just ask.

19   The -- within the red perimeter, you're indicating, as we look

20   at the photograph -- we obviously have the Capitol.  And to the

21   left of it you are indicating is the west lawn?

22        THE WITNESS:  Yes.  To the -- the area, kind of,

23   where there's an oval is, kind of, that west lawn area.

24        THE COURT:  Okay.  You actually can put your finger

25   on it, and it should show up.  Touch it.

1           MR. DISNEY:  Your Honor, I'll advise you, my next

2     witness will go into some detail.

3           THE COURT:  That's fine.  Not a problem.  We do

4     have -- actually, you can mark it, but I can see what you're

5     talking about; so we don't need it.  We don't have a jury; so

6     I'm the only one who needs to see it.

7           Go ahead.  Redirect.

8           MR. DISNEY:  No redirect, Your Honor.

9           THE COURT:  All right.  You can step down at this

10    time.

11          MR. DISNEY:  And may she be free to leave, subject to

12    recall?

13          THE COURT:  Yes.

14          (Witness excused.)

15          THE COURT:  And your next witness.

16          MR. DISNEY:  Thank you, Your Honor.  We would call

17    Captain Carneysha Mendoza.

18          THE COURT:  If you would step up over here and step

19    up to the -- to the witness stand.  If you would stand and

20    remain standing, and she'll swear you in.

21          (Oath administered.)

22          THE WITNESS:  I do.

23          THE COURTROOM DEPUTY:  Please be seated.

24          THE COURT:  All right.  If you can speak in a loud,

25    clear voice right into the mic and make sure we --

1            THE WITNESS:  Testing.

2            THE COURT:  Perfect.  If you allow counsel to finish

3     their question, even if you know what they're going to ask you,

4     before you start to answer.  They should wait for you to answer

5     before they move to the next question so we make sure we have a

6     record.  If you see counsel say objection or start to say

7     they're going to object, if you haven't answered the question,

8     don't.  If you're in the middle of your question, stop.  Let me

9     hear the objection, and I'll make a ruling.  Okay?

10           THE WITNESS:  Yes, ma'am.

11           THE COURT:  Proceed.

12           MR. DISNEY:  And, Your Honor, can the witness remove

13    her mask during the questioning?

14           THE COURT:  Yes.

15                       DIRECT EXAMINATION

16    BY MR. DISNEY:

17    Q.  Ma'am, speaking into the microphone, can you tell us your

18    name.

19    A.  Carneysha C. Mendoza.

20    Q.  And where are you employed?

21    A.  United States Capitol Police.

22    Q.  And what is your rank at the Capitol Police?

23    A.  I am a captain.

24    Q.  How long have you been employed by the Capitol Police?

25    A.  Twenty years.

1    Q.  What is the overall mission of the Capitol Police?

2    A.  To keep visitors, Congress safe; to secure the buildings;

3    and also ensure the legislative process continues.

4    Q.  I want to talk to you about your specific duties at the

5    Capitol Police.  Can you tell me in January of 2001, what

6    division were you assigned to?

7              THE COURT:  2001?

8              MR. DISNEY:  I'm sorry.  2021, Your Honor.  I'm

9    sorry.

10   A.  I was assigned to the special operations division.

11   BY MR. DISNEY:

12   Q.  And what was your rank, or can you give us some idea of

13   where you fell in that division?

14   A.  Sure.  I was still a captain, but I was the field commander

15   for the Capitol Police.

16   Q.  And within the special operation division, is there also a

17   unit that is known as the civil disturbance unit?

18   A.  Yes, sir.

19   Q.  What is the function of the civil disturbance unit?

20   A.  Basically, it's to mitigate any type of civil unrest or

21   riot -- riotous activity.

22   Q.  And what was your role as it related to the civil

23   disturbance unit?

24   A.  I was one of the captains, commanders, responsible for the

25   civil disturbance unit.

1    Q.  Okay.  And focusing on January 6, 2021, in your role as

2    captain or commander of the civil disturbance unit, did you

3    respond to the U.S. Capitol on January 6th, 2021?

4    A.  I did.

5    Q.  And I'd like to talk to you about your familiarity with the

6    U.S. Capitol.  During your time with the Capitol Police, have

7    you had occasion that you've had to work in or go to the

8    U.S. Capitol?

9    A.  Generally, I've had to go to the Capitol for meetings and

10   events, yes.

11   Q.  And have you had training at the Capitol?

12   A.  Some training, yes.

13   Q.  Okay.  Thank you.

14        And can you tell us, in January of 2021, was the Capitol

15   open to the public?

16   A.  It was not.

17   Q.  And I'm not talking about just on January 6th.  I'm just

18   talking about, in general, the whole month of January.  Why was

19   it closed to the public?

20   A.  The building was closed due to COVID restrictions.

21   Q.  Okay.  And then on January 6th, 2021, specifically, was

22   there another reason why the Capitol was closed to the public?

23   A.  Yes, sir.  We had restrictions due to the certification of

24   the electoral votes.

25   Q.  Okay.  Thank you.

1          On January 6th, 2021, who was allowed into the Capitol

2     Building?

3     A.   Members of Congress, authorized staff with business inside

4     the Capitol Building itself, and Capitol Police.

5     Q.   What about people who might be there on official business?

6     A.   Yes, official business.

7     Q.   Okay.  And was everyone who entered into the Capitol

8     required to provide some sort of identification?

9     A.   Yes, sir.

10    Q.   And can you tell us the type of security screening that

11    was -- that took place in the Capitol on January 6th, 2021?

12    A.   Yes.  So in order to get into the building, you would have

13    to go through a magnetometer or a metal detector, and then you

14    would have to have your bag screened on the X-ray machine.

15    And, of course, you have to have identification.

16    Q.   So identification.  And then go through the metal detectors

17    and the screening?

18    A.   Yes.

19    Q.   And was there anyone who could get in without going through

20    screening?

21    A.   Members of Congress and preapproved dignitaries that were

22    escorted by security details.

23    Q.   Okay.  So, for instance, the Vice President would not have

24    had to go through security?

25    A.   Correct.

1  Q.  Okay.  You talked about staff and people who were there on

2  official business without security detail.  Did they have to go

3  through security?

4  A.  Yes, sir.

5  Q.  So if someone worked at the Capitol day in and day out for

6  20 years, every day they had to go through security?

7  A.  Yes, sir.

8  Q.  X-ray machine?  The whole thing?

9  A.  Yes, sir.

10  Q.  And as -- can you tell us why the use of the X-ray machine

11  and the searching like that is important in providing

12  protection at the Capitol?

13  A.  We want to make sure no contraband gets in, no type of

14  weapons, or anything that could harm anybody in the building.

15  Q.  Okay.  Now, I want to ask you about members of the media.

16  Could -- is there a credentialing process that members of the

17  media have to go through to enter the Capitol?

18  A.  Yes, sir, there is.

19  Q.  Can you tell us about that.

20  A.  In order to be credentialed media, you would have to go

21  through either the Senate media gallery or the House media

22  gallery.  They vet the personnel who apply for a media pass,

23  and they give them an ID similar to our staff ID, and those

24  individuals are then treated like staff.

25  Q.  And when you say "they vet" them, what does that mean?

1   A.  They go through a security process where -- some sort of

2   background check.

3   Q.  So once a member of the media has applied and been vetted,

4   they could then receive credentials?

5   A.  Yes, sir.  But they're also vetted by their respective

6   agencies.

7   Q.  Okay.  But there's a process that they could receive

8   credentials?

9   A.  Yes.  So it's not just general media off the street.  It's

10   people who were vetted by their company, and then also they're

11   vetted by the respective galleries.

12   Q.  And -- and then if a person -- if a member of the media had

13   gone through this process and had received their credentials,

14   you say then they are treated, essentially, like staff?

15   A.  Correct.

16   Q.  Does that mean that they still had to go through the

17   screening, just like the staff did?

18   A.  Yes, sir; that's correct.

19   Q.  And what about all the equipment they carry?

20   A.  It all goes through an X-ray machine.

21   Q.  So every day we see some reporter coming into the Capitol,

22   if he's credentialed -- or he or she is credentialed, they

23   still have to go through the screening?

24   A.  Yes, sir.

25   Q.  Now, what about if there's a member of the media who did

1    not have congressional credentials, could they enter the

2    Capitol on January 6th?

3    A.   No, sir.

4    Q.   And were they, essentially, treated the same as the public?

5    A.   That's correct.

6    Q.   So if my hometown reporter wanted to come up and for one

7    day watch what was going on on January 6th -- treated like

8    public?  Couldn't come in?

9    A.   Right.

10   Q.   Thank you.

11        I want to talk to you now about the layout of the

12   Capitol Grounds and Capitol Building.  And we have on the

13   screen a -- Exhibit 100.  Can you, first of all, orient the

14   Court to --

15        Well, let's start on here.  Can you show us where -- the

16   U.S. courthouse that we're in now, about where its approximate

17   location is?

18             THE COURT:  Hold on one second.  Dorothy, do we have

19   it set up that it shows up if they touch the screen?

20             THE COURTROOM DEPUTY:  I'm sorry.  What did you say?

21             MR. DISNEY:  Yes.

22             THE COURT:  If you touch the screen -- you know, they

23   can do it so if you touch the screen, it shows up.  Can you fix

24   that?

25             THE COURTROOM DEPUTY:  They should be able to do it.

```
1              THE WITNESS:  It looks like it works.

2              THE COURT:  Okay.

3     BY MR. DISNEY:

4     Q.  Let me just -- let me just clear that.  And then can you

5     just put an X in the approximate location of the U.S.

6     courthouse.

7              THE COURT:  Okay.

8     BY MR. DISNEY:

9     Q.  Thank you.

10             And the witness has put an X on the top left of the

11    screen where -- of the photo where there's a round circle.

12             And then can you tell us the street there that runs

13    along -- you don't need to draw -- but runs along the top of

14    the photo?  What street is that?

15    A.  That's Constitution Avenue.

16    Q.  And the street, then, that comes straight down from the

17    courthouse in front of the Reflecting Pool?

18    A.  That's 3rd Street.

19    Q.  And what's the street that makes up the bottom of the

20    photo?

21    A.  From -- from 3rd Street, you have Pennsylvania Avenue.

22    Q.  I'm sorry.  All the way down at the bottom.  I'm trying --

23    A.  Okay.  Independence Avenue.

24    Q.  And then the street that makes up the right-hand side of

25    the Capitol?
```

1   A.   That's First Street in the east.

2   Q.   And can you draw a circle around the Peace -- just circle

3   the Peace Monument.

4   A.   Sure.

5   Q.   What's the road that goes from 3rd Street to Peace

6   Monument?

7   A.   That's Pennsylvania Avenue, Northwest.

8   Q.   Thank you.

9        Now, the -- just to get some terminology.  Do you see

10  the grassy area just to the right of the Peace Circle?

11  A.   Yes, sir, I do.

12  Q.   What is that area called?

13  A.   That is the west front.

14  Q.   Can you just write west lawn or something on there, just so

15  we'll know.

16  A.   Sure.

17  Q.   And some people call that the west lawn.  Some people call

18  it the west front.  But it's the west side, the grassy area on

19  the west side, of the Capitol; correct?

20  A.   Yes, sir, it is.

21  Q.   And in this photograph -- I didn't cover this -- but north

22  is to the top and west is to the left?

23  A.   That's correct.

24  Q.   And then are you familiar with an area called the lower

25  west terrace?

1    A.  Yes, sir.

2    Q.  And can you just maybe put a circle around that?

3    A.  Sure.

4    Q.  And then there is an upper west terrace?

5    A.  Yes, sir, there is.

6    Q.  And can you just circle that.  Thank you.

7         I'm going to clear all that now.

8         MR. DISNEY:  And the witness has complied by putting

9    circles and labeling them as --

10        THE COURT:  Can I just ask in terms of the lower west

11   terrace, the lawn area that's in front of that, what is that

12   called?  Is that the west front?

13        THE WITNESS:  That's also the west front, ma'am.

14   That would be -- so we have, like, the middle -- we call it the

15   middle of the west front, the Senate side of the west front,

16   and the House side of the west front.

17        THE COURT:  Okay.  Thank you.

18        MR. DISNEY:  And I'm going to -- Your Honor, if it's

19   okay, I'd like to clear this.

20        THE COURT:  Yes.  Go ahead.

21   BY MR. DISNEY:

22   Q.  Can we just do this:  Right in front of the stage, there's

23   a grassy area.  Would you put the number 1 there.

24   A.  Right here?

25   Q.  Yes.

1    A.  Okay.

2    Q.  And then the area above it on the sidewalk, can you put the

3    number 2.

4    A.  Up on the sidewalk?

5    Q.  Just straight up, crossing over Pennsylvania Avenue.  I'm

6    sorry.  I wanted to -- I wanted -- yeah, I wanted to

7    distinguish that there's -- looks to be three lawn sections

8    that are cut off by sidewalks; correct?

9    A.  Correct.

10   Q.  And all that's called the west front or the west lawn?

11   A.  Yes, sir, it is.

12   Q.  Okay.  That's what I wanted to clear up.  Thank you.  I'm

13   going to clear this.

14        On January 6th was there some construction going on on

15   the west lawn?

16   A.  Yes, sir, there was construction on the west -- the west

17   side of the Capitol.

18   Q.  What was being built?

19   A.  The inaugural stage was being built.

20   Q.  Okay.  Now, we've heard testimony from a Secret Service

21   agent about this perimeter that's shown in red on this

22   photograph.  I'd like to talk to you about the construction of

23   that perimeter.  Are you familiar with how that perimeter is

24   constructed?

25   A.  Yes.

1    Q.  Can you just tell the Court, then, what is the makeup of

2    what we see represented by the red line here?

3    A.  So, basically, the red line dictates the restricted

4    perimeter.

5    Q.  Yes.

6    A.  And the restricted perimeter is -- we usually put that in

7    place for any type of event that we would deem a secure event.

8    Q.  What's it made up of?  What's the construction?

9    A.  Bike rack and some mesh fencing --

10   Q.  Okay.

11   A.  -- and signs.

12   Q.  Can you describe the bike rack?

13   A.  Yes.  Bike racks, like metal -- it's actually, literally, a

14   bike rack used to secure bikes, but it's made up of metal.  And

15   then we generally -- we always have police signs on the bike

16   racks.

17   Q.  And can the bike racks be interlocked together, then, to

18   make a continuous fence?

19   A.  Yes, they can.

20   Q.  And you say that this perimeter that's shown in the red,

21   was it on January 6th marked with signs that showed it to be a

22   restricted area?

23   A.  Yes, sir, it was.

24   Q.  And within the restricted area, was there -- you had an

25   outer perimeter; correct?  And that's shown by the red line?

1    A.  Correct.  Yes, sir.

2    Q.  Was there also some fencing that was in place inside the

3    red lines for various purposes?

4    A.  Yes, sir.

5    Q.  Can you tell us about that.

6    A.  So inside the bike rack, we had snow fencing, which is like

7    a green mesh fencing, and there were also additional layers of

8    bike rack within the perimeter.

9    Q.  Thank you.

10        Just a couple more questions while we are on the -- on

11   this photograph.  Do you see the U.S. Capitol Building in the

12   photograph?

13   A.  I do.

14   Q.  And to the right, what is that area called?

15   A.  That is the east front plaza.

16   Q.  And there looks to be two gray rectangle squares.  Can you

17   tell us what those are.

18   A.  The Senate Chamber and the House Chamber.

19   Q.  Oh, I'm sorry.  I'm talking about on the east front.

20   A.  Oh, the --

21   Q.  I'm talking --

22   A.  Those are skylights.

23   Q.  Can you circle those.

24   A.  Sure.

25   Q.  And what -- what are those skylights for?

1    A.  Those are -- they're just skylights that go to the Capitol

2    visitors center.

3    Q.  Okay.  That's what I wanted to get to, the visitors center.

4         So the public -- if they were -- when the public is

5    allowed to visit the Capitol when it does open or if it's open,

6    where do they go in?

7    A.  They would go in through the Capitol visitors center.

8    There are doors if you -- to the left.  They actually go

9    underground.  You can't really see them on this.

10   Q.  That's fine.

11   A.  But, yeah, there are doors that go to the Capitol visitors

12   center.

13   Q.  Okay.  And so that area with the visitors center, what's

14   that typically called?

15   A.  The Capitol visitors center.

16   Q.  All right.  Is that the east lawn or the east side of the

17   Capitol?

18   A.  The -- yes.

19   Q.  Okay.  I want to show you a video -- and I don't want to

20   play it, but I just want to pull it up.  I don't want to play

21   it right yet, but it's 302.  And we can just start it and then

22   stop it.

23            (A video recording was played.)

24   BY MR. DISNEY:

25   Q.  Do you recognize what's depicted in this photograph -- on

1    this video?

2    A.  Yes, sir, I do.

3    Q.  And just a little bit louder.

4           THE COURT:  Speak into the microphone.

5           THE WITNESS:  Sure.

6           MR. DISNEY:  It's hard.

7    BY MR. DISNEY:

8    Q.  Can you tell us what we're seeing here?

9    A.  So you -- to the west you can see the Peace Monument, and

10   then the grassy area is the Senate side of the west front.

11   Q.  Up at the top in the middle, that's the Peace Monument?

12   A.  Yes, sir, it is.

13   Q.  And then the area that we've been talking about, part of it

14   is -- is the area right in the middle of the picture?

15   A.  That's correct.

16   Q.  You talked about this area being under construction.  Can

17   you identify some of the construction material in this

18   photograph?

19   A.  Yes.  So we have some snow fencing in the middle that was

20   set up for the construction.  There's a construction trailer

21   and various construction equipment from construction crews.

22   Q.  And it's hard to see from where we are, but can you draw a

23   line along where that snow fencing is?

24   A.  Sure.

25   Q.  And so if one would look really close, they would see this

1    green mesh fencing at that spot?

2    A.  Yes, sir; that's correct.

3    Q.  And, now, you talked about the outside perimeter.  Can you,

4    as far as you can on this photograph, trace the outside

5    perimeter that represents that red line we saw in Exhibit 100?

6    A.  Sure.

7    Q.  And does it continue on off the -- thank you.

8        And we see about -- at the bottom of the Peace Monument,

9    underneath the fencing that you've just shown, some -- some

10   rectangles in -- in this area that I've just circled in red.

