**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-0060-CKK** |
| **v.** | : | |
| | : | |
| **JESUS D. RIVERA,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jesus D. Rivera to a sentence of nine months' incarceration, in the middle of the guideline range as calculated by the government, 12 months of supervised release, and $500 in restitution.

I.     **Introduction**

Defendant Jesus D. Rivera participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.7 million in losses.[1]

Following a two-day bench trial, this Court found Rivera guilty of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), Disorderly and

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

As explained herein, a sentence of a nine months' incarceration, followed by 12 months of supervised release, and $500 in restitution is appropriate in this case because Rivera: (1) filmed the assault on the police at the Lower West Terrace as they attempted to hold off rioters who were trying to get to the Upper West Terrace, and continued filming the assault on police as their line gave way; (2) encouraged rioters climbing the walls to the Upper West Terrace, yelling to them that "there's an easier way up!"; (3) made a concerted effort to go to the front of the mob that was trying to breach the Senate Wing Door; (4) watched rioters breach the Parliamentarian Door; (5) entered the Capitol through a broken window adjacent to the Senate Wing Door; (6) spent 20 minutes inside the Capitol going, as he had previously stated he would, to the "middle" by entering the Crypt; (7) live-streamed the riot and urged his followers to share his broadcast, as he celebrated the riot and the destruction of property as it was on-going; and (8) in the days after the riot, not only demonstrated no remorse or contrition for his acts, but instead mocked the pain and trauma suffered by victims and celebrated his participation in the riot in public posts on his social media accounts.

The Court must also consider that Rivera's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers trying to prevent a breach of the Capitol Building, and disrupt the proceedings. As this Court recognized, Rivera's presence and conduct at the Capitol caused the continued disruption to Congressional proceedings just as an individual raindrop contributes to a

flood. *See* Findings of Fact and Conclusions of Law, ECF 62:13.  *See also United States v. Thomas Fee*, 1:21-cr-00133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Rivera's crime support a sentence of nine months' incarceration, 12 months of supervised release, and $500 in restitution.

## II.    Factual and Procedural Background

### The *January 6, 2021 Attack on the Capitol*

From March 2020 to January 6, 2021, the United States Capitol was guarded by officers of the United States Capitol Police (USCP) 24 hours a day and open only to those with official business, such as Members of Congress and their staff.  Findings of Fact and Conclusions of Law, ECF 62:3. Before then, when the Capitol was open to the public, members of the public had to enter through Capitol Visitor's Center, show identification, pass through a metal detector, and be subject to a search by USCP officers. *Id*. at 3-4. Capitol Police would detain anyone who avoided those measures, and "if necessary, … lock down portions of the Capitol in such a way that could include stopping certain Congressional proceedings." *Id*. at 4.

In preparation for the January 6 certification vote, the USCP and agents of the Secret Service established a protective perimeter around the entire Capitol grounds, comprised of snow and mesh fences and interconnected bike racks. ECF 62:4. Posted on those barriers at regular intervals were readily visible signs stating, "Area Closed." *Id*. Only authorized persons were permitted beyond that point. *Id*.

On January 6, Vice President Pence, along with his wife and daughter, escorted by his Secret Service detail, arrived at the Capitol around 12:30 p.m. ECF 62:4-5. Outside the Capitol, a mob of rioters breached a police security line at the Peace Circle at around 12:55 p.m. *Id*. at 5. Then,

> [t]The mob began to tear down fencing across the West Front of the Capitol at that same time. …. Officers of the Metropolitan Police Department ("MPD") joined Capitol Police on these lines in stages. Over the course of the following hour, various sections of the police line broke in the face of heavy violent resistance, including the northwestern stairway on the West Front leading from the Lower Terrace to the Upper Terrace at 2:09 p.m. Just a few minutes later, the rioters smashed through the Senate Wing Door and its windows. Capitol Police officers briefly reclaimed the Senate Wing Door, only for rioters to overwhelm that line again at 2:49 p.m. Meanwhile, another door with access to the Senate side of the Capitol, the Parliamentarian Door, was breached at 2:42 p.m. For some period of time after 1:00 p.m. and before 2:42 p.m., MPD deployed chemical spray (pepper spray or something similar) to disperse the insurrectionists who had yet to join the portion of the riot that had captured the Upper West Terrace, ultimately to little effect.