11   A.  Yes, sir.

12   Q.  And what are those?

13   A.  Those are police -- it says police, restricted by -- I

14   think it says --

15   Q.  We'll get to that.

16   A.  -- restricted ". . . By order of the . . . Capitol Police

17   Board."

18   Q.  Okay.  But I just wanted to say, those are the signs that

19   you were talking about?

20   A.  Yes.

21   Q.  Okay.  Thank you.

22       In this photograph, you talked about Pennsylvania -- you

23   had talked about Pennsylvania Avenue.  And does Pennsylvania

24   Avenue end at the Peace Monument?

25   A.  Yes, it does.

1    Q.  And then where does -- is there a sidewalk that continues

2    on up to the Capitol?

3    A.  Yes.

4    Q.  That would normally be Peace Monument?

5    A.  Yes.  Yes, sir.

6    Q.  And where is that shown in this picture?

7    A.  The sidewalk starts over here and then comes up this way.

8    Q.  And is there also just a big sidewalk to the left, that big

9    brick sidewalk?

10   A.  Yes.  That one -- that's the sidewalk that goes straight to

11   the lower west terrace.

12   Q.  Thank you.  I'm going to clear so that so we can see that.

13        In addition to -- is -- is this a true and accurate

14   picture of how the perimeter was set up at 12:53 p.m. on

15   January 6th?

16   A.  Yes, sir.

17   Q.  And in addition to the fencing, was there also a presence

18   by the Capitol Police along this perimeter?

19   A.  Yes, sir.

20   Q.  And do you see any of the police presence shown in this

21   video?

22   A.  Yes, sir.

23   Q.  Can you just maybe draw a circle around what you see.  And

24   on the far left is -- yeah.  Thank you.  The witness has

25   complied.

1          Thank you.  And I'll clear that now.

2          I would like -- are you familiar, Officer Mendoza, with

3     this area right around the Peace Circle?

4     A.  Yes, sir, I am.

5     Q.  This video that we're seeing now doesn't show the signs

6     from the street level.  And I'd like to show you a video marked

7     State's [sic] Exhibit 101 for the purpose of showing the signs

8     along the perimeter at Peace Monument on January 6th.

9          (A video recording was played.)

10    BY MR. DISNEY:

11    Q.  And I'll show you next -- did you recognize that area as --

12    that video as being taken from outside Peace Circle looking

13    into the Capitol?

14    A.  Yes, sir.

15    Q.  And I'll show you a -- I want to focus on a photograph,

16    which is a still clip from that picture; and I'll show you

17    what's been marked as State's -- I'm sorry, Government's 101A.

18    And if we could zoom in on the sign that's shown in the middle

19    here.  Can you tell us what this sign is showing?

20    A.  The sign is dictating that the area is closed.

21    Q.  And when you had talked earlier about signs being shown

22    along the perimeter fencing, is this the type of signage you're

23    talking about?

24    A.  Yes.

25    Q.  Thank you.

1          Now, I'd like to show you one other video that shows the

2     same area.  And before we play it, let me just make sure

3     Mr. Womack has no objection.

4          I want to show you another video that is, essentially,

5     of the Peace Circle.  I want to focus on the signs on that

6     video.

7               MR. DISNEY:  Any objection?

8               MR. WOMACK:  Which one is that?

9               MR. DISNEY:  It's 102.

10              MR. WOMACK:  102?

11              MR. DISNEY:  It's just a short video, similar to the

12    one we just showed.  You don't have it in there, Mr. Womack.

13    It's just -- it's just, essentially, what we saw but from a

14    different angle.

15              MR. WOMACK:  That's fine.

16              MR. DISNEY:  If we could play Government's 102.

17              (A video recording was played.)

18              MR. DISNEY:  And if we could now go to Exhibit 102A.

19    BY MR. DISNEY:

20    Q.  And, Captain Mendoza, does this 102A also show the fencing

21    and signage that was in place around the Peace Monument?

22    A.  Yes, sir, it does.

23    Q.  And can you just describe it into the record.

24    A.  The fencing that's being shown right now is actual snow

25    fencing notated --

1              THE COURT:  Can you speak up.  You need to hit the

2     front of the microphone.  It's a -- you have to talk well into

3     the headset.  You have to turn a little bit.

4     A.  So it's also -- I'm sorry.  It's notated with signing that

5     says, "Area Closed By order of the Capitol Police Board."

6     BY MR. DISNEY:

7     Q.  Thank you.

8              And now I'd like to talk to you about the -- a model

9     that we have used and want to drill down a little bit on some

10    specific locations on the U.S. Capitol.

11             MR. DISNEY:  And if we could bring up Government's

12    Exhibit 106.

13    BY MR. DISNEY:

14    Q.  Captain Mendoza, have you seen this model before?

15    A.  Yes, I have.

16    Q.  And do you agree that it's a true and accurate model of the

17    Capitol Grounds along the west lawn?

18    A.  Yes.

19    Q.  You had told us that -- you see the number 1 that's shown

20    in -- in Exhibit 6?

21    A.  Yes, sir.

22    Q.  I mean in Exhibit 106.

23             What is that road that runs to the left and up?

24    A.  That is the -- you're talking about the street?

25    Q.  Yes.  What is the street?

1    A.   Okay.   That's Constitution Avenue.

2    Q.   Okay.   I just wanted to orient everyone.   And so the

3    U.S. courthouse that we're sitting in today would be just to

4    the left of the number 1?

5    A.   Correct.

6    Q.   Okay.   And the Peace Circle, can you draw a circle around

7    where the Peace Circle is?

8    A.   Sure.

9    Q.   Okay.   And then just -- maybe a line to show Constitution

10   Avenue.   And a line to show 3rd Street.

11        Thank you.

12   A.   Uh-huh.

13        MR. DISNEY:   And if we could zoom in on that model.

14   BY MR. DISNEY:

15   Q.   And I'll clear the -- can you tell us what -- can you

16   orient us to what we're seeing here?

17   A.   So it's just a 3D model of the Capitol Building and part of

18   the Capitol Grounds.

19   Q.   And what is this area right in here?   Is this -- I just

20   want you to kind of describe what -- kind of what that is.

21   A.   That's a grassy area.

22   Q.   Okay.   And then the sidewalks are to the right of that

23   grassy area?

24   A.   Correct.

25   Q.   Now if we could go to Location No. 2.   And can -- we've

1    talked a lot about the west lawn of the Capitol.  Can you tell

2    me what we're seeing here.

3    A.  That's the Senate side of the Capitol lower west terrace

4    area.  It's directly around the lower west terrace.

5    Q.  We saw in some of the previous exhibits that there was

6    construction trailers and a crane, a yellow crane.  That's not

7    shown in this model.  But can you show us approximately where

8    those trailers and -- and cranes were, if it's shown on here?

9    A.  Yeah.  I believe they were right -- maybe around here.

10   Q.  Okay.

11   A.  This area.

12   Q.  That's fine.  The point being that it's right in that area;

13   correct?

14   A.  Yeah.

15   Q.  Okay.  Thank you.

16           MR. DISNEY:  And can we zoom out of this location.

17   BY MR. DISNEY:

18   Q.  And the area that we're talking about is the area shown

19   with the number 2; is that correct?

20   A.  Correct.

21           MR. DISNEY:  Okay.  Now, I want to go back to zooming

22   in one more on Exhibit 2 -- or to Exhibit 106.  If we could

23   zoom in on this Location 2.

24   BY MR. DISNEY:

25   Q.  You talked about the building of the stage -- or that there

1    was a stage being built.  Can you show the Court by circling

2    where that stage was being built.

3    A.  The stage was being built, like, right around here.

4    Whoops.  Disappeared off my screen.

5    Q.  That's fine.  And now -- the -- the witness has complied.

6          We also talked about a staircase that leads up to the

7    upper west terrace.  Can you show the Court where that

8    staircase is?

9    A.  Sure.  The staircase is right here.

10    Q.  Thank you.

11          Now, if we could go to Location 3.  And does that show,

12    maybe, a better view of the stage that's being built?

13    A.  Yes, it does.

14    Q.  And also of -- of the stairs; is that correct?

15    A.  Yes, sir.

16    Q.  And do you see over on the far right -- and I'll circle it

17    in red.  What is this thing here?

18    A.  That's a media tower.

19    Q.  A media tower?

20    A.  Yes.

21    Q.  Okay.  And that was going to be used for the inauguration

22    that was coming up?

23    A.  Yes, sir.

24    Q.  Okay.

25          MR. DISNEY:  If we could go to Location 4.  I'm

1    sorry.  Stay where you are.

2    BY MR. DISNEY:

3    Q.  What is this area down -- that I just marked in red?

4    What's that area called?

5    A.  That is the lower part of the lower west terrace.

6    Q.  And we can see that the terrace -- there's a lower terrace

7    marked down here.  And that's -- you call it the lower terrace

8    because there's an elevated area up above where the 4 and 5

9    are?  That's the upper terrace?

10   A.  Yes; that's correct.

11   Q.  Okay.  Thank you.

12        If we could go to Location 4.  And what are we looking

13   at in Location 4?

14   A.  This is the upper terrace, the upper west terrace.

15        MR. DISNEY:  And just -- if we could just zoom out

16   just for a second so the Court could orient.  And then go ahead

17   and zoom back in.

18   BY MR. DISNEY:

19   Q.  And this is on the Senate side; is that correct?

20   A.  Yes, sir; that's correct.

21   Q.  On -- I failed to ask you this, but the -- what side is the

22   Senate side?  Is it --

23   A.  The Senate side is on the north side.

24   Q.  On the Constitution Avenue side?

25   A.  Correct.

1    Q.  And then the House side is on the opposite side?

2    A.  Correct.

3    Q.  And if we go to Location 5.  And what are we seeing here in

4    Location 5?

5    A.  Location 5 is still the area of the upper west terrace and

6    then a couple of the entrances to the west terrace.

7    Q.  Okay.  And I want to talk to you about the two entrances

8    that are closest to Location 5.  Can you, first, show us what

9    we refer to as the parliamentarian door?

10   A.  Yes.  That would be the door at the top of the stairs here.

11   Q.  Okay.  And where does that door lead in to?

12   A.  The door leads into a hallway near the parliamentarian's

13   office.

14   Q.  Okay.  Is that a fire escape door?

15   A.  It is.

16   Q.  Okay.  And then is there another door that's not readily

17   visible but also in this area?

18   A.  Yes, there is.

19   Q.  And I'm going to clear the screen.

20       Can you show us that second door?

21   A.  Sure.  It's right up under this little awning right here

22   and at the top of the stairs.

23   Q.  And is that referred to as the Senate wing door?

24   A.  Yes, sir, it is.

25   Q.  So a person standing on the upper west terrace would have

1    access to the parliamentarian door, number 1, and the Senate

2    wing door, number 2; is that correct?

3    A.  Yes, sir; that's correct.

4    Q.  Thank you.

5         Now, I want to take you inside the Capitol and go to

6    Location 6.  Now, if you stay -- if you would go into the

7    Senate wing door and stay on that level, can -- what -- where

8    would you go to?

9    A.  You would go to the Crypt.

10   Q.  Can you show me the Senate wing doors that we had talked

11   about earlier?

12   A.  Sure.  I'm not making a good circle, but they're down here.

13   Q.  I'm sorry.  Is that the Senate -- or is that the -- did you

14   circle the Senate --

15   A.  Sorry.  It doesn't clear.

16   Q.  Okay.  I'll clear it.

17        I thought the Senate wing door -- maybe I'm wrong.  I

18   thought the Senate wing door was further -- over on the left

19   side.

20   A.  Yeah, it's -- it's to the left.

21   Q.  Okay.

22   A.  This was just hard for me to -- I'm sorry.

23   Q.  That's okay.  Let's go back --

24            THE COURT:  You can't talk at the same time.  We

25   can't hear.

1          MR. DISNEY:  Thank you, Your Honor.

2     BY MR. DISNEY:

3     Q.  Let me just ask you this:  In the middle of the Capitol,

4     shown by the Location 6, what -- what -- what is that area of

5     the Capitol called?

6     A.  That's the Crypt.

7     Q.  Okay.  And if we looked at the Capitol -- you know you have

8     the big dome?

9     A.  Yes.

10    Q.  Where is that Crypt in relation to the dome?

11    A.  The -- it's underneath; the bottom level, below the

12    Rotunda.

13    Q.  Okay.  Thank you.

14         And now let's go to Location 7.  And what are we seeing

15    in Location 7?

16    A.  That is the Senate wing door.

17    Q.  Okay.  So we have the parliamentarian door that we just

18    saw, and then this is the Senate wing door?

19    A.  Correct.

20         MR. DISNEY:  And then, finally, can we go to

21    Location 8.  And can we zoom out.

22    BY MR. DISNEY:

23    Q.  Can you tell us what Location 8 is on this?

24    A.  That's the Senate side of the Capitol.  So if you're on the

25    landing area right there, that would be the Senate upper

1    terrace.

2    Q.  Okay.  And let's go back to Location No. 1.  I want to talk

3    to you now, Captain Mendoza, about the breaches.  You've told

4    us on January 6th there was this outer perimeter that was

5    established.  I want to talk to you about the breaches of the

6    perimeters.  And are you -- did you work on January 6th, 2021?

7    A.  Yes, I did.

8    Q.  And are you familiar with the events that took place

9    from personally being there and also from reviewing the --

10   the closed-circuit TV that the Senate -- or that the Capitol

11   has?

12   A.  Yes.

13   Q.  On --

14          THE COURT:  If you could talk more in front of the

15   microphone or just move it.

16          MR. DISNEY:  Okay.  Thank you, Your Honor.

17   BY MR. DISNEY:

18   Q.  On January 6th was the perimeter around Peace Circle

19   breached?

20   A.  Yes, it was.

21   Q.  And did unauthorized individuals get to the west lawn of

22   the Capitol?

23   A.  Yes.

24   Q.  And then in Location No. 2 --

25          MR. DISNEY:  If we can go to Location 2.  Zoom in.

BY MR. DISNEY:

Q.  On January 6th was -- the stairway that's shown in Exhibit 106, Location 2, was it breached by individuals?

A.  Yes.

Q.  And because of that breach, were individuals able to make it to the upper west terrace?

A.  Yes, sir.

        MR. DISNEY:  And then if we go to Location 4.  And location -- let's go to 5.

BY MR. DISNEY:

Q.  On January 6th was the parliamentarian door breached?

A.  Yes, sir, it was.

Q.  And was the Senate wing door breached?

A.  Yes, sir, it was.

        MR. DISNEY:  And, Your Honor, at this time we would move to show you State's -- I mean Government's 336, which is a summary of the breaches that occurred at Peace Circle, and the stairway, the parliamentarian door, and the Senate wing door.

        THE COURT:  All right.  Is there any objection, Mr. Womack?

        MR. WOMACK:  None.

        THE COURT:  All right.

        MR. DISNEY:  This is approximately 9 minutes -- or I'm sorry -- 14 minutes long.

        THE COURT:  Okay.

1        MR. DISNEY:  It's --

2    BY MR. DISNEY:

3    Q.  Before we do that, let me just ask you, Captain Mendoza,

4    does -- I'm showing you Exhibit 336.  Is this a summary of the

5    breaches that we just talked about?

6    A.  Yes, sir, it is.

7    Q.  And do these show the times that the breaches occurred?

8    A.  Yes, sir.

9    Q.  Peace Circle was breached at what time?

10   A.  12:54 p.m.

11   Q.  And the stairway at what time?

12   A.  2:09 p.m.

13   Q.  And the Senate wing -- the first breach of the Senate wing

14   door?

15   A.  2:13 p.m.

16   Q.  And the breach of the parliamentarian door?

17   A.  2:42 p.m.

18   Q.  And the breach -- the second breach of the Senate wing

19   door?

20   A.  2:49 p.m.

21   Q.  And were those breaches captioned -- or captured on

22   closed-circuit TV?

23   A.  They were.

24        MR. DISNEY:  And, Your Honor, I misspoke.  I said 336

25   was the video.  The video is Exhibit 300.

1          MR. WOMACK:  No objection.

2          THE COURT:  If I could just clarify.  336 sets the

3    timeline out; right?

4          MR. DISNEY:  Yes.  And in 300 is the actual exhibit.

5          THE COURT:  Okay.  Mr. Womack.

6          MR. WOMACK:  I see it's 11 o'clock.  Would this be an

7    appropriate time to take the morning break?

8          THE COURT:  I don't have a problem with that.  Why

9    don't we do the morning break if it's going to be 14 minutes.

10         MR. DISNEY:  That's fine.

11         THE COURT:  So it's 11 o'clock.  Come back at 11:15

12   and we'll resume.

13         MR. DISNEY:  Thank you.

14         THE COURT:  Captain Mendoza, don't talk about your

15   testimony while you're on break.

16         THE WITNESS:  Yes, ma'am.

17         THE COURT:  All right.  The parties are excused until

18   11:15.

19         (Recess taken.)

20         THE COURT:  All right.  Good morning again.  And

21   we're resuming the direct examination of Captain Mendoza.

22         MR. DISNEY:  Thank you.

23   BY MR. DISNEY:

24   Q.  Captain Mendoza, we had just shown the Court Exhibit 336,

25   which was a summary of the breaches.  And I'd like to now play

1    for the Court Exhibit 300, which is a montage showing the

2    breaches that are described in Exhibit 336.

3              (A video recording was played.)

4              MR. DISNEY:  Thank you.

5    BY MR. DISNEY:

6    Q.  Officer, I want to talk to you about the crowd size on the

7    west lawn after those breaches occurred.  You had noted the

8    inauguration stage and the media tower that was in the middle.

9    Can you just maybe put an X where that inauguration -- where

10   that media tower was.

11   A.  Yes.  My screen went black.

12             THE COURT:  The screen went out?

13             MR. DISNEY:  So did mine.  We'll try to pull that

14   back up again.

15             THE COURT:  There you go.

16   BY MR. DISNEY:

17   Q.  Try it now.  Okay.  And that was that media tower that was

18   right there?

19   A.  Yes, sir.

20   Q.  I'd like to show you what's been marked as Government's

21   Exhibit 304, a time lapse video constructed from the CCTV to

22   show the Court the crowd size after that breach of Peace

23   Circle.

24             MR. DISNEY:  So if we could show 304.

25             (A video recording was played.)

1           MR. DISNEY:  I'll note on the times, on the bottom

2     right is military time.  So it's approximately 1:03 right now.

3           (A video recording was played.)

4     BY MR. DISNEY:

5     Q.  Officer, I noted that at approximately the 2:45 or 14:45

6     period, there was a plume of red smoke that came up from the

7     crowd.  Can you -- are you familiar with what that means?