ECF 62:5-6.

Meanwhile, the Joint Session of Congress assembled for the count of the Electoral College votes at 1:00 p.m. with Vice President Pence presiding. ECF 62:5. At 1:15 p.m. the Secret Service first learned that its protective area had been breached by a mob of rioters. *Id*. The mob first breached the Senate side of the Capitol at 2:30 p.m., at which point the Vice President's Secret Service detail evacuated him and his family to a more secure location in the Capitol. *Id*. Shortly

thereafter, "with multiple police lines overrun and the several entrances to the Capitol breached, the Senate recessed for its own safety; the House shortly followed." *Id.*

"Capitol Police officers 'engaged in combat' with the rioters to prevent them from further breaking police lines, [but] were ultimately unsuccessful [and could not] secure the Capitol and the safety of the Vice President, Members of Congress, and staff until several hours later." ECF 62:6. The certification proceedings did not resume until 8:00 p.m., after all rioters had been removed from the Capitol. *Id.*

### *Rivera's Role in the January 6, 2021 Attack on the Capitol*

As this Court found, Rivera "was a willing and supportive participant in the riot." Findings of Fact and Conclusions of Law, ECF 62:6. In December 2020, Rivera posted on Facebook that he would attend the "Stop the Steal" rally in Washington, D.C.  Rivera traveled from his home in Florida to Washington, D.C. On January 6, after attending the rally, Rivera marched with thousands of others to the Capitol, stating on a live-feed video he was filming, "we just keep coming" and shouting "America!" *Id.* at 7 citing Gov.'s Ex. 305; Gov.'s Ex. 326 (Crypt), "He urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *Id.*



*Figure 1, Ex 305: Rivera livestreaming as he approaches the Capitol*



*Figure 2, Ex 326: Rivera in the "middle" of the Capitol*

Entering the restricted area, Rivera observed the destroyed fencing that he understood had been established to prevent members of the public from entering the Capitol grounds. ECF 62:7. He also observed intact fencing that still bore the "Area Closed" signs in plain view. *Id* citing Gov's Ex. 306. One man told Rivera "we're not supposed to be here; it's all blocked off," but Rivera continued to move to the front of the mob. *Id.*

At 1:59 p.m., Rivera arrived at northwestern stairway of the Capitol, which led from the Lower Terrace to the Upper Terrace. ECF 62:7 citing Gov's Ex. 310, 312. There, he filmed police struggling against a horde of rioters attempting to reach the Upper Terrace. *Id*. He kept filming until the police line fell at 2:09 p.m. *Id*. While filming, Rivera told his Facebook audience, "Patriots are going crazy. Let's get out there!'" *Id*. He announced that MPD officers were firing pepper spray at the rioters. *Id*. at 7-8.

After the police line on the stairway broke, Rivera ascended the stairs and reached the Upper West Terrace at 2:23 p.m. ECF 62:8 citing Gov's Ex. 312. He saw rioters climbing a wall and shouted at them, 'there's an easier way up!'" *Id* citing Gov's Ex 333.



*Figure 3 Ex. 402: Rivera on Upper West Terrace*

He watched other rioters breach the Senate Wing Door for the second time at 2:42 p.m. and breach the Parliamentarian Door at 2:49 p.m. *Id* citing Gov's Ex. 317. He yelled to a nearby rioter:

> This is what me and my boy were talking about, saying [that] the only way this would be a real revolution is if we go in and pull their asses out of there. This is the only fucking way. All this fucking talk—it has to get done, dude. This is what we need. This is what they needed.

*Id*.

Rivera entered the Capitol Building through a broken window adjacent to the Senate Wing Door as the PA system loudly warned Members of Congress and staffers to take cover. ECF 62:9 citing Gov's Ex. 321, 322. He was inside the Capitol for approximately 20 minutes, "roaming the halls of the Capitol, videoing, livestreaming, and taking selfies" ultimately going to the Crypt before exiting. *Id* citing Gov.'s Exs. 321, 322, 328, 329.



*Figure 4 Ex. 322: Rivera enters Capitol through a window*

After returning home, Rivera bragged about his involvement in the riot and proclaimed his pride in "challeng[ing] authority" on January 6 after "push[ing] his way through [] riot police. ECF 62:9 citing Gov.'s Ex. 331. When some of his Facebook followers criticized him, Rivera responded that they were "weak as fuck," and told a friend "I can honestly say I had a great time." *Id* citing Gov.'s Ex 332, 400.