8     A.  Yes, sir, I am.

9     Q.  What does that mean?

10    A.  Officers deploy red smoke when they need additional

11    assistance or they're calling for emergency help.

12    Q.  Thank you.

13          Now, you told us that you were working on January 6th;

14    is that correct?

15          THE COURT:  Let me make sure the court reporter is

16    okay.

17          THE COURT REPORTER:  I just need a cough drop.

18          (Off the record.)

19    BY MR. DISNEY:

20    Q.  Officer Mendoza, you told us you were working on

21    January 6th.

22    A.  Yes, sir, I was.

23    Q.  And what -- were you aware that there were some protests

24    planned that may require your civil disturbance unit to come

25    into work?

1    A.  Yes, sir.

2    Q.  And do you have any idea what those protests centered

3    around?

4    A.  Yes.

5    Q.  And what was that?

6    A.  Around the certification of the electoral votes, the Stop

7    the Steal rally.

8    Q.  And which --

9             MR. DISNEY:  You're fine.

10            THE COURT:  Do you want to take a break?

11            THE COURT REPORTER:  Yes.

12            (Recess taken.)

13            THE COURT:  I believe our court reporter is all right

14   at this point; so we'll resume.  We'll pick up on the direct

15   with Captain Mendoza.

16   BY MR. DISNEY:

17   Q.  Captain Mendoza, what time did you plan on going to work?

18   A.  I'm sorry.  I planned to arrive around 15:00, 3:00 p.m.

19   Q.  3:00 p.m.?

20   A.  Yes.

21   Q.  And what, in fact, occurred?

22   A.  I received a call from a fellow commander asking me where

23   my SWAT team was at.  I told her that.  She called me back and

24   basically told me I might want to come in.  So I proceeded to

25   work.

1    Q.  When you say "proceeded to work," what physical location

2    did you go to?

3    A.  I went to my -- one of my offices, which is in the

4    Fairchild Building, 399 [sic] South Capitol Street.

5    Q.  Okay.  And then what time did you, I guess for lack of

6    better words, get out on the street?

7    A.  By the time I changed my clothes and everything, I think it

8    was around 14:00 hours, or 2 o'clock.

9    Q.  What was your intention when you hit the street in your

10   uniform?  What were you going to do?

11   A.  I was going to respond to the DNC for the explosive device

12   that was at that location.

13   Q.  And did something change your mind and you go somewhere

14   else?

15   A.  Yes.

16   Q.  Tell us about that.

17   A.  I heard an officer call 10-33 for officer -- or a 10-33 for

18   officer in trouble.  So I proceeded to the Capitol.

19   Q.  Okay.  And tell us about what happened when you arrived at

20   the Capitol.

21   A.  Once I arrived, I arrived on the east front plaza.

22   Q.  Can -- we have the screen in front of us.  Can you just

23   draw an X about -- on your -- we have a screen of -- I'm sorry.

24   We have Exhibit 100, which is a photograph of the U.S. Capitol.

25   Can you draw an X on this where you arrived.

1    A.  I arrived on the House side.  So probably somewhere around

2    here.  I parked right down there.

3    Q.  Okay.  And that's the lower right side of the Capitol --

4    A.  Yes.

5    Q.  -- shown on the photograph?

6    A.  Yes.

7    Q.  And tell us what you did from there.

8    A.  Well, when I arrived, I saw, you know, people on the plaza.

9    So my plan was to enter the Rotunda door, but it was

10   inaccessible.  So I entered through a separate door at the

11   bottom of the building.

12   Q.  And when you arrived, can you tell us, just briefly -- you

13   said you saw people on the Rotunda door.  What are you talking

14   about?

15   A.  There's stairs -- you know, there's stairs -- there's

16   stairs leading here up to the Rotunda, and so there were people

17   there.  So I was not able to access the Rotunda door.

18   Q.  And the witness has drawn a circle right where the words

19   Capitol Grounds are.

20        When you say "there were people," can you tell us about

21   the crowd size that you're seeing on the east part of the

22   Capitol?

23   A.  I would say -- I don't know if I could accurately say how

24   many people, but maybe hundreds of people.

25   Q.  And about what time is it that you're arriving at the

1    Capitol?

2    A.  I believe I arrived around 14:00 --

3    Q.  Which is 2 o'clock?

4    A.  -- hours.  Correct.

5    Q.  And so where -- you went into the Capitol through that door

6    down at the lower right.  Is that correct?

7    A.  Lower -- lower -- on my screen, it's the lower -- it's

8    right around here, the Memorial Door.

9    Q.  You went in what's known as the Memorial Door?

10   A.  Correct.

11   Q.  And where did you go from there?

12   A.  I proceeded to the hallway, past the Memorial Door, where I

13   saw a group of my officers holding back unauthorized people.

14   Q.  When you entered the Memorial Door of the Capitol, did you

15   see anything that concerned you?

16   A.  Yes.

17   Q.  And tell the Court what you saw.

18   A.  Immediately when I walked in, there was a group of what

19   appeared to be a couple hundred people in the area of that

20   door.  I actually was going to turn around and go back out the

21   door because I didn't think I could get through that group, but

22   I heard banging on the door that I came in.  So I had to end up

23   just proceeding through the crowd.

24   Q.  And where did you go to?

25   A.  I went to the hallway right past the Memorial Door.

1    Q.  And what did you encounter there?

2    A.  I encountered a line of officers holding back unauthorized

3    people in the building.

4    Q.  And -- and kind of describe the scene to the -- for the

5    Court.  You said people.  I mean --

6    A.  Well, angry people.  So there were, you know, people in the

7    building.  Obviously, they were angry; chanting, yelling at the

8    officers, that type of thing.  And the officers were,

9    basically, trying to hold them from penetrating further into

10   the building.

11   Q.  And what did you do then?

12   A.  I jumped on the line with my officers.

13   Q.  Trying to hold the crowd back?

14   A.  Yes.

15   Q.  Were you successful in doing that?

16   A.  Not for long, no.

17   Q.  What -- what happened next?

18   A.  Eventually they -- the crowd overran myself and the

19   officers on the line.

20   Q.  When you were in the -- in line trying to hold the crowd

21   back, was there any -- was it very loud in there or not?

22   A.  Yes, it was very loud.

23   Q.  And because of what?

24   A.  People yelling, chanting.  Officers trying to communicate

25   with the crowd.  The crowd yelling at the officers.

1    Q.   Was there any -- does the Capitol use any device to audibly

2    tell people that they're not authorized?

3    A.   Yes.  We have a PA system.

4    Q.   And was that PA system going off while these unauthorized

5    people were in the Capitol?

6    A.   Yes, the PA system went off multiple times.

7    Q.   And what was it saying?

8    A.   The PA system -- I don't know exactly what it was saying,

9    but it was basically stating that the building was in a

10   lockdown, staff proceed to their offices, close and lock the

11   doors, something to that effect.

12   Q.   Thank you.

13        What was -- could you smell anything in the air?

14   A.   I smelled chemicals, like C- -- they say CS is odorless,

15   but it's not.  I'm an instructor.  It's not odorless.  So I

16   smelled that.

17   Q.   Do you know what that was coming from?

18   A.   Chemicals were deployed by both rioters and officers in the

19   building.

20   Q.   Okay.  Did you see any of your officers assaulted?

21   A.   I did.

22   Q.   And tell us about what -- just give us a flavor of what you

23   were seeing.

24   A.   From my perspective, I saw officers trampled, knocked down,

25   hit with various objects.

1      MR. WOMACK:  At this point I'll object; only that,

2  really, this is well before Mr. Rivera got to the Capitol or

3  inside.  So at this point this is completely irrelevant.

4      MR. DISNEY:  I'll move on, Your Honor.

5      THE COURT:  All right.

6  BY MR. DISNEY:

7  Q.  So you said you arrived at the Capitol at -- right around

8  2 o'clock; correct?

9  A.  Correct.

10  Q.  And how long were you in the Capitol?

11  A.  How long was I inside the building?

12  Q.  Total, yeah.

13  A.  Maybe six hours.

14  Q.  From about 2 o'clock until?

15  A.  Until later that night, so...

16  Q.  Okay.  How long were you and your officers actively

17  involved in conflict with the crowd?

18  A.  About four hours, maybe.  Four or five hours.

19  Q.  So that would be from approximately 2 o'clock until

20  approximately 6 o'clock?

21  A.  Yes.

22  Q.  Thank you.

23      And during that time, can you tell the Court what kind

24  of struggle you were having with the crowd, your officers were?

25  A.  Yes.  Mainly just getting compliance and -- and getting the

1  crowd to leave the building, so...

2  Q.  Thank you.

3      Would it be correct that, specifically, between

4  2:59 p.m. and 3:40 p.m., that during that time period, your

5  officers, as a whole, were engaged in combat with rioters in

6  the building?

7  A.  Yes, sir; that would be correct.

8          MR. DISNEY:  Your Honor, I have no other questions.

9          THE COURT:  All right.  Cross?

10         MR. WOMACK:  Thank you.

11                 CROSS-EXAMINATION

12  BY MR. WOMACK:

13  Q.  Captain Mendoza --

14  A.  Yes, sir.

15  Q.  -- in the video that you watched, which I think is

16  Exhibit 302 -- the montage that -- the government called it --

17  it showed that about 2:26, 2:28 -- 14:26, 14:28 hours --

18  protesters left the Senate door peacefully.  They were walking

19  out.  It looks like the officers had restored order and

20  everybody was leaving that door.  Do you remember seeing that?

21  A.  I remember seeing people leaving; correct.

22  Q.  Okay.  And it looked like everyone had left that area and

23  had gone completely -- all the protesters had gone outside.  Do

24  you recall that?

25  A.  Yes.

1   Q.  And then it was about -- so 20 minutes later or so that

2   they came back again.  Do you know what happened in the

3   interim?

4   A.  No.

5   Q.  If you don't know, you don't know.

6   A.  No.

7   Q.  Okay.  And that's not an area you were working, was it?

8   A.  No, it was not.

9   Q.  Okay.  In that time frame, from around 2:30, 2:25, until,

10   say, 3:30 p.m., 15:30, what area of the Capitol were you in?

11   A.  I was in various areas of the Capitol Building at that

12   time.

13   Q.  Okay.  Were you back in the area of the Senate door, the

14   west -- the west Senate door that we were talking about?

15   A.  Yeah, I can't tell you exactly what area I was in at what

16   time because I visited various areas throughout the Capitol

17   Building.  There were not -- only so many commanders available.

18   So I tried to visit different locations.  So I couldn't tell

19   you what time I was around that area.

20   Q.  Did you remain on that floor of the building, or did you go

21   up on the second floor, or where did you stay?

22   A.  I was on the first floor, second floor, and also near the

23   chambers.

24   Q.  Okay.  And the floor that had the parliamentarian door and

25   the west Senate door, is that the first floor?

1  A.  That is the second floor.

2  Q.  Second floor.

3  A.  Uh-huh.

4  Q.  Okay.  And the first floor, is that down on the -- even

5  with the lower terrace, more or less?

6  A.  Yeah, I'm not -- I can't answer those questions a hundred

7  percent.  I'm not sure.

8  Q.  I gotcha.

9  A.  Yeah, I -- I don't generally work inside the building.  So

10  there's a floor under the -- if what you're asking me is if

11  there's a floor under there, there is.  So there's a floor

12  underneath, and it could be the basement.  I don't -- I'm not

13  familiar with the exact floors, the name of the floors.

14  Q.  The actions that were depicted in that montage video on the

15  second floor going through the Senate -- west Senate door and

16  the parliamentarian door, would it be fair to say, you didn't

17  see any of that?

18  A.  I didn't see any of that, no.

19  Q.  Thank you.

20          MR. WOMACK:  No further questions, Your Honor.

21          THE COURT:  Redirect?

22          MR. DISNEY:  No, Your Honor.

23          THE COURT:  All right.  You can step down.

24          THE WITNESS:  All right.  Thank you.

25          MR. DISNEY:  Your Honor, subject to recall, if

1  needed, can Capitol Mendoza leave the building?

2          THE COURT:  Yes.

3          MR. DISNEY:  Thank you.

4          (Witness excused.)

5          THE COURT:  Your next witness.  I usually take a

6  lunch break between 1:00 and 2:00, if that works for you.

7          MR. DISNEY:  Whatever -- yeah, that's fine.

8          MR. WOMACK:  That's fine.

9          MR. DISNEY:  That's fine.

10          THE COURT:  Okay.  So your next witness.

11          MS. FURST:  Your Honor, we call Agent Nicholas Alex

12  Chan.

13      And, Your Honor, may I remove my mask while I speak with

14  the witness?

15          THE COURT:  Yes.  And you can as well, sir.  We're

16  going to swear you in.

17          THE COURTROOM DEPUTY:  Raise your right hand, please.

18          (Oath administered.)

19          THE WITNESS:  Yes, ma'am, I do.

20          THE COURTROOM DEPUTY:  Please be seated.

21          THE COURT:  All right.  And if you could speak --

22  make sure you speak into the microphone.  You already heard my

23  instructions about objections, if they stand, you know, not to

24  answer, and also to let people finish their questions before

25  you start to answer.  And they should wait for you too.

1           THE WITNESS:  Yes, ma'am.

2           THE COURT:  Okay.

3           MS. FURST:  And, Your Honor, for the Court's benefit,

4     we're now turning to the --

5           THE COURT:  You can take the mask off, if you want.

6           MS. FURST:  Thank you.

7           THE COURT:  And if you can talk into the microphone.

8     The microphone really does project quite easily.

9           MS. FURST:  Your Honor, for the Court's benefit, we

10    are now turning to the specific actions of Mr. Rivera and how

11    we learned about him, now that we've done the general overall.

12          THE COURT:  Okay.

13          MS. FURST:  All right.

14                        DIRECT EXAMINATION

15    BY MS. FURST:

16    Q.  Would you tell the judge, please, your name and your

17    occupation.

18    A.  My name is Nicholas Chan.  I'm a special agent with the

19    Federal Bureau of Investigation.

20    Q.  How long have you been employed in that capacity?

21    A.  Three years.

22    Q.  And what are your job duties in that capacity?

23    A.  I investigate violations of federal law as it pertains to

24    health care fraud, bank robberies; investigate international

25    terrorism.

1    Q.  And where are you stationed presently?

2              THE COURT:  Move the front of the microphone towards

3    you.

4    A.  I am stationed out of the Fort Walton Beach and Pensacola

5    resident agencies out of the Jacksonville division.

6    BY MS. FURST:

7    Q.  And was that your duty station on January 6th of 2021?

8    A.  Yes, ma'am.

9    Q.  And while working on that date, did Pensacola get a lead

10   concerning a Jesus Rivera?

11   A.  Yes, ma'am.

12   Q.  And can you briefly, in summary, tell the Court how that

13   happened?

14   A.  Yes, ma'am.  So the FBI received a tip through the National

15   Threat Operations Center that was routed through our

16   headquarters, and then it was routed through the Pensacola

17   office.

18   Q.  And --

19             THE COURT:  Can you slow down just a tiny bit.

20             THE WITNESS:  Sure.  Sorry.

21             THE COURT:  Go ahead.

22   BY MS. FURST:

23   Q.  Okay.  And at that time, was Pensacola getting tips about

24   not just general crimes but also about the riots, January 6th

25   of 2021, in Washington, D.C.?

1    A.  Yes, ma'am.

2    Q.  And was this tip concerning Mr. Jesus Rivera about the

3    riots in D.C.?

4    A.  Yes, ma'am.

5    Q.  And what was the indication that the tip told you about?

6    A.  The tip revealed social media posts and pictures of -- of

7    Mr. Rivera in and about the -- the Capitol Grounds.

8    Q.  And did you determine if Mr. Rivera, in fact, lived in the

9    area of Pensacola?

10   A.  Yep.

11   Q.  And what was that address?

12   A.  It was 5110 West Fairfield Drive, Pensacola, Florida.

13   Q.  And did the Pensacola FBI office, including yourself and

14   other agents, open a case on Mr. Rivera and start looking into

15   whether or not he was there at the Capitol?

16   A.  Yes, ma'am.

17   Q.  And as part of that, did you review social media and

18   driver's license pictures to determine if you could recognize

19   who Mr. Rivera was?

20   A.  I personally did not, but the case agent on the case did.

21   Q.  Okay.  And as a result of the investigation, was it

22   determined that you believed -- you, meaning the office -- that

23   Mr. Rivera may have gone into the Capitol on January 6th of

24   2021?

25   A.  Yes, ma'am.

1    Q.  As a result of that, was a search warrant for his home and

2    devices obtained from the Pensacola office?

3    A.  Yes, ma'am; that's correct.

4    Q.  And was that search warrant for his home and devices

5    executed in Pensacola at his home?

6    A.  Yes, ma'am.

7    Q.  And before we move further, would you be able to recognize

8    Mr. Rivera if you saw him?

9    A.  Yes, sir.

10   Q.  And is he here today?

11   A.  Yes, ma'am.

12   Q.  Could you please identify him for the record by describing

13   where he's seated and what he's wearing.

14   A.  Yes, ma'am.  He's seated next to his attorney wearing what

15   appears to be a blue suit.

16        MS. FURST:  Your Honor, could the record reflect he's

17   identified Mr. Jesus Rivera?

18        THE COURT:  So reflected.

19   BY MS. FURST:

20   Q.  Were you part of going to execute the search warrant?

21   A.  Yes, ma'am, I was.

22   Q.  Do you recall what date that was?

23   A.  I believe it was January 20th, 2021.

24   Q.  Of 2021?

25   A.  Yes, ma'am.

1    Q.  And did you locate any evidence with -- within the scope of

2    the search warrant that day that was relevant to Mr. Rivera's

3    possible presence at the Capitol and inside?

4    A.  Yes, ma'am, we did.

5    Q.  And have you brought the -- those pieces of evidence with

6    you?

7    A.  Yes, ma'am.

8    Q.  And let's first move to what has been marked as Exhibit 9.

9    It's in a sack there by you.  Do you see that?

10   A.  Yes, ma'am.

11   Q.  And can you open that up and identify that, please?

12   A.  Yes, ma'am.  This is a red and black fleece button-down.

13   Q.  And was this something that Mr. Rivera was wearing on the

14   day inside the Capitol, according to the social media posts?

15   A.  Yes, ma'am, it appears to be that way.

16          MS. FURST:  This is not part of the stipulation; so I

17   would move to admit it.