Rivera maintains an active Instagram account titled "The JD_Rivera." In the days and weeks following January 6, Rivera made public posts to "The JD_Rivera," in which he mocked the suffering of U.S. Capitol Police in his posts, posting an image of the officers crying, with the

"tag line" suggesting that the officers had been frightened by a man dressed as a bear, yelling.:



*Figure 5: (posted March 19, 2022)*

The law enforcement officers shown above are U.S. Capitol Police Officers Aqulino

Gonell and Harry Dunn. Officer Gonell testified, in part, that the attack on the Capitol was

"horrific and devastating" and described how he and other officers were "punched, pushed,

kicked, showed, [and] sprayed with chemical irritants…"  Officer Dunn spoke of his "shock and disbelief over what had happened" during the riot.[2]

*The Charges and Trial*

On January 19, 2021, the United States charged Rivera by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 20, 2021, he was arrested at in Pensacola, Florida. On February 1, 2021, Rivera was charged by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). Rivera appeared before this Court for a bench trial on June 14 and 15, 2022.  Rivera asserted his Constitutional right not to testify or present evidence.  On June 17, 2022, this Court issued its Findings of Fact and Conclusions of Law (ECF 62), finding Rivera guilty on all counts.

## III.    Statutory Penalties

Rivera now faces sentencing on all four counts. As noted by the U.S. Probation Office, Rivera faces up to one year of imprisonment for his violations of 18 U.S.C. §§ 1752(a)(1) and (2) and six months imprisonment for his violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). He also faces a fine of up to $100,000.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANAYLYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should

---

[2] Their testimony concerning what they experienced on January 6, 2021 can be heard here: https://protect2.fireeye.com/v1/url?k=2a20e8b7-75bbd06e-2a27cc52-ac1f6b01751a-e662479644f85f96&q=1&e=1e72c09b-56bc-47d5-a825-d68748b23f81&u=https%3A%2F%2Fyoutu.be%2Fa8WU8MRC2M8

be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

*Objection to the PSR*

The government objects to the Sentencing Guidelines calculation for Counts One and Two set forth in the PSR (ECF 67).[3] The U.S. Probation Office began its calculation of the offense level for Counts One and Two, which charge violations of 18 U.S.C. §§ 1751 and 1752, respectively, by finding that the guideline for both Section 1752(a)(1) *and* Section 1752(a)(2) is U.S.S.G. § 2B2.3, and also finding that these offenses grouped. See PSR at ¶ 35 ("Counts 1 and Two: The applicable guideline is USSG §2B2.3.  Counts 1 and 2 are grouped …."). The Probation Office then made a single calculation of the offense level for Counts One and Two as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Adjusted Offense Level (Subtotal) | 6 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | 0 |
| Total Offense Level | = 6 |

*See* PSR at ¶¶ 35-43. The Probation Office calculated Rivera's criminal history as a Category I. PSR at ¶ 46. Accordingly, the Probation Office calculated Rivera's corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶ 84.

The Probation Office's calculation of the guidelines is erroneous in two respects: it groups Counts One and Two before calculating the offense level for each of these counts of conviction

---

[3]   The Guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction.  Accordingly, the Guidelines do not apply to Counts 3 and 4.  PSR at ¶ 33.

individually, and it uses the wrong guideline for Count Two.   The correct calculation of the guidelines is as follows.

The Application Instructions in the Guidelines set out the specific order in which the calculation of the offense level is to be made: first, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. § 1B1.1(a)(1)-(3). Then, repeat each step for each count ("If there are multiple counts of conviction, repeat steps (1) through (3) for each count."). U.S.S.G.   § 1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. Id. Concerning the first step ("determine the offense guideline"), the Statutory Index lists two potential applicable guidelines for a violation of 18 U.S.C. § 1752 -- U.S.S.G. §§ 2A2.4 (Obstructing or Impeding Officers) and 2B2.3 (Trespass). The Commentary to U.S.S.G. § 1B1.1 (Application Instructions) provides that "In the case of a particular statute that proscribes a variety of conduct that might constitute the subject of different offense guidelines, the Statutory Index may specify more than one offense guideline for that particular statute and the court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted." Application Note 1. Here, as noted, Count One charged a violation of  18 U.S.C. § 1752(a)(1), which proscribes entering or remaining in any restricted building or grounds.  The Superseding Information charged that Rivera did "knowingly enter and remain in a restricted building or grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds…." (ECF 39:1). Thus, the Probation Office correctly found that the appropriate guideline for a violation of Section 1752(a)(1) is U.S.S.G. §2B2.3(a) (Trespass). *See e.g. United States v. Jabr*, 2019 WL 6135456, at *1 (D.D.C., Sept. 19, 2019) (where this Court