18          THE COURT:  Any objection?

19          MR. WOMACK:  No objection.

20          THE COURT:  All right.  I'll admit it without

21   objection.

22          (Government Exhibit 9 admitted into evidence.)

23          MS. FURST:  Thank you, Your Honor.

24   BY MS. FURST:

25   Q.  And do you recall where that was located?

1    A.   I believe it was located in -- in Mr. Rivera's closet.

2    Q.   In Mr. Rivera's what?

3    A.   Closet.

4    Q.   Thank you.

5         In the bedroom?

6    A.   Yes, ma'am.

7    Q.   Thank you.

8         Let's turn now to Exhibit 1.  Are you familiar with what

9    that is?

10   A.   Yes, ma'am.

11   Q.   And what does that Exhibit 1 envelope contain?

12   A.   It contains two disks.

13   Q.   And what's contained within the disks?

14   A.   The disks are a -- excuse me.  They contain digital

15   evidence that was extracted by our computer forensic team from

16   Mr. Rivera's iPhone.

17   Q.   And was Mr. Rivera's iPhone seized as part of the search

18   warrant?

19   A.   Yes, ma'am.

20   Q.   That was taken from his person; is that correct?

21   A.   That's correct.

22   Q.   And I believe that is Exhibit 11.  Is that there in front

23   of you?

24   A.   Yes, ma'am.

25   Q.   And that was the iPhone that Mr. Rivera had with him when

1  he was at the Capitol on January 6th, according to what our --

2  our investigation revealed?

3  A.  Yes, ma'am; that's correct.

4        MS. FURST:  And, Your Honor, 1 and 11 have been

5  admitted already through stipulation.

6        THE COURT:  All right.

7  BY MS. FURST:

8  Q.  And Exhibit 4 is a camera; is that correct?

9  A.  Yes, ma'am; that's correct.

10  Q.  And did Mr. Rivera have that camera with him when he was at

11  the Capitol on January 6th?

12  A.  Yes, ma'am.

13  Q.  And inside the Capitol, was an SD card located?

14  A.  Inside the Capitol?

15  Q.  Inside the Capitol.  Right.

16        Inside the camera?

17  A.  Yes, ma'am.

18  Q.  And would you look at Exhibit 12, please.

19  A.  Yes, ma'am.

20  Q.  Is that the SD card?

21  A.  It is.

22  Q.  So Exhibit 4 is the camera.  Exhibit 12 is the SD card that

23  was within the camera.

24        Were videos found on the SD card?

25  A.  Yes, ma'am.

1    Q.  And were videos found in the iPhone as well?

2    A.  Yes, ma'am.

3    Q.  And were those all -- the phone was downloaded by

4    forensics; is that correct?

5    A.  That is correct.

6    Q.  And then the results were the two disks that is Exhibit 1

7    where those videos were downloaded?

8    A.  Yes, ma'am; that's correct.

9    Q.  All right.  Did you interview anyone that day?

10   A.  Yes, ma'am.

11   Q.  Who did you interview?

12   A.  I interviewed Mr. Rivera's wife, Jessecah Rivera.

13   Q.  And how long did you speak with her?

14   A.  Approximately an hour.

15   Q.  Did you have enough time to observe her that you would

16   recognize her again?

17   A.  Yes, ma'am.

18   Q.  And did you feel you had enough time to listen to her that

19   you would recognize her voice again?

20   A.  Yes, ma'am.

21   Q.  Have you reviewed Exhibit 403, which is an Instagram video

22   or social media video?

23   A.  Yes, ma'am, I was.

24   Q.  And were you able to identify the person who was doing most

25   of the talking in the video?

1    A.  Yes, ma'am.

2    Q.  And who was that?

3    A.  Ms. Rivera.

4    Q.  And you were familiar with her voice.  Was that her voice

5    in that video?

6    A.  Yes, ma'am.

7    Q.  Was anyone else in the video with her?

8    A.  Yes, ma'am.  Mr. Rivera was in there as well.

9    Q.  All right.

10            MS. FURST:  Your Honor, I believe all the exhibits --

11   1, 4, 9, 11, and 12 -- are now admitted.  And I will turn this

12   witness over for cross-examination.

13            THE COURT:  All right.  Cross.  Any questions, sir?

14            MR. WOMACK:  No, Your Honor.

15            THE COURT:  All right.  You can step down, sir.

16            THE WITNESS:  Thank you.

17            (Witness excused.)

18            MS. FURST:  Your Honor, our next witness is Special

19   Agent Alex Nogueiras.  And Mr. Disney is getting him; he's in

20   the room.

21       As to the physical exhibits, Your Honor, would you like

22   us to take them back at the end of the day?  I don't know how

23   you handle your physical exhibits.

24            THE COURT:  Yes.  At the end you can hand them over

25   to Ms. Patterson.  But at this point, it should be your

1    responsibility.

2           MS. FURST:  Okay.  And then when we submit the case,

3    then --

4           THE COURT:  Give them to Ms. Patterson.  Then I'll

5    get them.

6           MS. FURST:  Thank you, Your Honor.

7           THE COURT:  Sir, if you would step up over here.  If

8    you'd step up and remain standing, and we can swear you in.

9           (Oath administered.)

10          THE WITNESS:  Yes, ma'am.

11          THE COURTROOM DEPUTY:  Please be seated.

12          THE COURT:  All right.  I've asked -- go ahead and

13   sit down.  Make sure you speak in a loud, clear voice.  You

14   need to speak right into the head of the microphone; so you can

15   move it around.

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  I would ask that you allow counsel to

18   finish their question before you start to answer, and they

19   should wait for you to finish your answer before moving on so

20   we make sure we have the full question and answer for the

21   record.

22          THE WITNESS:  Yes, ma'am.

23          THE COURT:  If you hear the word objection or you see

24   counsel start to stand, they're going to object.  If you

25   haven't answered, don't.  If you're in the middle of the

answer, wait, and let me make a ruling.  And you can take your

mask off so we can hear you.

       THE WITNESS:  Okay.

       MS. FURST:  And, Your Honor, may I also remove my

mask?

       THE COURT:  Yes.

       MS. FURST:  Thank you.

               DIRECT EXAMINATION

BY MS. FURST:

Q.  Would you please tell the judge your name and your

occupation?

A.  Yes.  My name is Alex Nogueiras, Jr., and I'm a special

agent with the FBI.

Q.  Okay.

       THE COURT:  If you could slow down just a little.

       THE WITNESS:  Sorry.

       THE COURT:  Go ahead.

BY MS. FURST:

Q.  How long have you been employed by the FBI?

A.  I've worked for the FBI for 18 years, with the last 10 as a

special agent.

Q.  And as a special agent, where is your duty division?

A.  Jacksonville, Florida.

Q.  And what kind of cases do you investigate?

A.  I investigate terrorism cases, international and domestic,

1       as well as weapons of mass destruction.

2       Q.  And do you have any January 6th riot cases right now?

3       A.  Yes, ma'am.

4       Q.  And does one of them include a Jesus Rivera?

5       A.  Yes, ma'am.

6       Q.  And have you been part of the investigation into Mr. Rivera

7       since the beginning?

8       A.  Yes, ma'am.

9       Q.  Could you tell the judge, please, how the Jacksonville

10      office learned about Mr. Rivera.

11      A.  Yes, ma'am.  So after the events on January 6th, the FBI

12      began receiving information, public tips from --

13              THE COURT:  You have to use the microphone and speak

14      into it so we make a record.

15              THE WITNESS:  Yes, ma'am.

16              THE COURT:  Go ahead.

17      A.  That information was received by FBI headquarters and

18      passed to the field, including the Jacksonville field office

19      and the Pensacola resident agency.

20      BY MS. FURST:

21      Q.  And Mr. Rivera lives in Pensacola; so that's why it was

22      passed down there?

23      A.  Yes.  We received public information that Mr. Rivera -- via

24      his social media accounts and then posting, that he was in

25      Washington, D.C., on the 6th and at the U.S. Capitol.  Those

1    posts were confirmed through publicly available social media

2    checks, and then we also utilized Florida DMV records.

3              THE COURT:  I don't know what that is.

4              MS. FURST:  Judge, when our computers -- if they're

5    idle for a while, then they go -- they shut down and it makes a

6    huge noise.

7              THE COURT:  I know.  Mine does too.

8    BY MS. FURST:

9    Q.  All right.  So, Agent Nogueiras, did you have an

10   opportunity to look at those tips and -- and figure out who

11   Mr. Rivera was?

12   A.  Yes.

13   Q.  And what were some of the social media indications that

14   were within the tips?

15   A.  They identified a social media account by the name of

16   chicanopatriot, and that also had a profile photo that we

17   compared to the DMV photo.  And it appeared to be the same

18   individual by the name of Jesus Rivera.

19   Q.  And is that individual here in the courtroom today?

20   A.  Yep.

21   Q.  And could you identify him for the record?

22   A.  Yes, ma'am.  He's sitting with the white mask in the second

23   seat at the -- of counsel's table.

24   Q.  With the blue suit?

25   A.  Yes, ma'am.

1          MS. FURST:  And, again, Your Honor, could the record

2     reflect he's identified Mr. Rivera?

3               THE COURT:  So reflected.

4     BY MS. FURST:

5     Q.  Did headquarters get a search warrant for several

6     individuals' social media accounts that, apparently, were at

7     the Capitol on January 6th of 2021?

8     A.  Yes, ma'am.

9     Q.  Was Mr. Rivera's account one of them?

10    A.  Yes, ma'am.

11    Q.  And the data that was received from that Facebook search

12    warrant was relatively early -- or right after the riots; is

13    that correct?

14    A.  Yes, ma'am; that's correct.

15    Q.  And as part of that data, did you review any Facebook live

16    videos?

17    A.  Yes, ma'am.

18    Q.  And have you reviewed Exhibits 305, 310, 326, and 328?

19    A.  Yes, ma'am.

20    Q.  And were those part of that original, first headquarters

21    search warrant?

22    A.  Yes, ma'am; that's correct.

23    Q.  And those were live videos?

24    A.  Yes, ma'am.

25    Q.  And was there also a search warrant done around

1    January 21st of 2021 by the Pensacola office?

2    A.  Yes, ma'am, for a second Facebook account.

3    Q.  And was that data received as well?

4    A.  Yes, ma'am.

5    Q.  And was there a Facebook post from December 28th of 2020

6    that was received?

7    A.  Yes, ma'am.

8    Q.  And this was also on Mr. Rivera's account?

9    A.  Yes, ma'am.

10   Q.  And that is Exhibit 406; is that correct?

11   A.  Yes, ma'am.

12            MS. FURST:  Your Honor, this is part of the

13   stipulation.  I would move to publish for the Court.

14            THE COURT:  All right.  They were already admitted,

15   Dorothy.

16            MS. FURST:  It's a hard habit to break, Your Honor.

17   BY MS. FURST:

18   Q.  We have before us Exhibit 406.  Agent, for the record,

19   could you read what Mr. Rivera's post says.

20   A.  Yes.  My screen is not on.

21   Q.  Oh.

22   A.  So I can read it from that one.

23            THE COURT:  No.  Wait one second.  We'll put it on in

24   a minute.  For some reason his is not on.  Maybe he just

25   touched the button or something.  If we can wait a few minutes

1    and have it come on.

2         It was working with the earlier witnesses.  We're always

3    having troubles.  So we're not going to be -- if we can take

4    the lunch break and get IT to fix it.  He should be able to

5    look at what he's doing.

6         Okay.  So my suggestion is we take the lunch break.

7    I'll get IT to come up and fix it so he can actually look at

8    the exhibits.  At this point, for some reason, they're not

9    working.  All right.  So come back at 1:30, and we'll pick up

10   at that point.

11        All right.  So we're still -- you shouldn't discuss your

12   case since you're still under -- testifying.

13             THE WITNESS:  Yes, ma'am.

14             THE COURT:  All right.  All right.  The parties are

15   excused.  See you back at 1:30.

16             (Recess taken.)

17             THE COURT:  Good afternoon, everyone.

18        So we were in the middle of the direct of Special Agent

19   Nogueiras.  So proceed.

20             MS. FURST:  Thank you, Your Honor.

21   BY MS. FURST:

22   Q.  Agent Nogueiras, I had just asked you to read for the

23   record the Facebook post of December 28th, 2020.

24   A.  Yes.

25             THE COURT:  So this is Exhibit 406?

1    MS. FURST:  Exhibit 406, Your Honor.

2    THE COURT:  Okay.  Yes.  Go ahead.

3    THE WITNESS:  Thank you.

4  A.  So the post says, "It's official, your boy is going to DC

5  on the 6th.  Time to find a way to pay for my trip, but I'm not

6  missing this.  Patriot the Fuck up America."

7  BY MS. FURST:

8  Q.  And is there an author line down towards the end after that

9  post?

10  A.  Yes.  JD Rivera.

11  Q.  Is there also a link with ChicanoPatriot named in the

12  link?

13  A.  Yes, ma'am.

14  Q.  And are those a couple of the monikers that Mr. Rivera used

15  during this time frame?

16  A.  Yes, ma'am.

17  Q.  All right.  So as you continued your investigation into

18  Mr. Rivera, did you participate in the execution of a search

19  warrant at his home?

20  A.  Yep.

21  Q.  And that was on or about January 20th of 2021?

22  A.  Yes, ma'am.

23  Q.  And did you meet Mr. Rivera that day?

24  A.  Yes, ma'am, I did.

25  Q.  Did you have an opportunity to observe him and hear him

1    speaking?

2    A.  I did.

3    Q.  And based upon those observations, would you be able to --

4    you've already identified him, but would you be able to

5    identify his voice as well?

6    A.  Yes, ma'am.

7    Q.  And were there any videos on the devices that were seized

8    from the house?

9    A.  Yes, ma'am, there were.

10   Q.  And did Mr. Rivera turn the camera on himself at any -- in

11   any of those videos?

12   A.  Yes, he did turn the camera on himself and, in particular,

13   at times when he was speaking and narrating.

14   Q.  And did you watch those videos?

15   A.  Yep.

16   Q.  And based upon seeing his face and hearing him speak in the

17   videos, would you also recognize his voice?

18   A.  Yes, ma'am.

19   Q.  All right.  Now, the videos that were taken from the camera

20   and the phone we have marked as exhibits, do we not?

21   A.  Yes, ma'am.

22   Q.  And so as we talk about them, in general, could you just

23   give the judge just a short summary of what the exhibits that

24   we have portrayed that Mr. Rivera took that day?

25   A.  Yes, ma'am.  The videos portray actions that Mr. Rivera

1    filmed himself doing and other events going on around him on

2    January 6th while here in D.C. and at the U.S. Capitol.

3    Q.  And there are also two videos from the iPhone that was

4    seized; correct?

5    A.  Yep.

6    Q.  Those were taken on the 8th and 9th of January of 2021?

7    A.  Correct.

8    Q.  And so are you familiar with the areas around the Capitol

9    that were portrayed in the videos that Mr. Rivera took?

10   A.  Yes, ma'am.  I've personally been there.

11   Q.  So you've personally been to the Capitol?

12   A.  Yes, ma'am.

13   Q.  And have you walked the same route that he walked, best

14   that we could tell, based on the videos?

15   A.  Yes, ma'am.

16   Q.  And could you tell the judge, please, where his route first

17   started based upon the videos that we took.

18   A.  Based upon the videos, the route started at approximately

19   3rd and Constitution, right near the distinctive slanted wall

20   near that intersection, right outside of this courthouse, and

21   proceeded across the northwest lawn to the U.S. Capitol.

22          MS. FURST:  And if Your Honor would allow, I'd like

23   to play Video 305, which is a video that the -- that Mr. Rivera

24   himself took.

25          THE COURT:  All right.

1    BY MS. FURST:

2    Q.  And this is walking up past the courthouse.

3    A.  Yes, ma'am.

4            (A video recording was played.)

5    BY MS. FURST:

6    Q.  At the end of Exhibit 305, you could actually see the

7    Capitol in the background there; is that correct?

8    A.  Yes, ma'am.

9    Q.  All right.  And then he takes up, in Exhibit 306, walking

10   up the lawn, the north lawn; is that right?

11   A.  Yes, ma'am.

12           MS. FURST:  And let's play this one, please.

13           (A video recording was played.)

14           MS. FURST:  Can we stop here, please.

15   BY MS. FURST:

16   Q.  Do you see any snow fencing in this?  And we've stopped at

17   the 45-minute mark.

18   A.  Yes, ma'am.  You can see snow fencing in the middle right

19   of the frame.

20   Q.  You can go ahead and mark on the screen.

21           And for the record, what is the condition of that snow

22   fencing?

23   A.  It appears like it's been taken down, ripped down.

24   Q.  And earlier in the video, were we able to see bike racking

25   that was used to surround the perimeter?

1    A.  Yes, ma'am.

2    Q.  All right.

3            MS. FURST:  Go ahead.

4            (A video recording was played.)

5    BY MS. FURST:

6    Q.  All right.  Now, there was a man in a white T-shirt as we

7    were walking up in the beginning that appeared to say

8    something.  Could you hear what he said?

9    A.  Yes.  It sounds like he says, "We're not supposed to be up

10   here.  It's all blocked off."

11   Q.  And did this video take up where Exhibit 305, the previous

12   one, ends?

13   A.  Not exactly, no.

14   Q.  Was there a gap in between?

15   A.  Yes, ma'am, there appears to be a gap in the distance

16   covered geographically.

17           MS. FURST:  If we can pull up 302 and just stop it.

18   BY MS. FURST:

19   Q.  For the record, this is the beginning of Exhibit 302.  And

20   what does this depict?

21   A.  This depicts the northwest lawn outside the U.S. Capitol.

22   Q.  And are there items here of interest that were also in

23   Mr. Rivera's videos we just watched?

24   A.  Yes, ma'am, two items in particular.  The --

25   Q.  And what are they?

1   A.  The light array portable generator right here and the

2   yellow crane right there.

3   Q.  All right.  So does this depict the same place where

4   Mr. Rivera was walking across the street to the Capitol and

5   then up to the Capitol?

6   A.  Yes, ma'am.

7   Q.  And can you show the judge, please, on this screen the

8   angle that Mr. Rivera was walking.

9   A.  This way.

10  Q.  So you're marking from the upper right hand of the screen

11  up to about the generator light; is that correct?

12  A.  Yes, ma'am, walking in that direction.

13  Q.  Okay.  And where did the first video end?

14  A.  The first video ended where the upper right of the screen

15  would be, back on that grassy part.