applied U.S.S.G. § 2B2.3 to a conviction under 18 U.S.C. § 1752(a)(1)). Pursuant to Section 2B2.3(a), the Base Offense Level is 4. Section 2B2.3(a) also sets out several specific offense characteristics that require a 2-level increase, including where the "trespass occurred . . . at any restricted building or grounds." U.S.S.G. § 2B2.3(b)(1)(A)(vii). Because that is the conduct charged in Count One, Section 2B2.3(b)(1)(A)(vii) is applicable here, resulting in an Adjusted Offense Level of 6 as determined in by the Probation Office. PSR ¶ 40.

Although the applicable guideline for the Section 1752(a)(1) offense charged in Count One is U.S.S.G. § 2B2.3 (Trespass), the applicable guideline for the Section 1752(a)(2) offense charged in Count Two is U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers). Here, the Superseding Information charges in Count Two that Rivera "knowingly … engage[d] in disorderly and disruptive conduct … when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business" (ECF 39:2). Because a defendant cannot "in fact" impede government business without also impeding and obstructing officers—as Rivera here did—the most appropriate guideline is U.S.S.G. § 2A2.4.[4] *See United States v. Montez*, 36 F.4th 824, 826 (8th Cir. 2022). *Montez* surveyed other statutes for which 2A2.4 is the applicable Guideline when

---

[4]  In its guilty plea offers and sentencing memoranda, the government has almost uniformly taken the position that the appropriate guideline for a violation of 18 U.S.C. § 1752(a)(2) is U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers). *See* Government's Supplemental Sentencing Memorandum, *United States v. Sidorski, 1:21-cr-00048* (ABJ) (ECF 45) (listing all Section 1752(a)(1) and 1752(a)(2) cases charged to date, with corresponding choice of USSG § 2B2.3 or USSG § 2A2.4, and noting that use of Section 2B2.3 in a plea offer in a single Section 1752(a)(2) case was an error by the government in that case, as acknowledged by the government at sentencing). To date, the Probation Office has concurred with the use of U.S.S.G. § 2A2.4 as the relevant guideline in these Section 1752(a)(2) cases; its failure to do so in the draft PSR here presumably was an unintentional error that occurred as a result of its erroneous early grouping of Counts One and Two. Thus, the use of Section 2A2.4 in calculating the offense level for Count Two in this case is the most fidelitous application of the guidelines and will ensure uniformity across cases at sentencing.

considering a charge of 18 U.S.C. § 231(a)(3), noting that those other statutes involved acts such as "obstructing" or "impeding"—i.e., the same basic actus reus covered in Section 1752(a)(2). The other statues which the court considered were 18 U.S.C. §§1501, 1502, and 3056(d). The Base Offense Level for U.S.S.G. § 2A2.4 is 10.

Thus, the appropriate offense level computations for Counts One and Two before any grouping analysis under Part D of Chapter 3, are as follows:

Count One, 18 U.S.C. § 1752(a)(1)

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | 0 |
| Total Offense Level | =6 |

Count Two, 18 U.S.C. § 1752(a)(2)

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | 10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | 0 |
| Total Offense Level | = 10 |

The government agrees that Counts One and Two group, but because Count Two has a higher offense level, the offense level for the group is the offense level for Count Two, which is 10. *See* U.S.S.G. § 3D1.3(a). Accordingly, Rivera's correct Guideline imprisonment range calculation is 6 to 12 months. U.S.S.G. Ch. 5, Pt. A.  For the reasons that follow, the government asks this Court to impose a sentence of nine months' incarceration, in the middle of that range.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96

(2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of nine months' and 12 months supervised release.