16  Q.  Let me clear this, and then you can do it again.  Why don't

17  you put an X where the first video ended.

18      And then where did the second one, where he's walking up

19  and the man in the second shirt says:  This is all blocked off;

20  where did that start?

21  A.  The next video appears to start somewhere in this area.  As

22  you can tell, he's almost to the light apparatus in the start

23  of that video.

24  Q.  And then he walks up all the way to the yellow construction

25  vehicle?

1    A.  Yes, ma'am.  He walks up, and you can see an individual

2    standing on the yellow crane there.

3    Q.  So I don't know how to make this go away.

4        Between the X and the slash that I've marked on the

5    screen, is that the area that we did not find video that

6    Mr. Rivera had taken in his camera or phone?

7    A.  Correct.

8    Q.  And what is significant about that area?

9    A.  There was fencing up in that area, along with the sign

10   saying that the area was closed.

11           MR. WOMACK:  Your Honor, objection.  Speculation.  He

12   doesn't know why there's a gap.  He can't possibly say that.

13           THE COURT:  I'm not sure in terms of -- if you look

14   at the photo, there's fencing up.  Is that the point that

15   you're making?

16           MS. FURST:  Yes, Your Honor.

17           THE COURT:  Now, whether it was up or not when he

18   came through, we obviously don't know because it's missing.

19   Would you agree with that?

20           MS. FURST:  Your Honor, I have a few more questions

21   relating back to some other exhibits that might answer that

22   question.

23           THE COURT:  Okay.  All right.  But I think this shows

24   that there is fencing up.  So I think that -- in terms of his

25   commenting, there was at least at one point fencing up?

1          MR. WOMACK:  Again, this is a -- keep in mind, this

2     is -- the picture they're referring to right now is well before

3     the crowd arrived.  There's no crowd at all.

4          THE COURT:  But the point -- before -- whether the

5     crowd is there or not, they're getting at the issue of the

6     fence.  There was a fence up there.  It shows the fence.

7          MR. WOMACK:  Yes, Your Honor, it does.

8          THE COURT:  Okay.  So that was --

9          MR. WOMACK:  And that was before he arrived, but yes.

10          THE COURT:  There was a fence there.  So the gap is

11     between where he ended the first and where he started, which

12     that area would not be -- is not on either of the videos.

13     We'll leave it at that.  It's not on the videos.

14          MR. WOMACK:  That's my objection, Your Honor.

15          THE COURT:  I guess at this point, you know, we don't

16     have any evidence of it.

17          MR. WOMACK:  Correct, Your Honor.  Thank you.

18          THE COURT:  At least at this point.

19          MS. FURST:  Thank you, Your Honor.

20          THE COURT:  Go ahead.

21     BY MS. FURST:

22     Q.  Agent Nogueiras, have you seen Exhibits 101, 102?

23     A.  Yes, ma'am.

24     Q.  You've looked at those?

25     A.  Yes, ma'am.

1    Q.  And 101A is a still shot and 102A is a still shot from each

2    of those videos; correct?

3    A.  Yes, ma'am.

4    Q.  And do those exhibits that the Court has already seen --

5    but we'll pull up the still shots again -- do they fill in the

6    gap on that day?

7    A.  Yes.  They show what the fences were on that day.

8    Q.  All right.

9          MS. FURST:  May we pull up 101A, please.  That's the

10   still shot.

11   BY MS. FURST:

12   Q.  And you recognize this photo?

13   A.  Yes, ma'am.

14   Q.  And is the yellow crane that we just saw in Exhibit 302, is

15   that in the picture?

16   A.  Yes, ma'am; it's on the left-hand side of the picture.

17   Q.  Can you circle it, please.

18         MS. FURST:  And then, please, let's pull up 102A.

19   BY MS. FURST:

20   Q.  And, again, do you recognize this picture?

21   A.  Yes, ma'am.

22   Q.  And is this in the same area?

23   A.  Yes, ma'am.

24   Q.  And is there fencing there?

25   A.  Yes, ma'am, and an area-closed sign.

1    Q.  All right.  Thank you.

2         MS. FURST:  Your Honor, at this time, because our

3    motion *in limine* concerning the Instagram live video that

4    Mrs. Rivera posted deals with fencing and barricades and what

5    the -- the -- Mr. Rivera and Mrs. Rivera saw that day, we would

6    at this point move to admit this.

7         THE COURT:  I was going to suggest that you do it

8    later.  But what I wanted to have you do is to play it -- I

9    know it's somewhat on the long side -- for me to be able to

10   look at it again in context and to -- you need to play all of

11   it because the issue is, you know, what -- what his conduct was

12   as to whether I can find that it's adoptive conduct while she's

13   doing her -- she's talking, as to whether -- what his conduct

14   is in terms of any comments or lack of comments he makes.

15        And it would give Mr. Womack an opportunity to argue

16   whatever he wants to argue about whether it's actually an

17   adoptive statement.  So if you there were the jury, you'd want

18   to do all of this now, but I would be inclined to do it

19   later --

20        MS. FURST:  Okay.

21        THE COURT:  -- so that -- because it's a longer one,

22   and have you continue with the rest of it, understanding we

23   would come back to that.

24        MS. FURST:  That's fine, Your Honor.  We'll do that.

25   We'll move on.

1   BY MS. FURST:

2   Q.  Let's move on to Exhibit 307.  Are you familiar with this

3   exhibit?

4   A.  Yes, ma'am.

5   Q.  And is Mr. Rivera portrayed in this next video?

6   A.  I'm sorry.  You said 307?

7   Q.  Yes.

8   A.  Yes, ma'am.  He is depicted in the video at the beginning.

9   Q.  So this will show him on the northwest lawn when he was

10  there on January 6th of 2021; is that right?

11  A.  Correct.

12          MS. FURST:  All right.  We would move to play 307,

13  Your Honor.

14          THE COURT:  All right.  Don't his videos have timings

15  on them, or not?  Do they show any time on the videos

16  themselves that he's taking?

17          MS. FURST:  No, Your Honor, they don't.

18          THE COURT:  Okay.

19          MS. FURST:  I'll ask the agent.

20          THE COURT:  I just wanted to know whether they did or

21  not.

22  BY MS. FURST:

23  Q.  Agent Nogueiras, Mr. Rivera's videos show a date, but we

24  can't figure out the time; is that right?

25  A.  Yes, ma'am.

1           THE COURT:  Okay.

2           MS. FURST:  Go ahead.

3           (A video recording was played.)

4           MS. FURST:  Stop it, please.

5    BY MS. FURST:

6    Q.  We just saw Mr. Rivera.

7           MS. FURST:  Can you back it up.  There it is.

8    BY MS. FURST:

9    Q.  Do you identify Mr. Rivera in this?

10   A.  Yes, ma'am.

11   Q.  And you've circled the gentleman in the gray watch cap and

12   the black and red plaid jacket; correct?

13   A.  Yes, ma'am.

14   Q.  Okay.

15          MS. FURST:  Go ahead.

16          (A video recording was played.)

17          MS. FURST:  Stop.

18   BY MS. FURST:

19   Q.  Okay.  Is there something -- and we've stopped at

20   18 seconds.  The prior stop was at 6 seconds.  At 18 seconds in

21   this video, with Mr. Rivera at the bottom left-hand corner, is

22   there something of significance flying in the air?

23   A.  Yes.  If you see at the very top of the screen -- I'm

24   circling it now -- there was an orange traffic cone flying

25   through the air towards the stair area where police officers

1   were standing.

2   Q.  All right.  And how is that significant?

3   A.  We will show that --

4           MR. WOMACK:  Objection.  Speculation, Your Honor.

5           THE COURT:  I'm sorry?

6           MR. WOMACK:  Objection.  Speculation, Your Honor.

7           THE COURT:  What's speculative?  What part is

8   speculative?

9           MR. WOMACK:  They're asking him what that means, a

10  cone is flying through the air.

11          THE COURT:  Well, we haven't -- let me see what she's

12  going to connect it to.  It does look like a traffic cone.

13  BY MS. FURST:

14  Q.  Does this connect to another video where there's a time

15  stamp so we can tell the Court what time Mr. Rivera is at this

16  location?

17  A.  Yes, ma'am.

18  Q.  All right.

19          MS. FURST:  Go ahead and play it.

20          (A video recording was played.)

21  BY MS. FURST:

22  Q.  Now, after the cone was thrown, we saw a number of people

23  rushing up the stairs.  Did you observe that?

24  A.  Yes, ma'am.

25  Q.  And based on your investigation in this case and your

1    review of the videos, what did that portray?

2    A.   That portrayed the police line breaking on the stairs there

3    and people rushing up to the northwest terrace on the

4    U.S. Capitol.

5    Q.   All right.  And do the officers in this video appear to be

6    trying to keep those people away from getting up farther past

7    the stairs?

8    A.   Yes, ma'am.  As you started the video, they were trying to

9    keep them back.

10   Q.   And was there any smoke in this video?

11   A.   I believe so.  I'd need to watch it again.

12   Q.   Toward the end.  All right.  Let's turn now --

13              MS. FURST:  And, Your Honor, this will be

14   Exhibit 309.  And this will be connecting the cone to the time

15   stamp.

16              THE COURT:  All right.

17              MS. FURST:  This is CCTV.

18              (A video recording was played.)

19              MS. FURST:  Stop.

20   BY MS. FURST:

21   Q.   We just saw the cone; correct?

22   A.   Yes, ma'am.

23   Q.   And what's the time on this stamp in the upper left-hand

24   corner?

25   A.   It says 2:09 and 41 seconds p.m.

1          MS. FURST:  Go ahead.

2          (A video recording was played.)

3     BY MS. FURST:

4     Q.  And then about 8 minutes later, the stairs are breached; is

5     that right?

6     A.  Yes, ma'am.

7     Q.  Eight seconds.  I'm sorry.

8          THE COURT:  What was the difference?  I'm sorry.

9     What was -- what was the difference between when we saw the

10    cone and when the crowd rushed up?

11         THE WITNESS:  It was the same view, Your Honor.

12    BY MS. FURST:

13    Q.  No.  The time difference.

14    A.  Oh.  I'm sorry.

15         THE COURT:  You need to answer, not her.

16         THE WITNESS:  Okay.

17         THE COURT:  I was trying to figure out what is the

18    difference in the timing.  You -- somebody had asked -- said

19    something about 8 minutes.  Was it 8 minutes' difference or

20    something different?

21         THE WITNESS:  No, ma'am, 8 seconds.

22         THE COURT:  Eight seconds.  Okay.

23         THE WITNESS:  Those cameras are showing the same

24    instance from different angles.

25         THE COURT:  You need to talk into the microphone.

1          THE WITNESS:  I'm sorry.

2          THE COURT:  We're trying to make a record.

3      Okay.  Go ahead.

4   BY MS. FURST:

5   Q.  Now, did Mr. Rivera take a video of the same scene?

6   A.  Yes, ma'am.

7   Q.  Was it a longer video and showed more detail?

8   A.  Yes, ma'am.

9          MS. FURST:  Your Honor, I would move to play

10  Exhibit 308, which is one of Mr. Rivera's videos.

11  BY MS. FURST:

12  Q.  And, again, they're on the northwest lawn?

13         THE COURT:  I'm sorry?

14  BY MS. FURST:

15  Q.  They're on the northwest lawn still; correct?

16  A.  Yes, ma'am.

17         MS. FURST:  Go ahead.

18         (A video recording was played.)

19         MS. FURST:  Stop.

20  BY MS. FURST:

21  Q.  What are we observing here, for the record, between the man

22  in the blue jacket and some others, and the police officers on

23  the stairs?

24  A.  The police line?

25  Q.  Yes.

1   A.  Yes, they're trying to keep the people from passing at that

2   point.

3           MS. FURST:  Okay.  Go ahead.

4           (A video recording was played.)

5   BY MS. FURST:

6   Q.  Agent Nogueiras, what did you see of consequence and

7   importance to your investigation into Mr. Rivera from this

8   video?

9   A.  That it was clear that the police officers were trying to

10  keep people off the stairs, and that was a clear line of

11  demarcation that they had set to keep people from progressing

12  past that point.

13  Q.  Did you see any people rubbing their eyes in this video?

14  A.  Yes, ma'am.  The one individual that was sitting down

15  looked like he was tearing and rubbing his eyes.

16  Q.  And based on your training and experience in this

17  situation, what would that have told you?

18          MR. WOMACK:  Objection.  Again, speculation.  If we

19  see one person out of hundreds who was rubbing his eyes --

20          THE COURT:  I'll sustain it.

21  BY MS. FURST:

22  Q.  Agent Nogueiras, did you see any smoke in the area in this

23  video?

24  A.  Yes, ma'am.

25  Q.  And do you have any training in the use of chemical

1    irritants, such as --

2              MR. WOMACK:  Same -- same objection, Your Honor.

3    They can ask a witness, if there was a witness there.  For him

4    to speculate about smoke, it could be smoke.

5              THE COURT:  I think in terms of trying to say what

6    the smoke actually signified, I think it's -- it is

7    speculative.  I'll sustain it.

8              MS. FURST:  I'm sorry, Your Honor?

9              THE COURT:  I'll sustain that.  I think it's

10   speculative as to what the smoke was.

11             MS. FURST:  May I lay a foundation with his

12   knowledge, Your Honor?

13             THE COURT:  Sure.  Go ahead.

14   BY MS. FURST:

15   Q.  As part of your training with the FBI, did you have any

16   training into what chemical irritants do to the body?

17   A.  Yes, ma'am.  Both as a --

18   Q.  Go ahead.

19   A.  Both as a -- going through new agent training and as a

20   defensive tactical instructor.

21   Q.  So could you just tell the judge a little bit about the

22   background of your training.

23             MR. WOMACK:  Just to not belabor this, we object as

24   to speculation.  It would be one thing if he said he was there,

25   he smelled something, and can say, yeah, I know what this is.

1    That's not the case.  He's looking at a film of God knows what.

2            THE COURT:  I think -- I think it goes beyond -- I

3    mean, he -- I'm sure he's an expert in terms of how it's used,

4    but I don't know that he could say that that's what that

5    actually was at this time, at least from this particular

6    witness.  So I'll sustain it.

7            MS. FURST:  All right.  We'll move on.  Thank you.

8        Let's show Exhibit 308, please.  And this is a still

9    shot from the video that we just showed.

10           THE COURT:  Are we looking at 308 or 308A?

11           MS. FURST:  308A, Your Honor.

12           THE COURT:  Okay.

13           MS. FURST:  Now, Your Honor, it may get back to your

14   ruling, but if I may ask some foundation questions.

15           THE COURT:  Go ahead.

16   BY MS. FURST:

17   Q.  Now, are you familiar with this still shot?

18   A.  Yes, ma'am.

19   Q.  Did it come from the video we just watched that Mr. Rivera

20   took?

21   A.  Yes, ma'am.

22   Q.  And does this have any significance to you as an instructor

23   and as an agent when it comes to chemicals like OC spray and

24   tear gas?

25   A.  Yes.  It appears to me that the individual in the center of

the frame here with the can that I'm circling is holding some

sort of can of pepper spray or chemical irritant that's --

MR. WOMACK:  Your Honor, may I ask what his expertise

is for a red and white can?  It's an air horn.  It could be

anything.

THE COURT:  Is the can distinctive in some way?

THE WITNESS:  To me, Your Honor, the with -- the way

that he's holding it with the thumb trigger -- did not look

like a typical Raid can.  That is something that's to be

commercially used and deployed.

THE COURT:  All right.  I don't see anything

that's -- do you see anything that purports to be a spray

coming out of it?  I don't.

THE WITNESS:  No, ma'am.

THE COURT:  I think it's stretching to decide that

it's pepper spray or some other irritant, at least based on

that photo.

MS. FURST:  Again, I'm sorry.  I didn't hear you.

THE COURT:  I'm sorry.  Based on that photo alone, I

don't -- I don't see that I can make a finding that that's

necessarily pepper spray or something else.

BY MS. FURST:

Q.  Okay.  Agent Nogueiras, combining this exhibit, this still

photo, and the video we just watched -- have you watched that

video more than once?

1    A.  Yes, ma'am.

2    Q.  And based on your training and experience, did you observe

3    what was being --

4              MR. WOMACK:  I have --

5              THE COURT:  Wait until she finishes the question.

6              MR. WOMACK:  I have an objection.

7              THE COURT:  Let her finish her question, please.

8              MR. WOMACK:  I will, Your Honor.

9              THE COURT:  Go ahead.

10   BY MS. FURST:

11   Q.  Based on your training and experience, did you observe what

12   appeared to be done with this canister by this individual?

13             MR. WOMACK:  Objection, Your Honor.

14             THE COURT:  I don't think that makes it any better.

15             MS. FURST:  Okay.  Your Honor, I'll move on.

16             THE COURT:  All right.

17             MS. FURST:  Thank you.

18             THE COURT:  At least based on the evidence that you

19   have here.

20   BY MS. FURST:

21   Q.  Let's move on to Exhibit 310.  And this is another

22   exhibit -- video that Mr. Rivera took.

23             (A video recording was played.)

24   BY MS. FURST:

25   Q.  Did you hear what he just said, what Mr. Rivera just said?

1    A.  Yes.  He said, "Let's see if all that time in the OC

2    chamber helps me out."

3    Q.  Now, do you know what that means?  Just yes or no.

4    A.  Yes, ma'am.

5    Q.  How do you know what that means?

6    A.  Through my training as a defensive tactics instructor and

7    being chemically sprayed as part of that.

8    Q.  So you teach others how to handle the spray, and you've

9    also been sprayed yourself?

10   A.  Yes, ma'am.

11   Q.  And OC, do you know what that term is?

12   A.  Yes.  It's the short version of the longer technical name

13   for the chemical compound that's the spray.

14   Q.  And so what is an OC chamber?

15   A.  So an OC chamber is typically used as part of military

16   training to help indoctrinate military members to the effects

17   of tear gas, OC spray.

18   Q.  All right.  Thank you.

19          Let's go ahead and go on.

20          (A video recording was played.)

21   BY MS. FURST:

22   Q.  And what happened at the end of this video?

23   A.  It also depicted the traffic cone being thrown to the

24   stairs and the police line breaking and the individuals in the

25   crowd pushing up the stairs of the building.

1    Q.  And -- thank you.

2        Did Mr. Rivera film what he did next?

3    A.  Yes, ma'am.

4            MS. FURST:  Please play 312.

5            (A video recording was played.)