### A.  The Nature and Circumstances of the Offense

While assessing Rivera's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence and/or property destruction; (4) defendant's reaction to acts of violence or destruction; (4) whether, during or after the riot, the defendant destroyed evidence; (5) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (6) the defendant's statements in person or on social media; (7) whether the defendant cooperated with, or ignored commands from police officers; and (8) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Rivera personally engaged

in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Rivera was a jubilant participant in the attack on the Capitol.  He joined the mob at the foot of the northwestern stairway on the West Front of the Capitol, leading from the Lower West Terrace to the Upper West Terrace. There, he live-streamed the rioters' violent attack on police who were attempting to defend the Capitol. Rivera continued to livestream as the police line fell. Far from being appalled by the rioters' brutal assault on police and the chaos around him, Rivera proclaimed the violent entry into the Capitol and urged others forward, exclaiming, "Patriots are going crazy.  Let's get out there!" Additionally, Rivera told another rioter that the only way this would be a real revolution is "if we go in and pull their [i.e., members of Congress's] asses out of there." Rivera himself pushed his way through riot police and made his way to "the front lines," as he boasted in a podcast interview done after January 6th.

After  livestreaming the fall of the Upper Terrace stairs, Rivera watched  rioters in front of him breach the Senate Wing Door and the Parliamentarian Door. Again, far from being horrified by the rioters' conduct, Rivera announced as he was livestreaming the violence and destruction around him that the events felt like a "birthday" present to him. (Rivera's birthday is in January.) Rivera encouraged his followers to "share, share, share" his live stream. Rivera eventually entered the Capitol through a broken window. Rivera then roamed the halls, and entering the Crypt, all the while live-streaming and taking selfies.

Significantly, in the days, weeks, and months after January 6, with time for sober reflection on what he had done, Rivera had no remorse.  To the contrary, the day after the riot he told a Facebook friend he "had a great time." He told those who disagreed with him that they were "weak

as fuck" and proclaimed it was time to do "Patriot shit." Rivera later said he was happy to have "challeng[d] authority on January 6. Additionally, and significantly, in March 2021, months after the attack on the Capitol, he publicly mocked the suffering of Capitol Police Officers Gonell and Dunn.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of nine months' incarceration and 12 months of supervised release in this matter.

### B. The History and Characteristics of Rivera

Rivera, age 38, joined the United States Marine Corps in 2002 and was honorably discharged in 2012. PSR, ECF 67 at ¶ 70. He receives a monthly veteran's disability benefit and also works intermittently as a cinematographer. ¶¶ 72-73. While Rivera's military service is laudable, it renders his conduct on January 6 more troubling. As a Marine, Rivera pledged allegiance to the Constitution and to uphold our government. [5]   Rivera's participation in the January 6 riot, an attack on Democracy itself, is in direct contradiction to his oath.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[5] https://www.marines.com/life-as-a-marine/standards/values.html

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As this Court noted during sentencing in *United States v. Virginia Spencer*, 21-cr-147-2-CKK:

> "[The defendant's] presence and action by joining other insurrectionists was an inexcusable attack on our democracy and the peaceful transfer of power, according to the Constitution, and a total disrespect for the rule of law which governs civilized societies."

Tr. at 44.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Rivera has accepted no responsibility for his crimes and has shown no remorse for his actions. Most importantly he has demonstrated a profound lack of understanding of the significant impact his crimes, along with those of his fellow rioters, have caused to this nation. Specifically, Rivera has shown no understanding of the impact of his crime on the victims who suffered acts of violence of the mob that assailed them and the Capitol. This Court should impose a sentence of nine months' incarceration, and 12 months' supervised release, to specifically deter Rivera from any such future crimes, to impress upon him the gravity of his crimes, and to promote respect for the law.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence Rivera based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[7] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[8]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Likewise, those convicted of misdemeanor offenses and who engaged in conduct that obstructed or impeded government business have been given harsher punishments than those who simply trespassed.