6    BY MS. FURST:

7    Q.  So what, based on this video, did Mr. Rivera do next?

8    A.  He was going up the stairs that he was previously filming

9    on the northwest side of the building.

10   Q.  Do you know where those stairs led?

11   A.  The upper terrace.

12   Q.  And have you yourself been there?

13   A.  Yes, ma'am.

14   Q.  And seen the stairs?

15   A.  Yes, ma'am.

16   Q.  And seen the terrace?

17   A.  Yes, ma'am.

18   Q.  The upper west terrace?

19   A.  Yes, ma'am.

20   Q.  And do we have an exhibit showing the --

21           MS. FURST:  Sorry, Your Honor.

22   BY MS. FURST:

23   Q.  -- showing Mr. Rivera coming up to the upper west terrace

24   and walking around?

25   A.  Yes, we do.

1          MS. FURST:  And I'd like to show the Court

2     Exhibit 313.

3               (A video recording was played.)

4          MS. FURST:  Stop, please.  Can we go a little bit

5     more.  There we go.

6     BY MS. FURST:

7     Q.  Do you see Mr. Rivera in this video?

8     A.  Yes, ma'am.  I'll circle him.

9     Q.  And could you point to the Court where the top of the

10    stairs are, the northwest stairs, that Mr. Rivera was climbing

11    in a previous exhibit?

12    A.  Yes, ma'am.  The stairs are over here.

13              THE COURT:  Keep your voices up.  I know everybody is

14    tired, but keep your voices up.

15              MS. FURST:  Yes, ma'am.

16              THE WITNESS:  Yes, ma'am.

17    BY MS. FURST:

18    Q.  So for the record, you've circled Mr. Rivera who is sort of

19    in the middle of the video, and we stopped it at the :03 mark.

20    And the stairs, you've put a green mark to the left.  And

21    that's the top of the stairs?

22    A.  Yes, ma'am.  The top of the stairs are just below that;

23    but, yes, it comes up to that general area.

24    Q.  All right.  And do you know what time he came up to this

25    area?

1    A.  That was approximately 2:23 p.m.

2    Q.  And how do we know that?

3    A.  From the time stamp on this video.

4    Q.  And it was on January 6th of 2021 from the time stamp?

5    A.  Yes, ma'am.

6    Q.  All right.  So we know he was down on the northwest lawn at

7    2:09 when the northwest stairs were breached; correct?

8    A.  Yes, ma'am.

9    Q.  And then we know now that he's at the upper west terrace by

10   2:23 p.m.  Was anything else going on around this time when he

11   was on the upper west terrace?

12   A.  Approximately 2:26 p.m. -- I'm sorry.  Let me back up.

13   Approximately 2:13 p.m. one of the Senate wing doors was

14   initially being breached.  And around 2:26 p.m. the

15   Vice President was moved to a safe location.

16   Q.  And we've done a timeline to sort of explain all this,

17   that's expanded from what we showed earlier; is that correct?

18   A.  Yes, ma'am.

19        MS. FURST:  Could I go ahead now at this time to

20   finish this video?  And then I'd like to pull up 337.

21        THE COURT:  All right.

22        (A video recording was played.)

23   BY MS. FURST:

24   Q.  All right.  And, Agent Nogueiras, we created Exhibit 337,

25   the expanded timeline.  Does this help you explain to the Court

1    sort of the time frames for all these different events and

2    where Mr. Rivera was during those events?

3    A.  Yes, ma'am, it does.

4              THE COURT:  Which exhibit number is it?

5              MS. FURST:  337, Your Honor.

6              THE COURT:  Okay.

7              MS. FURST:  And this is just expanding on Exhibit 336

8    that Mr. Disney had shown earlier.

9    BY MS. FURST:

10   Q.  And so, Agent Nogueiras, for the record, could you just run

11   through the locations and times up to when we have Mr. Rivera

12   at the upper west terrace?

13   A.  Yes, ma'am.  Located near the Peace Circle at 12:54 p.m.;

14   Mr. Rivera on the northwest lawn by 1:59 p.m.; northwest

15   stairway breached, 2:09 p.m.; Mr. Rivera reached the upper west

16   terrace, 2:23 p.m.

17   Q.  And then you had mentioned just recently that the Senate

18   wing door first breach was at 2:13 p.m. and that the

19   Vice President was moved to a safe location at 2:26 p.m.?

20   A.  Yes, ma'am.

21   Q.  Was Mr. Rivera on the upper west terrace by the Senate side

22   when the Vice President was moved to a safe location at 2:26?

23   A.  Yes, ma'am.

24   Q.  All right.  And then since we have this up, let's finish

25   the timeline.  The parliamentarian door was breached at what

1    time?

2    A.  2:42 p.m.

3    Q.  And was Mr. Rivera still on the upper west terrace at that

4    time?

5    A.  Yes, ma'am.

6    Q.  And the Senate wing door's second breach was at what time?

7    A.  2:49 p.m.

8    Q.  Was Mr. Rivera still on the upper west terrace at that

9    time?

10   A.  Yes, ma'am.

11   Q.  And are both those doors also on the upper west terrace?

12   A.  Yes, they are.

13   Q.  And at what time did Mr. Rivera enter the Capitol?

14   A.  2:59 p.m.

15   Q.  And at what time was Mr. Rivera in the Crypt and then out

16   of the Capitol?

17   A.  3:21 p.m.

18   Q.  And did Mr. Rivera remain and take, at least to our

19   knowledge, one more video on the north upper terrace after he

20   left the building?

21   A.  Yes, ma'am.

22   Q.  And that was after 3:21 p.m.?

23   A.  Yes, ma'am.

24   Q.  All right.  Thank you.

25            MS. FURST:  Let's move to Exhibit 333, which is a

1    video the defendant took from the upper west terrace,

2    Your Honor.

3              (A video recording was played.)

4              MS. FURST:  Can you stop it.

5    BY MS. FURST:

6    Q.  Can you see the Senate wing doors from here?  And we're

7    stopped at the 43-second mark.

8    A.  Yes, we can see the location where they are.

9    Q.  Can you circle that for the Court, please.

10             And are people in front of those doors?

11   A.  Yes, ma'am.

12   Q.  Okay.  And have you reviewed Exhibit 315, which is CCTV of

13   the first breach of those doors?

14   A.  Yes, ma'am, I have.

15   Q.  And how long did that first breach last before officers

16   were able to at least get the front door closed and get some

17   folks out?

18   A.  It was several minutes long.  I'm not sure, exactly, off

19   the top of my head.

20   Q.  All right.  From looking at Exhibit 315, was the first

21   breach still ongoing when Mr. Rivera got up to the upper west

22   terrace?

23   A.  Yes, I believe it was.

24   Q.  Okay.

25             MS. FURST:  Go ahead.

1          (A video recording was played.)

2          MS. FURST:  Can you stop it, please.

3     BY MS. FURST:

4     Q.  In the -- we're stopping at the 1:35 mark.

5          MS. FURST:  Can we back it up just a little bit,

6     please.

7          THE COURT:  And this is 333; right?

8          MS. FURST:  Yes, ma'am.

9          THE COURT:  Okay.

10         MS. FURST:  That's a great place to stop.  Thank you.

11    BY MS. FURST:

12    Q.  Now we're at the 1:34 mark.  What's depicted here, for the

13    record?

14    A.  Individuals are climbing up the sides of the walls of the

15    U.S. Capitol.

16    Q.  What are they using to help climb up?

17    A.  One of the individuals is climbing up the bike fencing.

18    Q.  And there's other bike fencing leaning up against the

19    building as well; correct?

20    A.  Yes, ma'am.

21    Q.  And someone said, "There is an" easy -- "easier way up,

22    guys."  Did you hear that?

23    A.  I did.

24    Q.  Who said that?

25    A.  Mr. Rivera.

1          MS. FURST:  Go ahead.

2          (A video recording was played.)

3          MS. FURST:  Thank you.

4     BY MS. FURST:

5     Q.  Now we turn to Exhibit 314, which, again, is Mr. Rivera's

6     video showing the crowd below from the upper west terrace.

7          (A video recording was played.)

8     BY MS. FURST:

9     Q.  So in this video, did you see the scene where it went all

10    the way back up the street?

11    A.  Yes, ma'am.

12    Q.  Were there more people in this video on the west lawn than

13    in the previous one?

14    A.  Yes, ma'am.

15    Q.  Do you have any idea how many people that depicted, for the

16    record?

17    A.  I don't.

18    Q.  It was a lot of people?

19    A.  Yes, ma'am.

20    Q.  Now, during this time, are you aware of whether or not the

21    defendant was on the terrace when the second breach of the

22    Senate wing doors and what we're calling the parliamentarian

23    doors were breached?

24    A.  Yes, ma'am, he was up there.

25    Q.  And did he film that?

```
1    A.  Yes, ma'am.

2            MS. FURST:  We'd like to play Exhibit 317, please.

3            (A video recording was played.)

4            MS. FURST:  Stop.

5    BY MS. FURST:

6    Q.  Did you hear someone speaking in the video?

7    A.  Yes, ma'am.

8    Q.  And we've now stopped at 58 minutes and 28 seconds.  This

9    clip has a different time stamp on it.  Do you know who was

10   speaking?

11   A.  Mr. Rivera.

12   Q.  And what did he say?

13   A.  He said, "This is what me and my boy were talking about.

14   We were saying the only way this would be a real revolution is

15   if we go in and pull their asses out.  This is the only fucking

16   way.  All this fucking talk has to be done.  This is what they

17   need.  This is what we needed."

18   Q.  And these were Mr. Rivera's words?

19   A.  Yes, ma'am.

20            MS. FURST:  Go ahead.

21            (A video recording was played.)

22   BY MS. FURST:

23   Q.  Agent Nogueiras, at the very end there was something about

24   a birthday that was being said.  Do you know who said those

25   words?
```

1    A.   Mr. Rivera.

2    Q.   And what did he say about a birthday?

3    A.   He says, "My birthday is in three days."  And there's a

4    pause.  And he says, "But today's my fucking birthday."

5    Q.   Do you know when his birthday really is?

6    A.   January 11th.

7    Q.   And other scenes that were depicted in this video included,

8    for the record, people who were up on scaffolding like you use

9    to wash windows on tall buildings; correct?

10   A.   Yes, ma'am.  They're smashing in windows.

11   Q.   They were smashing windows.  And did you see a door being

12   smashed in and opened, by those gold railings?

13   A.   Yes, ma'am.

14   Q.   And what are those gold railings leading to?

15   A.   To the parliamentarian -- that's the parliamentarian door.

16   It leads inside of the U.S. Capitol.

17   Q.   And so Mr. Rivera was filming that door being breached?

18   A.   Yes, ma'am.

19   Q.   Do you know where he was standing when he was filming it?

20   A.   It appears he was standing on the ledge on the building.

21   Q.   Okay.  And Mr. Rivera comments, again, in Exhibit 334.

22             MS. FURST:  Your Honor, let's play that, please.

23             (A video recording was played.)

24   BY MS. FURST:

25   Q.   Now, at the very beginning, did you see any police officers

1    in this video?

2    A.  Yes, there were some walking by.

3    Q.  And do there appear to be more officers or more rioters?

4    A.  More rioters.

5    Q.  And were -- was the crowd chanting anything in the

6    beginning?

7    A.  Sounded like they were saying, "Our house."

8    Q.  And they were also saying, "Stop the Steal"?

9    A.  Yes, ma'am.

10   Q.  And then did Mr. Rivera speak in this video?

11   A.  He did.

12   Q.  And what did he say?

13   A.  He said, "This is something we can tell our kids about."

14   Q.  All right.  And let's turn now to Exhibit 321, which is,

15   again, a video the defendant took.

16              (A video recording was played.)

17              MS. FURST:  Stop it.

18   BY MS. FURST:

19   Q.  Do you hear a shrill noise in this video where we stopped

20   it at 1:09:39?

21   A.  Yes, ma'am.  There's an alarm going off in the background.

22   Q.  And have you yourself heard this alarm?

23   A.  Yes, I've heard it in person.

24   Q.  In person.  And did you hear it at this Senate wing door?

25   A.  Yes, ma'am.

1   Q.  And is it very loud?

2   A.  Very loud, yes.

3           MS. FURST:  Okay.  Go ahead.

4           (A video recording was played.)

5   BY MS. FURST:

6   Q.  Did this depict Mr. Rivera going into the Capitol Building

7   itself?

8   A.  Yes, ma'am.

9   Q.  And how did he get into the Capitol Building?

10  A.  He went in through a broken window.

11  Q.  And that is through the Senate wing door?

12  A.  Yes, ma'am.

13  Q.  And do you know what time he went in?

14  A.  2:59 p.m.

15  Q.  And we know that from this video because someone had a

16  phone that showed the time on it; is that right?

17  A.  Yes.  As he pans around, you can see the time on the phone.

18  Q.  And that was by the broken window, the spider-glass broken

19  window?

20  A.  Yes.  In the shadow we saw the red hat.

21  Q.  All right.  Let me just pull up 320.  This is a screenshot

22  of the phone with the time on it; is that correct?  Is that --

23  A.  Yes; that's correct.

24  Q.  Thank you.

25          MS. FURST:  And now, Your Honor, we'd like to show

1    you CCTV, Exhibit 322, which will show the defendant entering

2    through the window at 2:59.

3              (A video recording was played.)

4              MS. FURST:  Stop, please.

5    BY MS. FURST:

6    Q.  Can you point out Mr. Rivera for the judge, please.

7              All right.  Thank you.

8              MS. FURST:  Go ahead.

9              (A video recording was played.)

10   BY MS. FURST:

11   Q.  And for the record, since there's no sound, he -- can you

12   just describe what he's doing.

13   A.  Yes.  Mr. Rivera was climbing in through a broken window,

14   coming from outside to inside the U.S. Capitol Building.

15             (A video recording was played.)

16   BY MS. FURST:

17   Q.  Is he heading down a hallway now?

18   A.  Yes.  He's walking down the hallway into the building.

19             (A video recording was played.)

20   BY MS. FURST:

21   Q.  And if you were to turn right at the end of that hallway,

22   where does that take you?

23   A.  Towards the Crypt.

24   Q.  Is that the direction Mr. Rivera went?

25   A.  Yes, ma'am.

```
 1              (A video recording was played.)

 2              MS. FURST:  All right.  We can stop that.

 3      BY MS. FURST:

 4      Q.  Let's --

 5              MR. WOMACK:  This video, what exhibit?

 6              THE COURT:  I'm sorry.  I can't hear you.

 7              MR. WOMACK:  The exhibit number for that video we

 8      were just watching.

 9              THE COURT:  322.

10              MR. WOMACK:  Thank you, Your Honor.

11      BY MS. FURST:

12      Q.  All right.  Let's go now to 323.

13              (A video recording was played.)

14      BY MS. FURST:

15      Q.  And what did that depict?

16      A.  That depicted an open door, somebody's office space inside

17      the U.S. Capitol, the people -- rioters were inside of.

18      Q.  And that was Room S-140, Senator Merkley's office?

19      A.  Yes.  You can briefly see the room number at the very end.

20      Q.  All right.  And then did -- did Mr. Rivera then walk down

21      the hallway?

22      A.  Yes, ma'am.

23      Q.  Towards the Crypt?

24      A.  Yes, ma'am.

25      Q.  All right.
```

```
1              MS. FURST:  Your Honor, we'll play 324.
2              (A video recording was played.)
3              MS. FURST:  And now we'll turn to the CCTV,
4    Your Honor, that shows Mr. Rivera.  It is a fishbowl camera; so
5    it's hard to see, Your Honor, but we'll stop it and Mr. --
6    Agent Nogueiras will be able to circle him for you.
7    BY MS. FURST:
8    Q.  From what direction does he come, just so the judge can be
9    looking?
10             THE WITNESS:  Your Honor, it will be on the right
11   side of the frame, coming towards the camera.
12             (A video recording was played.)
13             MS. FURST:  And let's stop it now.
14   BY MS. FURST:
15   Q.  Can you see him there?
16   A.  Yes, ma'am.
17   Q.  Can you circle him.
18             MS. FURST:  Okay.  Go ahead.
19             (A video recording was played.)
20             MS. FURST:  All right.  We can stop it.  He's --
21   BY MS. FURST:
22   Q.  For the record, did he leave sight of the camera?
23   A.  Yes, ma'am.  He comes down this way and then exits the
24   camera view that way.
25   Q.  So he's left the Crypt at this point?
```

1    A.  Yes, ma'am.

2    Q.  Now, do we have a video that he took himself?

3            MS. FURST:  Excuse me one minute, Your Honor.

4            THE COURT:  Sure.

5    BY MS. FURST:

6    Q.  What time is depicted on the CCTV?

7    A.  3:19 p.m.

8            THE COURT:  Is that connected to 325, your answer in

9    terms of 3:19?

10           THE WITNESS:  Yes, ma'am.

11           THE COURT:  Is it connected to what's being shown in

12   325; is that what you're saying?

13           THE WITNESS:  At 3:25 p.m., Your Honor.

14           THE COURT:  Let me just ask you.  You said 3:19 --

15   3 o'clock and 19 minutes; right?

16           THE WITNESS:  Yes, ma'am; that's the time stamp.

17           THE COURT:  Okay.  The time stamp on that.  Okay.

18   That's what I was asking.  It's on that Exhibit 325?

19           THE WITNESS:  Oh, yes, ma'am.

20           THE COURT:  Sorry.  Too many threes.

21           MS. FURST:  No, Your Honor.  It's confusing.  I'll

22   try to get past them.

23   BY MS. FURST:

24   Q.  And do we have an exhibit of Mr. Rivera at 326 that he

25   himself took, and he turned the camera on himself while he was

1   in the Crypt?

2   A.  Yes.  On the video he depicts himself as part of it.

3   Q.  All right.  Is there any chanting in this video that we're

4   going to show?

5   A.  There may be.  I don't recall.

6   Q.  Okay.

7           MS. FURST:  Let's go ahead and just play it, 326.

8           (A video recording was played.)

9   BY MS. FURST:

10  Q.  And I believe the chanting is in 328, is that correct, the

11  next exhibit?

12  A.  Yes, ma'am.

13  Q.  Let's play the next exhibit.

14          MS. FURST:  Your Honor, again, this is Mr. Rivera's

15  video taken inside the Crypt.

16          (A video recording was played.)