For one thing, although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of

---

[8]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Bromley*, 1:21-cr-00250 (PLF), the defendant pled guilty to a single count of violating 18 U.S.C. 1752(a)(2). The evidence showed that after the 2020 election and in the lead-up to January 6, 2021, Bromley sent texts to friends and family such as "the punishment

for treason is death"; "be ready for the physical fight"; and "Our forefathers did not politely protest the British.  They did not vote them out of office.  …  The fucking shot them."  Bromley planned to attend the Stop the Steal rally with his cousin but declined to bring his family because "it may get violent."  He and his cousin drove to Washington, D.C. for the rally.  On January 6, Bromley berated Capitol Police officers guarding a door to the Capitol building, then watched as his cousin assaulted one of them. After the officers were driven off, Bromley encouraged and helped his cousin attempt to breach the unguarded doors. When the doors were later opened, Bromley went inside, where he witnessed the shooting of Ashli Babbitt. In a pre-plea interview with the FBI, Bromley falsely claimed he had not seen any barricades or signs prohibiting entry, stated that he did not damage or destroy any property, and said he did not see any confrontation with the police. A short time later, the government obtained CCTV footage that revealed that Bromley had lied about his conduct at the Capitol.

The government gave Bromley a plea offer to one count of 1752(a)(2), which required him to admit that he had aided and abetted the destruction of government property, in violation of 18 U.S.C. § 1361.  After Bromley pled guilty, the government's filter team finished its review of his phone and discovered Bromley's texts to family and friends that promoted violence, as well as texts he sent to his wife on January 7, 2021, instructing her not to talk about "anything related to what I told you."  The government also reviewed a video on Bromley's phone (taken by a third party) showing officers being assaulted, with Bromley in the foreground, which again revealed that he had lied to the FBI in his interview.  The government recommended a sentence of 12 months' incarceration, at the top of the guideline range of 6 to 12 months.  The court imposed a sentence of 90 days' incarceration.

In *United States v. Johnson*, 1:21-cr-00648 (RBW), the defendant pled guilty to a single count of violating 18 U.S.C. 1752(a)(1). Johnson traveled to Washington, D.C. from Florida where he attended former President Trump's rally on the Ellipse and then marched with the crowd to the Capitol, running when he heard people had entered the building. Once on Capitol grounds, Johnson observed acts of violence and eventually made his way to the Upper West Terrace where he entered the Capitol building through the Senate Wing Door. Inside the Capitol, Johnson watched rioters engage with police at the House Chamber doors and took a podium from near the Speaker's office and placed it in the Rotunda where he posed for pictures. Johnson was in the Capitol for 35 minutes before exiting the building. After January 6, 2021 Johnson bragged to friends that he was "finally famous" and minimized his conduct by claiming his actions were peaceful and that he was only present to record history. Johnson's total adjusted offense level, after acceptance of responsibility, was level 4 with a guideline range of 0 to 6 months. The government recommended a sentence of 90 days' incarceration, and the court imposed a sentence of 75 days' incarceration.

In *United States v. Simon*, 1:21-cr-000-cr-00346 (BAH), the defendant pled guilty to a single count of violating 18 U.S.C. 1752(a)(2). Simon traveled to Washington D.C. from Maine where he attended former President Trump's rally before marching to the U.S. Capitol. On the Lower West Terrace Simon briefly joined other rioters in pushing a bicycle rack into a line of officers. He then made his way to the Upper West Terrace where he entered the Capitol through the Senate Wing Door at 2:14 p.m.  Once inside, Simon made his way to the Crypt and to the Rotunda. At each location he yelled and chanted in the direction of the police and recorded video of the mob's engagements with the police. Simon's total adjusted offense level, after acceptance

of responsibility, was level 11 with a guideline range of 8 to 12 months.[9] The government recommended a sentence of 10 months incarceration, and the court imposed a sentence of 8 months incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Rivera to nine months' incarceration, 12 months of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES

---

[9] Chief Judge Howell accepted and applied U.S.S.G. §2A2.4(a) guideline for Obstruction of Justice for Simon's violation of 18 U.S.C. 1752(a)(2).

United States Attorney
D.C. Bar No. 481052

By:    /s/ *Barry K. Disney*
Barry K. Disney
KS Bar No. 13284
Assistant United States Attorney – Detailee
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Email:  Barry.Disney@usdoj.gov
Cell:  (202) 924-4861

## CERTIFICATE OF SERVICE

On this 17th day of October, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ Barry K. Disney
Assistant United States Attorney – Detailee
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
Email:  Barry.Disney@usdoj.gov
Cell:  (202) 924-4861