17  BY MS. FURST:

18  Q.  And, Agent Nogueiras, for the record, it was inside the

19  Crypt.  And did you hear any chanting while he was filming

20  inside the Crypt?

21  A.  Yes.  It sounded like they were chanting, "Whose house?

22  Our house."

23  Q.  And then what did we see after he left the Crypt?

24  A.  Mr. Rivera goes up the hallway and exits the building

25  through a window.

1    Q.  And there was chanting there as well; correct?

2    A.  There was some chanting.  There was also an alarm that was

3    audible.

4    Q.  And the alarm was still going off?

5    A.  Yes, ma'am.

6    Q.  That we had heard before.

7         And what door did he go -- I mean.  I'm sorry.  What

8    area did he climb through the window from?

9    A.  That was back out the Senate wing doorway area that he

10   previously entered.

11   Q.  And did he go out the very same window he came in?

12   A.  No, ma'am.  It was the other window that he exited

13   through.

14   Q.  So for the record, there's a door at the Senate wing door

15   and then two windows on either side?

16   A.  Yes, ma'am.

17        MS. FURST:  Your Honor, we have CCTV showing him exit

18   through the window, and that's Exhibit 329.

19        (A video recording was played.)

20   BY MS. FURST:

21   Q.  And can you see him at this time?

22   A.  Yes, ma'am.

23        MS. FURST:  Can we stop it, please.

24   BY MS. FURST:

25   Q.  And can you point out for the judge where he is at 19

1    seconds.

2          And what's the time on the video right now?

3    A.  The time stamp on that is 3:20 p.m.

4          MS. FURST:  Let's go ahead and play it.

5          (A video recording was played.)

6    BY MS. FURST:

7    Q.  He's now right by the window; correct?

8    A.  Yes, ma'am.

9          (A video recording was played.)

10   BY MS. FURST:

11   Q.  And what's the time stamp now?

12   A.  3:21 p.m.

13   Q.  So he -- he left the building at 3:21 p.m.?

14   A.  Yes, ma'am.

15   Q.  Okay.

16         MS. FURST:  That's all.  We don't need to play that

17   anymore.

18   BY MS. FURST:

19   Q.  And then we have a video, Exhibit 330, of -- of Mr. Rivera

20   filming the door breach on the north side of the Capitol;

21   correct?

22   A.  Yes, ma'am.

23   Q.  And do we know if this was before or after he entered the

24   Capitol?

25   A.  It was after he entered the Capitol.

1   Q.  And how do you know that?

2   A.  On the video he's heard saying, "I was inside earlier."

3          MS. FURST:  May we play 330, please.

4          (A video recording was played.)

5   BY MS. FURST:

6   Q.  What did you see depicted here in this video, Exhibit 330?

7   A.  That there was an open doorway in the center frame before,

8   and then a large cloud of smoke erupted.

9   Q.  Were people going inside the doorway?

10  A.  It appeared so.

11  Q.  And is this a doorway to the Capitol Building?

12  A.  Yes, ma'am.

13  Q.  All right.  Now, Agent Nogueiras, you mentioned earlier in

14  your testimony about some videos that were taken after

15  January 6th.  Do you recall that?

16  A.  Yes, ma'am.

17  Q.  And Exhibit 331 is one of those exhibits; is that correct?

18  A.  Yes, ma'am, it is.

19  Q.  That was taken on January 9th of 2021, and the defendant --

20         MS. FURST:  Excuse me, Your Honor.

21  BY MS. FURST:

22  Q.  Mr. Rivera filmed this sometime after the 6th; correct?

23  A.  Yes, ma'am.

24         MS. FURST:  And, Your Honor, we'd like to play this.

25         (A video recording was played.)

1   BY MS. FURST:

2   Q.   And for the record, Agent Nogueiras, this was -- this was

3   Mr. Rivera speaking to the camera; correct?

4   A.   Yes, ma'am.

5   Q.   And what were the important things that he said to you as

6   an investigator?

7   A.   That --

8           MR. WOMACK:   Objection, Your Honor.

9           THE COURT:   I'm sorry?

10          MR. WOMACK:   It's not what's important to the

11  witness.   It's what the Court finds what is important.   They're

12  asking him what he thinks is important.

13          THE COURT:   I think we can ask what he considers

14  significant.   I may or may not agree.   Go ahead.

15          MS. FURST:   Thank you.

16  BY MS. FURST:

17  Q.   Go ahead.

18  A.   That, quote, one of the times I did challenge authority was

19  very recently during the D.C. riot.   I was inside the Capitol

20  Building and being one of the people who, unfortunately, pushed

21  their way through the riot police.

22  Q.   And as an investigator investigating Capitol riot cases

23  involving trespassing and being unlawfully on property and in

24  the Capitol Building, did these statements have any meaning?

25  A.   Yes.   It indicated in Mr. Rivera's own words that he was

1    inside the Capitol Building and that he did come in contact

2    and, in his words, pushed through -- pushed their way through,

3    meaning pushed his way through the riot police.

4    Q.  Okay.  And then we'll turn to Exhibit 332, which was

5    created January 8th of 2021; is that correct?

6              MS. FURST:  And, again, Your Honor, this is

7    Mr. Rivera talking to a camera.

8              (A video recording was played.)

9    BY MS. FURST:

10   Q.  And he also talked about -- excuse me.  Going back to this,

11   for the record --

12             THE COURT:  Can you speak into the microphone.

13   BY MS. FURST:

14   Q.  For the record, what did Mr. Rivera say concerning patriots

15   in this video?

16   A.  They pissed off patriots who were at the events on

17   January 6th who were involved in the riot.

18   Q.  And did he also say something about -- all about being

19   patriots until it's time to do some patriot stuff -- shit?

20   A.  Uh-huh.

21             MS. FURST:  I'm sorry, Your Honor.  That's his words,

22   not mine.

23   BY MS. FURST:

24   Q.  Did he also say that?

25   A.  Yes, ma'am.

1    Q.  Now, going back to the Facebook posts that we talked about

2    earlier in your testimony, I want to refer you to Exhibit 400,

3    which is a Facebook post.  Can you tell us when that was

4    posted?

5              MS. FURST:  Go ahead and bring it up.  And can we

6    enlarge it?  It's -- yes, please.  Thank you.  All right.

7    BY MS. FURST:

8    Q.  Can you tell us -- first of all, did this come from

9    Mr. Rivera's Facebook postings?

10   A.  Yes.  It shows the author was JD Rivera.

11   Q.  And can you tell us the time?

12   A.  Yes, ma'am.  It was 00:26 UTC, which is approximately 7:30

13   p.m. Eastern Time on January 6th.

14   Q.  So although it says January 7th, if you go back to D.C.

15   time, which is minus five hours, it makes it 7:30 p.m. on the

16   6th?

17   A.  Correct.

18   Q.  And that's the 6th of January, 2021?

19   A.  Yes, January 6th, 2021.

20   Q.  What's the conversation?  Somebody sent him a posting.  And

21   what did it say?

22   A.  It says, "Smh crazy as hell!  Did you guys have fun though

23   lol looked lit haha."

24   Q.  And what does "Smh" mean?

25   A.  Shaking my head.

1    Q.  And did Mr. Rivera respond?

2    A.  Yes.  He wrote back -- I'm sorry.  "I can honestly say I

3    had a great time."

4    Q.  And then we have another Facebook posting, Exhibit 401 that

5    occurred on January 21st at 19:00 UTC.  What time would that

6    be?

7    A.  That would be approximately 2:00 p.m. on January 6th.

8         MS. FURST:  And could we enlarge this.

9    BY MS. FURST:

10   Q.  Now, this is not something Mr. Rivera posted; correct?

11   A.  Correct.  This was shared to him, sent to him.

12   Q.  On his Facebook?

13   A.  Yes, ma'am.

14   Q.  And it was shared on January 6th at 2:00 p.m.; correct?

15   A.  Yes, ma'am.

16   Q.  And what does the summary say?

17   A.  The summary says, "Nancy just stepped aside to let China

18   Swalwell preside over the House.  If you don't believe you are

19   watching a fake coup movie by now, you never will."

20   Q.  And based upon your knowledge and your investigation in

21   these January 6th cases, do you know who Nancy is?

22   A.  Yes.  I believe that refers to Nancy Pelosi.

23   Q.  And at 2:00 p.m. on January 6th, 2021, was Congress in the

24   Capitol at that time?

25   A.  Yes, ma'am.

1  Q.  And Nancy Pelosi at that time was Speaker of the House; is

2  that correct?

3  A.  Yes, ma'am.

4  Q.  All right.  And then we have Exhibit 402.  And this a

5  social media post on an iPhone screenshot; is that correct?

6  A.  Yes, ma'am.

7  Q.  Does it depict Mr. Rivera?

8  A.  Yes, ma'am.

9  Q.  And are you familiar with the location that -- where

10  Mr. Rivera is standing?

11  A.  Yes.  That's the U.S. Capitol Building.

12  Q.  And that's on the upper terrace area; correct?

13  A.  Yes, ma'am, the upper terrace.

14  Q.  And there is a moniker right above the picture.  Can you

15  read that, please?

16  A.  chicanopatriot.

17  Q.  And above that under the number of views, it says

18  chicanopatriot, and there's a remark that says, "Inside the

19  Capital [sic] DC."  Correct?

20  A.  I'm sorry.  Can you say that again.

21  Q.  There -- right -- right under where it says 4879 views, it

22  says chicanopatriot.  Do you see that?

23  A.  Yes, ma'am.

24  Q.  And what does it say beside chicanopatriot?

25  A.  "Inside the Capital [sic] DC."

1      Q.  All right.

2              MS. FURST:  Your Honor, may I have a moment?

3              THE COURT:  Yes.

4              MS. FURST:  Your Honor, I'll turn this witness over

5      to Mr. Womack.

6              THE COURT:  All right.  I think we should take a

7      break at this point.  It's five after three.  So let's take a

8      break until 20 after, and then we'll start.

9              You can step down.  You shouldn't talk about your

10     testimony, though.

11             THE WITNESS:  Thank you, ma'am.

12             (Recess taken.)

13             THE COURT:  I want to clarify one thing.  Go ahead

14     and sit down.

15             In terms of Exhibit 403, I had stopped you from doing it

16     in the middle so -- because it's a long one, and what I'd like

17     to do is have it played, have you make your argument; since he

18     wants it excluded, whatever his argument; and then I'll make a

19     decision.

20             I wasn't sure whether you needed this witness to have

21     anything to do with it.  If you do, then we should play it now.

22     If this witness is -- is not going to be commenting or

23     questioned relating to it, then we can finish with the witness

24     and do it then.  So I wasn't sure, you know, whether you needed

25     him, in which case the timing of when we would do it might

1    differ.

2              MS. FURST:  Your Honor -- may I take my mask off?

3              THE COURT:  Yes.  Go ahead.

4              MS. FURST:  Your Honor, yes, I got the impression

5    that you would prefer to just wait until the end of everything.

6              THE COURT:  Okay.

7              MS. FURST:  We do not need this witness to comment.

8    It's simply -- it would speak for itself.

9              THE COURT:  That's fine.  Then we'll go ahead with

10   the cross-examination and finish with the witness.

11             MS. FURST:  Thank you.

12             THE COURT:  And then we can do it at that time,

13   depending on the timing.

14             MR. WOMACK:  We have no questions of this witness.

15             THE COURT:  Okay.  Well, that solved that.

16        You may be excused.

17             THE WITNESS:  Thank you, ma'am.

18             (Witness excused.)

19             THE COURT:  All right.  So let me let you finish

20   conferring.  Go ahead.

21        What I was going to suggest, then, is that you play what

22   you want.  I know you only want one part of it; but, frankly,

23   to admit it, I think I need to see all of it in terms of

24   the conduct of what occurred to -- in terms of -- because it's

25   basically his silence that you're talking about.  So I need to

1    see the pattern of what happened.  So I need to see all of it.

2    You can make your argument at the end.  Mr. Womack, who wants

3    it excluded, can make whatever he wants to make as an argument.

4    And then I'll make a ruling.

5              MR. DISNEY:  Your Honor, so we would play --

6              THE COURT:  I'd play the whole thing.  I realize you

7    only want to admit one piece, but to make a ruling, I need the

8    whole thing.

9              MR. DISNEY:  Yes.  And we'll play Exhibit 403, then.

10             THE COURT:  Okay.  Because it's been admitted, as I

11   understand it.

12             MR. DISNEY:  Yes.

13             THE COURT:  The question is whether it gets used.

14             MS. FURST:  Yes.

15             MR. DISNEY:  Thank you, Your Honor.

16             (A video recording was played.)

17             THE COURT:  Is that the equipment, or is that the way

18   it happened?

19             MR. DISNEY:  I think that's the way it happened,

20   Your Honor, and this is where it ends.

21             THE COURT:  So this is where it ends?

22             MR. DISNEY:  Yes.

23          You can take that down.

24             THE COURT:  So let me hear whatever argument you want

25   to make as to the adoptive statement.

1      MR. DISNEY:  Yes, Your Honor.  I would rely, of

2    course, on the motion that we previously filed.  But this video

3    is roughly 10 minutes and 46 seconds long.  I would note that

4    in the video, Mr. Rivera is --

5           THE COURT:  Can you speak into the microphone?

6           MR. DISNEY:  Yes.

7      In the video, Mr. Rivera is driving, and his wife is the

8    passenger.  She looks at him constantly.  I counted in the

9    10 minutes that -- not only is she looking at him constantly,

10   but he is -- he is interjecting into her conversation

11   constantly.  And I counted ten times that he commented on what

12   she was saying, sometimes correcting her, sometimes adding to

13   her, sometimes adding his own commentary, but that occurred

14   both before and after the comment -- the statements in

15   question.

16     Mr. Rivera showed no hesitation to correct his wife if

17   he disagreed with a statement or thought that she was using a

18   term that he -- that he did not agree with.  For instance,

19   she -- at 46 seconds in, he said, "What you saw."  He added

20   to -- added that they roughed it; that the port-a-potties did

21   not have a lock on it.

22     But when she described that they went through the area

23   and then stepped over barriers, he did not correct her at all.

24   And we believe for the reasons set out in our motion that --

25   that -- given the circumstance of what he had done during this

video when he did correct her and the number of times that he
interjected, he was there. He heard the statement. He knew it
was going out to a live audience. And when she described going
over barriers, he remained silent.

And we believe that that shows he adopted that portion
of the statement, and that's what we're asking that you admit
in.

THE COURT: All right. The -- the ten times that you
have indicated, is that a combination of looking over and
interjecting?

MR. DISNEY: I -- what I took note of, of the
ten times -- or ten times, those are independent of her looking
over. I counted ten times -- and I could give you the times,
because I wrote down the times -- the ten times that he
interjected a comment.

THE COURT: Okay. I was trying to figure out whether
your ten times was interjected a comment or -- or looking over
a combination. But you're talking about ten times that he
interjected a comment?

MR. DISNEY: Would you like me to run through those
real quick, Your Honor?

THE COURT: If you could. That would be helpful.

MR. DISNEY: So at 46 seconds, he said, "What you
saw" when she was trying to -- to describe I'm going to tell
you what I experienced or something. And he said at 46

seconds, "What you saw."

At 2 minutes and 12 seconds, he described the people as definitely patriots, adding to what she had described the people as.

At -- at 3:07, he makes an inaudible comment to her, but she -- but you could hear his -- hear him talking, and she listens. And then she tells the camera that we're trying to figure things out, but that was definitely in response to him.

At 3 minutes and 33 seconds, he makes an inaudible comment to her. I couldn't tell what he said, but he made a comment.

At 4 minutes and 18 seconds, he commented when she was describing the restaurants locking -- he commented -- the restaurants, he commented that they removed the trash cans.

At 4 minutes and 33 seconds, he added inconveniences to things that had been done to them.

At 5 minutes and 53 seconds, he made a -- I have that it stayed open for them. And I'm not sure -- I know it was a comment he made. I'm not sure what his notes mean.

At 6 minutes and 30 seconds, he interjects that they roughed it.

At 6 minutes and 56 seconds, he says that the port-a-potty didn't have a fence around it, and he added, "Or lock." It was at 7 -- so that was at 6:56 that he made a comment.

        And then at 17 minutes -- or at 7 minutes and 17 seconds
is when she goes into the statement that we wish you to find he
adopted.

        And then at 10 minutes and 18 seconds, he -- he adds
that they -- he interjects that these were inconveniences that
the city had put up.

        So those are the times and the -- that he interjected
into the conversation.

                THE COURT:  All right.

                MR. DISNEY:  And I know that, Your Honor, when you
look at the adoption of statements, that it's the whole what's
going on in that particular set of circumstances.  And it's
really a study in human nature is -- is what the case law
describes.  Our point is if -- if he didn't agree with the fact
that they stepped over barriers, given everything that she --
everything that had happened and how they were interacting, he
would have commented, but he did not.  He stayed silent.

        Thank you.

                THE COURT:  All right.  If -- before you start,
Mr. Womack --

        I'm not getting anything.  No feed.

            (Off the record.)

                THE COURT:  Mr. Womack, go ahead.

                MR. WOMACK:  Thank you, Your Honor.

        Your Honor, what this tape shows is that Mr. Rivera was

1  driving the car.  He was occupied, busy doing something.  He

2  was driving the vehicle.  His wife was making this video for

3  her friends or whoever.  The very first comment he made about

4  their experience or what we saw, now, that's the only direct

5  comment he made.

6       Now, the other comments he made -- and I apologize.  My

7  hearing is not as good.  I'm sure that Mr. Disney is correct

8  about what the words are.  I couldn't make them out, but it

9  appeared there might have been some kind of comment or

10  something, but his wife was looking at him when he would say

11  something.

12       The comment that they want to introduce is worded

13  differently in their motion than what Mr. Disney attributed

14  here, but as I heard, the --

15            THE COURT:  It would be whatever the statement -- he

16  talks about -- they've got a number of statements in here

17  relating to barriers and whatever.

18            MR. WOMACK:  Yes, ma'am.

19            THE COURT:  They have a particular statement about

20  barriers, which is presumably what they're asking for and not

21  some of the other --

22            MR. WOMACK:  That's correct.

23            THE COURT:  -- and at least as I understood it.

24            MR. WOMACK:  I understand, Your Honor.

25       And the comment they want to put in, I think it was said

1  the same way by Mrs. -- Ms. Rivera as it was in the written

2  motion, which is she talked of seeing barriers that had been

3  removed or broken.  She said nothing else about walking over

4  barriers.  And that's how I heard it on the tape.  I believe

5  that's what she said.  Not that she stepped over the barriers,

6  but they saw mesh fence and barriers that had been broken or --

7          THE COURT:  Maybe what we need to do is to get from

8  the government, for a second -- can you tell us exactly what

9  statement, Mr. Disney, you want in?

10          MR. DISNEY:  Your Honor, I believe it's -- and I may

11  be wrong.

12          THE COURT:  Can you speak into the mic.

13      Why don't you move over a little bit and let him speak

14  into the microphone.

15          MR. DISNEY:  Your Honor, it's the statement that

16  starts at 7 minutes and 37 seconds in when she describes what

17  they encountered when they came onto the Capitol Grounds.

18          THE COURT:  And 7 minutes and 37 seconds to what?

19  Until when?

20          MR. DISNEY:  So she starts describing we went to the

21  restroom, and then by the time we got done, she realized that

22  there were barriers being broken at the Capitol.  She goes on

23  to describe those barriers.  And this is all set out in our

24  motion.

25          We want from that portion of where she said, "When we

went to the restroom" until -- then she ends by saying, "The
police at this point have been pushed back about as far as they
could be pushed before people are at the doors."  So -- so at
the --

THE COURT:  So at 7 minutes and 37 seconds to when?

MR. DISNEY:  To her saying --

THE COURT:  No, no, no.  7 minutes and what, or
8 minutes or whatever?

MR. DISNEY:  I have -- I have at -- when I was
watching the video, I had it at 7 minutes and 17 seconds to
7 minutes and 32 seconds.

THE COURT:  Okay.  That's what I was asking.  So
we're exact about precisely what he said.  But it, presumably,
is after the restroom -- and I don't remember precisely what it
is -- but it talked about barriers and the police being pushed
back, as I believe.

MR. WOMACK:  That's correct, Your Honor.  And that's
why I wanted to correct this.  She did not say anything about
them stepping over barriers.  Rather, they saw -- or she saw
that barriers had been pushed back, not that she was stepping
over them.

THE COURT:  Well, we -- the video --

MR. WOMACK:  The video --

THE COURT:  -- is exactly what it is.

MR. WOMACK:  Yes, Your Honor.

1           THE COURT:  But we know, generally, what it is and

2      why they want it in.

3           MR. WOMACK:  Correct, Your Honor.

4           THE COURT:  So let me hear your argument about why

5      it's not an adoptive statement.

6           MR. WOMACK:  Everything else that she was talking

7      about for this 10 minutes was the fact that there were no

8      adequate restroom facilities at the rally, that there were a

9      hundred thousand people -- or million people there; that even

10     the restaurants were closed.  Those that were open didn't have

11     a restroom.  She was talking about restroom breaks.  That's

12     all.

13          And -- and that's what the driver of the car,

14     Mr. Rivera, would have heard.  He didn't interject anything

15     about the barriers because she was talking about the restrooms.

16     There's nothing to show that he was even listening to that part

17     of it, because for -- at that point, over 7 minutes, she had

18     been going on talking about the lack of restrooms.  So he had

19     tuned out that part of it.  And he would not necessarily have

20     said anything or interjected a comment.  It's not an adoptive

21     comment under *Harris*, which we cited in our brief, Your Honor.

22          THE COURT:  All right.  Anything you want to respond

23     to, Mr. Disney?  In front of the microphone, please.

24          MR. DISNEY:  I disagree with the comment that he had

25     checked out.  At 6 minutes and 30 seconds, he added a comment

1    that they roughed it.

2        At 6 minutes and 56 seconds he added to the conversation

3    that the port-a-potties not only -- she said that they didn't

4    have gates around them.  And at 6 minutes and 56 seconds, he

5    said, "Or locks."

6        She then begins the statement in question 21 seconds

7    later, after his last comment.

8        THE COURT:  Okay.  Let me take just a few minutes --

9    I'm trying to figure out whether I need to go back and look at

10   this a little more carefully to make a ruling as opposed to

11   trying to do it tonight.  I'm assuming you're at the end of --

12   you're going to be resting this evening or -- resting?

13       MR. DISNEY:  Yes, Your Honor.

14       THE COURT:  Okay.  Let me go back and look at my

15   notes.  I've done the research.  Let me see if I can make

16   enough of a record one way or the other, and I'll be out in

17   about five minutes.  Five after four I'll be out.  And I'll

18   either make a ruling or not.

19       (Recess taken.)

20       THE COURT:  I'm going to grant the government's

21   motion.  I am going to write something this evening, which I'll

22   put out, which will be factual and will set out the law.  I

23   think it's sufficient based on what I had looked at before, but

24   I wanted to have it, again, put in the record so it was clear.

25       I think there's enough connection with it to be able

1    to -- in terms of his commentary and when he made statements,

2    what she was talking about, to indicate that he was listening

3    to it.  And his comments related less to what she was concerned

4    about, restrooms, et cetera, and more in the context of what

5    the events were of that particular day, the -- the riot.  So I

6    will put something out so you will have something in writing,

7    and I want to make sure you have that before you start.

8        Mr. Womack, we can at this point move to your case, if

9    you have your witnesses.

10       Unless you've got something further.

11       MR. DISNEY:  Your Honor, in that statement, I know

12   you're -- you've said you will grant that portion that we asked

13   you to.

14       THE COURT:  Right.

15       MR. DISNEY:  There was a portion where -- at the very

16   beginning where the defendant says they're fleeing the scene,

17   and we would also ask that you accept that as a statement of

18   the defendant, that --

19       THE COURT:  Mr. Womack.

20       MR. DISNEY:  I'm sorry.  Not as an adoptive

21   statement, but just consider that as part of the evidence, a

22   statement of the defendant.

23       THE COURT:  Mr. Womack.

24       MR. WOMACK:  I don't recall hearing that, Your Honor,

25   but if it is -- perhaps Your Honor will want to listen to the

1    tape again.  I don't recall hearing him say I'm fleeing the

2    scene.

3            THE COURT:  Let's assume it's on the tape -- and I'll

4    go back and listen to it -- but any issue from your

5    perspective?

6            MR. WOMACK:  Not if it's a statement by him himself.

7            THE COURT:  Okay.  All right.  I will also go back

8    and listen briefly and make sure that's what -- as I said, I'll

9    have a short order that will go out in writing.

10           So at this point, the government has rested; is that

11   correct?

12           MR. DISNEY:  That is correct, Your Honor.

13           THE COURT:  Okay.  So, Mr. Womack, if you have your

14   witnesses here, there's no reason not to proceed until 5:00 and

15   get them in and out, if you'd like.

16           MR. WOMACK:  Yes, Your Honor.  How I'll proceed

17   instead is I'm going to -- at this point, with the government

18   having rested, I'm going to make a motion for a finding of not

19   guilty --

20           THE COURT:  Certainly.

21           MR. WOMACK:  -- as to Counts 2, 3, and 4.  Rule 29 --

22           THE COURT:  Right.

23           MR. WOMACK:  -- under the federal rules.

24           THE COURT:  I will let you make a record.  I will

25   indicate to you that I will take it under advisement and I'll

1  weave it into my final ruling.  But please go ahead and make

2  the record you wish to make.

3       MR. WOMACK:  Thank you, Your Honor.

4       With regard to Count 2, which shows disorderly or

5  disruptive conduct in a building, restricted building --

6       THE COURT:  If you can give me a second.  If I can

7  get the elements out.

8       MR. WOMACK:  I'm not sure you're referring to the

9  juxtaposed instructions --

10       THE COURT:  That's what I'm looking at.  Yes.  Go

11  ahead.

12       MR. WOMACK:  We think there is insufficient evidence

13  as a matter of law as to the -- Mr. Rivera engaging in

14  disorderly or disruptive conduct in the building or he did so

15  with the intent to impede or disrupt the orderly contact --

16  conduct of government business.  His conduct, when it occurred,

17  in fact, did not impede or disrupt the orderly conduct of

18  business.

19       The counting of the ballots had stopped, I believe it

20  was, 40 minutes or so before he even went in the building.

21  Outside he was not doing anything that would be disruptive that

22  would bother the people inside.  Inside he did nothing

23  disruptive at all, and the video shows that very clearly.

24       He entered the building.  He was completely by himself.

25  He was looking around, filming everything.  He walked down the

hallway.  Every time we see him in that building, he is filming

other people.  He is not talking to them, not giving direction,

not receiving direction.  He's not participating in any way

except that he is filming the goings-on in the Senate wing,

when he entered the -- the window, walked down the hallway to

the Crypt, and in the Crypt.  He then turned around and walked

back out the same way he came, out of the first exit, which was

a different window, if you will.  He did nothing disruptive.

And, very importantly, he came in after the government

business had been impeded by other people.  He's only in there

for 20 minutes -- 21 minutes.  So he was gone way before the

other people had quit impeding, if you will, and left.  He was

not the last person out of the building.  He was only there

about 20 minutes.  He's out about 3:21.  So he -- Count 2

doesn't -- doesn't fit.

Count 3, this violent entry or disorderly conduct;

again, he was not disorderly or disruptive in the Capitol, did

not do anything to impede or disrupt or disturb conduct of

Congress, and did not willfully or knowingly act in such a way

that he would do that.  He was merely there filming, and that's

all.

Count 4, he was neither parading, demonstrating, or

picketing in a Capitol Building.  He wasn't marching through

with a crowd.  He wasn't parading in some way.  He was carrying

nothing except a phone in one hand and a Sony digital camera in

1     the other hand; devices for filming.  He was doing nothing but

2     filming.  He did nothing that would constitute picketing,

3     parading, demonstrating in the Capitol.  And -- and, again, he

4     was merely walking through the crowd taking pictures.

5            So for those three counts, Your Honor, we think it's a

6     matter of law the evidence is insufficient.

7            Thank you.

8            THE COURT:  All right.  Government.

9            MR. DISNEY:  Your Honor, when you look at the

10    instructions that we gave and the -- the conduct that is

11    charged, in Count 3, we -- the *mens rea* that we have to show is

12    that the defendant engaged in the conduct with the intent to

13    impede or disrupt the -- the orderly conduct of government

14    business.  When you go to Count 3, it's the same thing; that

15    the defendant engaged in disruptive conduct with the impede

16    to -- with the intent to impede or disrupt.  And that -- it

17    even says that the -- the --

18           Well, then in Count 4, we have to show that the

19    defendant demonstrated.  It says that demonstrated means that

20    conduct includes conduct that disrupts.  So all this comes down

21    to is whether or not the defendant engaged in conduct that

22    disrupts.  There's a question of did he intend to do that.

23    Then there's a question of was the conduct that he engaged in

24    disruptive.

25           So what we have here is -- the other thing I want to

1    point out -- I'm sorry.  I'm jumping around, but the other

2    thing I want to point out is in the disorderly, it says the

3    defendant did so with the intent to impede or disrupt.  So we

4    have the -- we have testimony today that -- that this

5    individual -- that Mr. Rivera crawled through a window, went

6    past -- bypassed any type of security, and he roamed the halls

7    of Congress.  And not only just roaming the halls, but

8    associated himself with a violent mob that had pushed past the

9    police to get into the building.

10    And you have the testimony of the Secret Service agent

11    this morning who told you that it would not be wise to let the

12    Vice President come back in when someone has gone through

13    security without going through any sort of screening.  And she

14    talks about the danger of that.  And it just makes common sense

15    that you set up a perimeter to keep people from -- to have some

16    sort of idea who's inside, and then when you have someone

17    violate that perimeter and -- and come inside, that they're --

18    it's reasonable that that's going to disrupt.

19    We also have the testimony of Sergeant Mendoza that

20    tells you that when the defendant went inside, during that time

21    that he was inside, she was still engaged in fighting with --

22    with the crowd and fighting with the mob.

23    You know, I guess to -- to say that the defendant did

24    not disrupt anything is really taking a -- a very narrow view.

25    We don't have to show that -- that he went in there and was

chanting or throwing things around.  His going in through a

window when he was not authorized to was a disruption.  I mean,

it would be, you know, for lack of better words, very foolish

for the Secret Service to bring the Vice Present out and let

him commence when you had not only the defendant but a lot

of -- you know, hundreds of other people doing the exact same

thing.  That was not safe, and -- and the defendant, by being

there, lent himself to that.

I know that the -- the D.C. district -- the other thing

I want the Court to consider is that the D.C. district has an

instruction on aiding and abetting.  And to find the defendant

aided and abetted and committed a crime, the fact-finder must

find that the defendant knowingly associated himself with the

commission of the crime and that he participated in the crime

as -- as it's something that he wished to bring about or

intended by his actions to make it succeed.

And as you see all throughout these videos that we've

played to you today, Mr. Rivera was associating himself with

the crowd, cheering on the -- the protesters, saying that what

we need to do is to drag them out, words to that effect.  So he

was associating himself with those protesters.

So the Court can look -- on Counts 2 and 3 and 4, the

defendant by -- just by looking at what the defendant himself

did, you can find that that was disruptive and that he intended

that.  But the Court can also look at the actions of the entire

mob in evaluating Mr. Rivera's guilt because he aided and
abetted this riot.  He knowingly associated himself with the
riot, and he participated in it as it was something that he
wished to bring about.

He wasn't -- we admit, he wasn't the tip of the spear.
He wasn't the first one through the window, but he was part of
the spear.  I mean, he took advantage of every breach that was
made in his actions that day.  The -- the breach at
Peace Circle, he took advantage of that and came in.  He took
advantage of the breach of the stairway and came in.  He took
advantage of the breach of the Senate wing door and came in.
So he can't -- he doesn't get to just say, oh, look at only
what I did.  He's part of this whole mob, and he's associated
himself with it.

So you can just look at what he did because that
disrupted Congress.  Him going into that building through a
window unchecked, without going through security -- no one
knows if he had a gun, a knife, a bomb, what he had on him --
that disrupted Congress.

But also his association with this whole mob disrupted
Congress.  And so for those reasons, you can find that there is
probable or -- I'm sorry, not probable.  You can find that
there is evidence to convict him of Counts 2, 3, and 4.  I know
it's not closing argument, but certainly there's enough there
to survive a motion to dismiss.

1      THE COURT:  All right.  Mr. Womack, do you want to

2  respond?  As I indicated, I'll take it under advisement and

3  handle it along with my ultimate ruling.

4      MR. WOMACK:  Just very briefly, Your Honor.

5      With regards to the last point by the government

6  counsel -- it was funny -- when we were doing instructions, he

7  had argued that we should not hear about aiding and abetting,

8  because I was the one that suggested that.  And part of aiding

9  and abetting that I suggested is the part that says that mere

10  presence at the scene of a crime, even with knowledge that a

11  crime is being committed, is not enough.

12      And as the specification is worded in the information

13  and the instruction, the government had to prove that

14  Mr. Rivera willfully and knowingly intended to impede or

15  disrupt the workings of government, that he went into the

16  Capitol and was -- that he was disruptive, destructive, or

17  whatever.  There was no evidence of that.  All the evidence is

18  to the contrary.

19      He went in there filming the crowd, did not participate

20  in any violence, any act of destruction.  He did not crawl

21  through a window.  He walked up to a doorway and two windows

22  that the crowd was moving through.  The one closest to him was

23  a window.  And he just walked through it.  When he walked out,

24  it was a different window that was closest to him.  He walked

25  out the window.

1    He was not leading or participating with anyone in

2    anything disruptive.  He was not trying to.  He was filming

3    everything.  In fact, as we have from his own video, he told

4    the police officers:  Why are you letting this go on?  He was

5    not part of that.  He didn't approve of that.

6        It's one thing for Americans to voice their

7    First Amendment disagreement with the government, the most

8    protected thing in our Constitution.  But he was not involved

9    with any violence.  He was filming it, and filming everything

10   that happened, and that is all.  He did not disrupt or attempt

11   to disrupt anything.

12       So for those three counts, he should be found not guilty

13   as a matter of law.

14       Thank you, Your Honor.

15       THE COURT:  All right.  Then, as I indicated, I'll

16   take it under advisement and -- and do it, you know, with the

17   final one, since this is a short-enough case.

18       MR. WOMACK:  Your Honor --

19       THE COURT:  Do you want to call a witness?  I mean,

20   we can go until 5:00, if you have somebody here, so that they

21   can get in and out.

22       MR. WOMACK:  No, Your Honor.  The defense rests.

23       THE COURT:  Oh, okay.

24       All right.  Then let me suggest that we break for this

25   evening and tomorrow morning we'll do closing arguments.

1          MR. WOMACK:  Your Honor --

2          THE COURT:  I don't think there's anything else that

3     we need to do.  I think we've taken care of all the other

4     issues, exhibits, et cetera.

5          All right.  So let me -- let me set 9:30.  Does that

6     work for people?

7          MS. FURST:  Yes.

8          MR. WOMACK:  I didn't hear what you said.

9          THE COURT:  9:30.  I'm sorry.  9:30.

10          MR. WOMACK:  Oh.  Thank you, Your Honor.  9:30.

11          THE COURT:  So I'll see you at 9:30, and we'll

12     proceed at that point.

13          All right.  Parties are excused.  Take care and see you

14     tomorrow.

15          MS. FURST:  Your Honor, I'm sorry.  Do you want us to

16     take the evidence back, the physical exhibits, and bring them

17     back tomorrow for you, or would you --

18          THE COURT:  I think so.  We've got -- we have, I

19     think -- we were provided an extra copy, if I needed to take a

20     look, but we have the 403; right?

21          THE LAW CLERK:  We don't have the actual physical

22     evidence, the camera --

23          MS. FURST:  Well, it's the shirt, Your Honor.

24          THE COURT:  If you could -- why don't you leave it

25     with us.  I'll put it in a safe place.

```
1            Mr. Womack, do you have a problem with that?

2               MR. WOMACK:  No, Your Honor, that's fine.

3               THE COURT:  Then I can look at them this evening.

4               MR. WOMACK:  That's fine, Your Honor.

5               THE COURT:  We don't have to worry about it.

6               MR. WOMACK:  They can take a picture and substitute

7    in the record of trial.  It would be very easy, I think.

8               THE COURT:  Have a good evening, everybody.

9               (Proceedings were concluded at 4:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                   Dated this 21st day of June, 2022.

10

11                  /s/ Nancy J. Meyer
                    Nancy J. Meyer
12                  Official Court Reporter
                    Registered Diplomate Reporter
13                  Certified Realtime Reporter
                    333 Constitution Avenue Northwest
14                  Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25